## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GLAXOSMITHKLINE LLC and )
SMITHKLINE BEECHAM (CORK) )
LIMITED, )
           )
          Plaintiffs, )        **REDACTED - PUBLIC VERSION**
           )
      v. )        Civil Action No. 14-877-LPS-CJB
           )
GLENMARK PHARMACEUTICALS )
INC., USA, )
           )
          Defendant. )
_____ )
GLAXOSMITHKLINE LLC and )
SMITHKLINE BEECHAM (CORK) )
LIMITED, )
           )
          Plaintiffs, )        **REDACTED - PUBLIC VERSION**
           )
      v. )        Civil Action No. 14-878-LPS-CJB
           )
TEVA PHARMACEUTICALS USA, INC., )
           )
          Defendant. )
_____ )

## MEMORANDUM ORDER

Presently pending in these two related patent infringement cases are Defendant Glenmark

Pharmaceuticals Inc., USA's ("Glenmark") and Teva Pharmaceuticals USA, Inc.'s ("Teva")

(collectively, "Defendants") letter motions to strike portions of Plaintiffs GlaxoSmithKline LLC

("GSK") and SmithKline Beecham (Cork) Limited's (collectively, "Plaintiffs") expert report

offered by Plaintiffs' damages expert, Robert S. Maness, Ph.D (the "Motions").  (Civil Action

No. 14-877-LPS-CJB (hereinafter "*Glenmark* Action"), D.I. 164; Civil Action No. 14-878-LPS-

CJB (hereinafter "*Teva* Action"), D.I. 204)[1] The portions of Dr. Maness' report at issue are those that provide a basis for seeking damages in the form of lost profits based on convoyed sales. For the reasons set forth below, the Court DENIES Defendants' Motions.

## I. BACKGROUND

### A. Procedural Background

On July 3, 2014, Plaintiffs commenced these actions. (*Glenmark* Action, D.I. 1; *Teva* Action, D.I. 1) Plaintiffs allege that Defendants induce infringement of United States Patent No. RE40,000 ("the '000 patent") by making, offering to sell, selling, importing and promoting and distributing generic carvedilol tablets. (*Glenmark* Action, D.I. 59, 175; *Teva* Action, D.I. 60, 211) The '000 patent contains nine method claims directed to methods of decreasing mortality caused by congestive heart failure in a patient in need thereof by administering carvedilol in a manner recited in the claims. ('000 patent)[2] Claim 1 is the only independent claim of the '000 patent, and it reads:

> **1.** A method of decreasing mortality caused by congestive heart
> failure in a patient in need thereof which comprises administering a

---

[1]    Our Court has treated motions to strike as non-dispositive motions, which may be resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2). *See, e.g., Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *1 n.1 (D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 987 n.1 (D. Del. 2013) (citing cases). This is in line with decisions of other courts in this Circuit, which have also treated such motions as non-dispositive, at least where the ultimate decision was not determinative of a party's claims (just as the decision is not here). *See, e.g., Hawkins v. Waynesburg Coll.*, Civil Action No. 07-5, 2007 WL 2119223, at *1 n.1 (W.D. Pa. July 20, 2007); *Reedy v. CSX Transp., Inc.*, Civil Action No. 06-758, 2007 WL 1469047, at *1 n.1 (W.D. Pa. May 18, 2007).

[2]    The '000 patent appears on the dockets in these actions more than once, including as an exhibit to the Joint Claim Construction Chart. (*Glenmark* Action, D.I. 68, ex. B) Citation to the patent will simply be to the "'000 patent."

> therapeutically acceptable amount of carvedilol in conjunction with one or more other therapeutic agents, said agents being selected from the group consisting of an angiotensin converting enzyme inhibitor (ACE), a diuretic, and digoxin,
>
> > *wherein the administering comprises administering to said patient daily maintenance dosages for a maintenance period to decrease a risk of mortality caused by congestive heart failure, and said maintenance period is greater than six months.*

('000 patent, col. 8:30-40 (emphasis in original)) The italicized portion of the claim is the portion that was added during a reissue proceeding.

On October 16, 2014, Chief Judge Leonard P. Stark referred these cases to the Court to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (*Glenmark* Action, D.I. 16; *Teva* Action, D.I. 18) On April 20, 2015, the Court entered a Joint Scheduling Order in the actions. (*Glenmark* Action, D.I. 37; *Teva* Action, D.I. 38) With fact discovery underway, the parties filed opening and answering claim construction briefs on November 5, 2015 and December 22, 2015, respectively, (*Glenmark* Action, D.I. 70, 74, 83, 84; *Teva* Action, D.I. 76, 80, 90, 92), and the Court issued its Report and Recommendation regarding claim construction on June 3, 2016, (*Glenmark* Action, D.I. 133; *Teva* Action, D.I. 165). Fact discovery closed on July 1, 2016. (*Glenmark* Action, D.I. 121; *Teva* Action, D.I. 151)

Pursuant to multiple Court-ordered amendments to the expert-related deadlines (all issued at the parties' joint requests), opening expert reports were due on September 16, 2016; rebuttal reports were due on November 4, 2016, and reply reports were due December 2, 2016. (*Glenmark* Action, D.I. 156, 160; *Teva* Action, D.I. 199, 203) Expert discovery is set to close on January 20, 2017, with dispositive motions due one week later, on January 27, 2017. (*Glenmark* Action, D.I. 160; *Teva* Action, D.I. 203) A pre-trial conference is scheduled for May 26, 2017,

3

and trial of one of the two cases is to begin on June 12, 2017. (*Glenmark* Action, D.I. 37 at ¶¶ 19, 22; *Teva* Action, D.I. 38 at ¶¶ 19, 22)

### B. Factual Background

On September 23, 2015, Teva served Plaintiffs with its First Set of Interrogatories, which included an Interrogatory seeking Plaintiffs' damages contentions as follows (hereinafter, the "damages Interrogatory request"):

> INTERROGATORY NO. 12
> Describe with particularity all damages for which Plaintiffs contend Teva is liable, including the amount of any such damages, the form (e.g., lost profits, reasonable royalty, price erosion, or any other form of damages) of any such damages, the complete factual bases supporting the recovery of such damages, Plaintiffs' method of calculating such damages, and identify all documents and witnesses with information relating to Plaintiffs' claims for such damages.

(*Teva* Action, D.I. 98, ex. B at 21; *see also* Teva's December 8, 2016 Hearing Slides at 2) GSK initially "took the position that [the damages Interrogatory request] was premature and called for expert testimony." (*Teva* Action, D.I. 98, ex. E at 1) Teva was not satisfied, and pushed for a more substantive response. (*Id.* (Teva explaining to Plaintiffs its position that "to the extent that GSK is claiming lost profits, Teva believes it is entitled to understand the basis for that contention and the evidence that GSK would rely on to support that contention")) Plaintiffs then provided a "First Supplemental Response to Interrogatory No. 12" on November 16, 2015, in which they stated that "GSK seeks damages in the form of lost profits where available . . . . GSK expects to rely upon financial and market data produced by the parties in this case. . . . GSK specifically reserves the right to supplement, amend, modify, and/or correct this response over the course of fact and expert discovery." (*Id.*, ex. B at 21-22) Teva remained unsatisfied,

4

asserting in a December 29, 2015 letter to Plaintiffs that "Teva expects an *explanation* for GSK's contention that lost profits are available in this case." (*Id.*, ex. F at 4 (emphasis in original)) Plaintiffs, for their part, took the position that they would "disclose the basis for [their] lost profits claim when [they] serve[] [their] opening expert report[.]" (D.I. 98 at 4)

The issue ultimately ripened into a discovery dispute, as Teva moved to compel a more complete response to its damages Interrogatory request. (*Teva* Action, D.I. 97, D.I. 98 at 4) Teva explained to the Court that "GSK's refusal to articulate its lost profits claim with any particularity, or to disclose any facts forming the basis for such contentions, prejudices Teva's ability to investigate or indeed comprehend GSK's damages claim." (*Teva* Action, D.I. 98 at 4) On January 28, 2016, the Court granted Teva's motion to compel and ordered GSK to provide a "Second Supplemental Response relating to GSK's claim for lost profits damages [that] shall amount to a meaningful articulation of the bases for GSK's contention that it is entitled to such damages[.]" (*Teva* Action, D.I. 101 at 1 (hereinafter, the "January 28, 2016 Court Order"))

On February 17, 2016, Plaintiffs served that Second Supplemental Response. With respect to lost profits, Plaintiffs noted that a patentee is entitled to lost profits if it proves "(1) there is demand for the patented product; (2) there are no non-infringing substitutes; (3) the patentee had the manufacturing and marketing capability to exploit the demand; and (4) the amount of profit the patentee would have made absent the infringing conduct[,]" (*Teva* Action, D.I. 205, ex. D at 6)—factors known as the "*Panduit* factors," (*id.* (citing *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1267 (Fed. Cir. 2013)). Plaintiffs asserted that they are "entitled to lost profits under each of these factors" and provided an articulation as to why they believed that to be so, citing to supporting documents where applicable. (*Id.* at 6-10) Plaintiffs

5

further noted that "[t]o be clear, GSK is seeking lost profits only on infringing sales—*i.e.*, only on Defendant's sales of carvedilol for use in reducing the risk of mortality from CHF." (*Id.* at 10) Plaintiffs' supplemental response also explained that where lost profits were determined to be unavailable, they would seek reasonable royalty damages. (*Id.*) Accordingly, Plaintiffs' supplemental response proceeded to "analyze the various *Georgia-Pacific* factors in its reasonable royalty analysis[,]" and in that discussion, they noted the following with respect to convoyed sales:[3]

> GSK has yet to receive sufficient discovery from Defendant to evaluate the impact of the Accused Products in the promotion of derivative or convoyed sales by Defendant as a result of the Accused Products. The limited information that has been provided by Defendant relating to the Accused Products shows that they are popular and achieved commercial success, due almost entirely to the ability of carvedilol to reduce the risk of mortality from CHF. Defendant has made extensive use of carvedilol in the manner claimed for this purpose. GSK will further evaluate the extent of this factor as discovery continues.

(*Id.* at 11) Plaintiffs' supplemental response concluded by noting, *inter alia*, that "GSK's analysis will separate or apportion the damages (lost profits and/or reasonable royalty) to cover only carvedilol sold and used for the patented method." (*Id.* at 12)[4]

---

[3]    One of the *Georgia-Pacific* factors relevant to the determination of the amount of a reasonable royalty for a patent license is "[t]he effect of selling the patented speciality in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[4]    The discovery dispute discussed above arose only in the *Teva* Action, and Glenmark did not participate in the dispute in any way. Glenmark did, however, propound its own interrogatory seeking, *inter alia*, the factual details supporting Plaintiffs' position that Plaintiffs were entitled to lost profits. (*Glenmark* Action, D.I. 165, ex. B at 48) In response to that interrogatory, Plaintiffs, *inter alia*, noted that "GSK is seeking lost profits only on infringing

A few months later, on June 3, 2016, the Court issued its Report and Recommendation regarding claim construction. (*Glenmark* Action, D.I. 133; *Teva* Action, D.I. 165) With respect to the disputed term "maintenance dosages," the Court rejected Plaintiffs' position that the term should be construed to mean "dosages intended to achieve and maintain the therapeutic effect." (*Id.* at 26 (brackets omitted)) While the Court did not agree with certain aspects of Defendants' proposal, it did find that the patent makes clear that a "maintenance dosage" is something distinct from dosages of the drug that are provided prior to the maintenance dosage—that is, dosages that are provided to a patient in order to gauge the patient's tolerance of the drug. (*See, e.g., Glenmark* Action, D.I. 74 at 11)[5] In light of the intrinsic record, the Court recommended that the term be construed as "'dosages to maintain the therapeutic effect following a period in which the patient's tolerance of the drug is monitored.'" (*Glenmark* Action, D.I. 133 at 33; *Teva* Action, D.I. 165 at 33)[6]

Following the issuance of the June 3, 2016 Report and Recommendation, Plaintiffs did not further supplement their response to the damages Interrogatory request. (*Glenmark* Action,

---

sales—i.e., only on Defendant's sales of carvedilol for use in reducing the risk of mortality from CHF." (*Id.* at 52)

[5] Defendants have always maintained, even before the claim construction process began, that use of carvedilol prior to the infringing maintenance period recited in the claims was a non-infringing use of the drug. (*See, e.g., Glenmark* Action, D.I. 22 at 3-4 (Glenmark arguing in its reply brief in support of its motion to dismiss Plaintiffs' First Amended Complaint that "before carvedilol can be administered during the allegedly infringing maintenance period, *every* CHF patient must undergo a period of 'up titration,' during which time administration of carvedilol is not infringing") (emphasis in original))

[6] Plaintiffs have filed objections to, *inter alia*, the Court's recommended construction for "maintenance dosages"; those objections are pending before Chief Judge Stark. (*Glenmark* Action, D.I. 141 at 4)

D.I. 165 at 1; *Teva* Action, D.I. 205 at 1)  On September 16, 2016, Plaintiffs served Dr. Maness'

damages expert reports in the related cases.  (*Glenmark* Action, D.I. 165, ex. A (hereinafter,

"*Glenmark* Maness Report"); *Teva* Action, D.I. 205, ex. A (hereinafter, "*Teva* Maness Report"))[7]

The Maness Report sets out a damages theory seeking lost profits from lost convoyed sales of the

drug during the initial monitoring period:

> In this case, the '000 patent has been construed to cover the use of carvedilol during the maintenance period where that maintenance period is greater than six months.  Patients, however, cannot reach the maintenance period without an initial "period in which the patient's tolerance of the drug is monitored."  That is, I understand that if a patient is administered Coreg® or Coreg® CR during the maintenance period of treatment, the patient would have been administered Coreg® or Coreg® CR during the initial monitoring period as well.  Thus, although the sales of carvedilol for prescriptions during the initial monitoring period do not fall within the scope of the claims as construed, these sales can be considered a functional unit with the maintenance period prescription sales and, therefore, convoyed sales.  Thus, [Glenmark's/Teva's] infringing sales of carvedilol also caused GSK to lose non-infringing sales associated with the monitoring period.

(*Glenmark* Maness Report at ¶ 117; *Teva* Maness Report at ¶ 118 (internal citations omitted))

Dr. Maness then calculated the total lost profits from these lost sales during the initial monitoring

period to amount to ████████████████████████ in the *Teva* Action, (*Teva* Maness Report

at ¶ 121; Teva's December 8, 2016 Hearing Slides at 9), and ████████████████████

in the *Glenmark* Action, (*Glenmark* Maness Report at ¶ 120).[8]

---

[7]    For ease of reference, when the Court refers to the "Maness Report," it is referring to content that appears in both the *Glenmark* Maness Report and *Teva* Maness Report, unless otherwise indicated.

[8]    It has become clear that the parties also have a dispute over whether the administration of carvedilol during the first six months of the maintenance period amounts to infringing use. (*See, e.g., Teva* Maness Report at ¶ 119 n.210)  Plaintiffs have asserted that, to

On October 11, 2016, Teva filed its motion to strike, (*Teva* Action, D.I. 204), requesting that the Court "strike the portions of GSK's expert reports that seek damages in the form of lost profits based on convoyed sales pursuant to [Federal Rules of Civil Procedure] 37(b)(2)(A)(ii), 37(c)(1), and/or 16(f), and preclude GSK from seeking such damages[,]" (*Teva* Action, D.I. 205 at 1).[9] On October 18, 2016, Glenmark filed its motion to strike, in which it requests the same relief as Teva. (*Glenmark* Action, D.I. 164, D.I. 165 at 1-2)[10] On December 8, 2016, the Court heard oral argument on the motions. (*Glenmark* Action, D.I. 189 (hereinafter, "Tr."))

## II.   LEGAL STANDARD[11]

Federal Rule of Civil Procedure 26 imposes a continuing obligation to timely supplement or correct discovery disclosures, requiring that "[a] party who has . . . responded to an interrogatory . . . must supplement or correct its disclosure or response:  (A) in a timely manner if

---

the extent that such use is found non-infringing, they will also consider prescriptions for the first six months of the maintenance period to be convoyed sales. (*See, e.g., id.*)

[9]     Specifically, Teva requests that the Court strike paragraphs 117-121 and 185 of the *Teva* Maness Report and the corresponding summaries in paragraphs 21 and 220. (*Teva* Action, D.I. 205 at 1 n.1)

[10]     Specifically, Glenmark requests that the Court strike paragraphs 116-120 and 174 of the *Glenmark* Maness Report and the corresponding summaries in paragraphs 21 and 209. (*Glenmark* Action, D.I. 165 at 1 n.1) Glenmark's opening letter brief notes that Dr. Maness' "theory of lost convoyed sales on *non-infringing sales* is clearly at odds with GSK's discovery responses[,]" and it then simply notes that the theory should be stricken "for the reasons set forth" in Teva's opening letter brief, which it incorporates by reference. (*Id.* at 1-2 (emphasis in original))

[11]     Because the discovery matters at issue here are not unique to patent law, the law of the United States Court of Appeals for the Third Circuit applies. *See Invista N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *1 (D. Del. June 25, 2013) (citation omitted); *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (citing *Micro Chem, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)).

the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A) & (B). "If a party fails to provide information or identify a witness [in the manner required by the Court under Rule 26], the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Additionally, pursuant to Federal Rule of Civil Procedure 16(f), the court may impose sanctions (such as the exclusion of expert testimony), including those authorized by Rule 37(b)(2)(A),[12] if, *inter alia*, a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C); *see also Invista N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *2 (D. Del. June 25, 2013).[13]

Although a court clearly has the authority to strike an expert report and/or exclude evidence (such as expert testimony) pursuant to Rule 37, it should be mindful that because "[t]he exclusion of critical evidence is an extreme sanction," such a remedy should not be imposed where an untimely or improper disclosure amounts to only a "slight deviation from pre-trial notice requirements" or occasions only "slight prejudice" to the movant. *In re Paoli R.R. Yard*

---

[12] Under Rule 37(b)(2)(A)(ii), if a party "fails to obey an order to provide . . . discovery . . . the court . . . may . . . prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" Fed. R. Civ. P. 37(b)(2)(A)(ii); *see also Meyer v. Callery Conway Mars HV, Inc.*, Civil Action No. 2:13-cv-00109, 2015 WL 65135, at *16 (W.D. Pa. Jan. 5, 2015).

[13] If portions of an expert report are stricken, that action effectively precludes the expert from testifying as to the subject matter and opinions contained in those portions of the report. *See, e.g., Withrow*, 967 F. Supp. 2d at 1000; *see also Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 615 (D. Del. 2007).

*PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted). Instead, exclusion should be reserved for circumstances amounting to "willful deception or flagrant disregard of a court order by the proponent of the evidence." *Id.* at 792 (internal quotation marks and citations omitted); *see also Bridgestone Sports Co., Ltd. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (noting that while the decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered"); *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005) (finding that although "the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure [that] should be avoided where possible[,]" it can be appropriate to prevent against the "flouting of discovery deadlines[,]" so as to maintain "fidelity to the constraints of Scheduling Orders and deadlines[, which] is critical to the Court's case management responsibilities") (internal quotation marks and citations omitted), *rev'd on other grounds*, 543 F.3d 1306 (Fed. Cir. 2008).

In considering whether to exclude evidence relating to an untimely or otherwise improper disclosure, the United States Court of Appeals for the Third Circuit has directed district courts to weigh certain factors, known as "the *Pennypack* factors": (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the testimony sought to be excluded. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894,

904-05 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).

## III.   DISCUSSION

Below, the Court first assesses whether Plaintiffs' disclosure of a portion of their damages theory was untimely. Finding that there was an untimely disclosure here, the Court will then proceed to examine how the *Pennypack* factors inform the decision as to whether evidence regarding the theory should be excluded.

### A.   Timeliness of Plaintiffs' Disclosure of their Convoyed Sales Damages Theory

The disclosure at issue, as noted above, relates to Plaintiffs' "convoyed sales" damages theory. "A convoyed sale refers to the relationship between the sale of a patented product and a functionally associated non-patented product. A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (internal quotation marks and citation omitted). The Court agrees with Teva that, given the circumstances here, Plaintiffs had an obligation to disclose their convoyed sales theory before they served Teva with the Maness Report on September 16, 2016.[14]

Throughout this case, Teva has repeatedly trumpeted its desire to obtain more particular and specific information regarding Plaintiffs' lost profits damages theory. Teva propounded its

---

[14]     The Court's analysis here primarily focuses on the facts at issue in the *Teva* Action. It does so because Teva's arguments are more robust than Glenmark's arguments, due in part to the fact that Glenmark was not involved in the discovery dispute that resulted in the January 28, 2016 Court Order—an order that plays a key part in Teva's motion.

damages Interrogatory request seeking exactly that information in September 2015; thereafter, Teva asked Plaintiffs to provide a substantive response during multiple meet and confers. Teva was then forced to move to compel Plaintiffs to provide a more complete response—one that would "articulate [Plaintiffs'] lost profits claim with [] particularity" and "disclose any facts forming the basis for such contentions[.]" (D.I. 98 at 4)  The Court ultimately agreed with Teva, and in January 2016, it ordered Plaintiffs to provide the information that Teva was entitled to.

Against this backdrop, by at least early 2016, Plaintiffs should have been on clear notice that they were obligated to provide Teva with a fulsome explanation of the basis for their lost profits claim. And the Federal Rules clearly impose a continuing obligation to timely supplement discovery disclosures as additional information becomes known.

In their letter brief, Plaintiffs argue that their convoyed sales theory is not untimely, and that it should be of no surprise to Teva, because: (1) Plaintiffs had disclosed their intent to seek lost profits on the sales of carvedilol during the initial monitoring period early in discovery (before the Court's June 3, 2016 Report and Recommendation recommended excluding sales in such a period from being considered infringing sales); (2) Plaintiffs' second supplemental response to the damages Interrogatory request reiterated that they were seeking lost profits for *all* sales of the drug for symptomatic heart failure, including those sales made in the initial monitoring period; (3) this second supplemental response further noted that Plaintiffs were "evaluating a convoyed sales theory"; and (4) Plaintiffs had disclosed the "functional association" between the initial monitoring and maintenance periods in a 2014 opposition brief to Teva's motion to dismiss, and Teva had made a similar argument in support of its proposed construction of the term "maintenance dosages." (*Teva* Action, D.I. 209 at 1-3)  The Court

13

disagrees. Plaintiffs' suggestion that Teva should have independently figured out the substance of Plaintiffs' convoyed sales/lost profits damages theory—based on a few isolated and exceedingly vague portions of the large record in the case—is not fair to Teva. Nowhere in this prior record was there any clear indication of the convoyed sales theory that Plaintiffs now press.

Plaintiffs also assert that it was only once the Court's June 3, 2016 Report and Recommendation excluded sales related to the initial monitoring period from the scope of the claims, that they then determined those same sales should still be considered lost profits, pursuant to a convoyed sales theory. (*Id.* at 2) Accordingly, during the summer of 2016, Plaintiffs had their expert "survey[] a panel of physicians to quantify the sales in each of the initial monitoring and maintenance periods[.]" (*Id.*) Plaintiffs argue that they could not have provided any more "'meaningful articulation'" of their convoyed sales theory before service of the Maness Report on September 16, 2016, since their expert's survey was not complete until late August 2016. (*Id.*)

The Court, again, disagrees. Plaintiffs' suggestion that they need not have formally disclosed this new theory until the submission of the Maness Report ignores their obligations under Rule 26.

Plaintiffs themselves assert that they formulated the theory soon after the June 3, 2016 Report and Recommendation issued—i.e., that once the Report and Recommendation "excluded sales related to the initial monitoring period from the scope of the claims" Plaintiffs then "determined those [excluded] sales were still subject to lost profits." (*Id.* at 1) If that is so, then once Plaintiffs made that determination—once they decided that they would press a new basis for why this category of lost profits damages was obtainable—then they should have disclosed the

14

new theory to Teva.  This is especially true here, where Teva had previously successfully moved to compel more detailed information regarding Plaintiffs' damages theories.  (*Teva* Action, D.I. 98 at 4)

Even if this kind of supplementation would not have been required immediately after Plaintiffs conceived of the new theory, it certainly would have been warranted by July 2016, when Plaintiffs' expert was busy gathering financial data relating to the theory.  (Tr. at 47) Admittedly, Plaintiffs may not then have had enough information to provide Teva with the "amount of any such damages" (a category of information sought by the damages Interrogatory request), since Dr. Maness was then still working to quantify those sales.  But neither of Plaintiffs' prior responses to the interrogatory had included reference to specific dollar figures. (*See id.* at 66 (Teva's counsel noting that it is "clear that at some point [Plaintiffs] arrived at [their convoyed sales] theory and they did not disclose it.  They made a conscious choice, at some point, not to disclose it" and instead to save any disclosure until the time Dr. Maness' expert report was served))  Instead, Plaintiffs could then at least have provided some indication that a convoyed sales theory was now in play and some articulation of the "factual bases supporting the recovery of such damages[.]" (*Teva* Action, D.I. 98, ex. B at 21)

The Court's conclusion—that Plaintiffs should not have waited three and a half months (from the date of the June 3, 2016 Report and Recommendation to the September 16, 2016 submission of the Maness Report) to disclose their new theory—was solidified by three additional factors.  The Court addresses each below.

First, Plaintiffs seem to have contradictory positions as to *why* no violation of the Federal Rules occurred here.  (*See, e.g.*, *Teva* Action, D.I. 212 at 2)  For example, as noted above,

Plaintiffs spend some time in their briefing (weakly) suggesting that the underlying factual bases for their current convoyed sales theory has long been in the record. The implication seems to be that, as a result, Teva should have early on anticipated that Plaintiffs might later rely on this theory. (*Teva* Action, D.I. 209 at 2-3) But at the same time, Plaintiffs explain that *even they* did not *come up with the theory* until after the June 3, 2016 Report and Recommendation issued. (*Id.* at 1-2; Tr. at 45-46) The competing nature of Plaintiffs' arguments makes it hard for the Court to understand which argument it is supposed to credit (and why).

Second, Plaintiffs' assertion that they only conceived of the convoyed sales theory after the Court's issuance of the June 3, 2016 Report and Recommendation is surprising. Since the very beginning of these cases, Defendants have asserted their position that administration of carvedilol prior to the completion of a maintenance period of more than six months was not an infringing use. (*See, e.g.*, *Teva* Action, D.I. 21 at 10, D.I. 25 at 3, D.I. 80 at 11, D.I. 92 at 8) And Plaintiffs long knew that Defendants were taking the position in claim construction that certain dosages of carvedilol—those taken at an initial stage by patients in order to monitor the patient's tolerance to the drug—were not covered by the claims. (*See, e.g.*, *Teva* Action, D.I. 80 at 11-12) Therefore, Plaintiffs *had* to have known for a long while that (1) if the Court adopted Defendants' claim construction position (or something like it) regarding the term "maintenance dosages"; and (2) Plaintiffs still wished to capture as lost profits damages the use of carvedilol that preceded patients' maintenance dosages; then (3) Plaintiffs would have to have a damages theory ready that would explain how such (non-infringing) lost profits damages were obtainable. *Cf. St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, C.A. Nos. 04-1436-LPS, 06-404-LPS, 08-371-LPS, 2012 WL 1015993, at *5 (D. Del. Mar. 26, 2012)

("When claim construction remains an open issue at the time the parties serve expert reports and infringement contentions, the parties have an obligation to prepare for the fact that the court may adopt [the other party's claim] construction.") (internal quotation marks and citations omitted).[15] Thus, Plaintiffs should have prepared for this set of circumstances in advance; that they did not helped lead to an untimely disclosure.[16]

The third factor relates to a new argument Plaintiffs made in support of their position during the hearing on the motions to strike. At that hearing, Plaintiffs' counsel explained that while reviewing Teva's reply letter brief (served on October 27, 2016), he noticed that Teva's damages interrogatory request had sought from Plaintiffs "'the complete *factual* bases'" supporting the recovery of any such lost profits damages. (Tr. at 36 (quoting *Teva Action*, D.I. 205, ex. D at 4 (emphasis added))) This particular word choice in Teva's damages Interrogatory request did not "catch [Plaintiffs' counsel's] eye" up until that point. (*Id.*) But once Plaintiffs' counsel started to focus on this wording, it caused counsel to conceive of the new argument, which goes as follows: (1) Plaintiffs' convoyed sales theory is actually a new *legal* theory, but (2) Teva's damages Interrogatory request was really seeking only the underlying *factual* bases supporting Plaintiffs' damages positions, and so (3) since the underlying *factual* bases supporting

---

[15] *See also France Telecom S.A. v. Marvell Semiconductor Inc.*, Case No. 12-cv-04967-WHO, 2014 WL 1899616, at *4 (N.D. Cal. May 12, 2014).

[16] In any event, again, once Plaintiffs *did* determine that there was a basis to seek lost profits damages under the new theory, they should then have timely supplemented their response to the damages Interrogatory request "after the June 2016 [Report and Recommendation] and while deposition and other discovery was still ongoing." (*Teva* Action, D.I. 212 at 2) Teva could have then immediately sought the discovery that it needs with respect to this new theory, even if that meant seeking a slight extension to the July 1, 2016 fact discovery deadline.

Plaintiffs' lost profits theory "were all provided" well in the past, there would have been no need for Plaintiffs to supplement their interrogatory answer after they conceived of the new convoyed sales theory. (*Id.*)

This "late-noticed loophole" argument does not help Plaintiffs' cause. For one thing, Plaintiffs obviously did not mention this argument in their pre-hearing brief. Parties should not reserve for oral argument positions that were not (but should have been) elucidated in their briefs. *See Kaavo Inc. v. Amazon.com Inc.*, Civil Action No. 15-638-LPS-CJB, Civil Action No. 15-640-LPS-CJB, 2016 WL 6562038, at *9 n.17 (D. Del. Nov. 3, 2016); *TSMC Tech., Inc. v. Zond, LLC*, Civil Action No. 14-721-LPS-CJB, 2014 WL 7251188, at *7 n.8 (D. Del. Dec. 19, 2014) (citing cases). Moreover, on the merits, the Court does not agree with Plaintiffs that their convoyed sales theory does not rely on any unique *facts*. For example, a determination as to whether there is a "functional association" between patented uses and non-patented uses is certain to depend on various facts that would not likely need exploration, absent the invocation of such a theory. (Tr. at 14-15); *cf. Emcore Corp. v. Optium Corp.*, Civil Action No. 6-1202, 2008 WL 3271553, at *11 (W.D. Pa. Aug. 5, 2008) (stating that functionality with respect to convoyed sales "is typically a question of fact"); *Tivo Inc. v. Echostar Commc'ns Corp.*, No. 2:04-CV-1-DF, 2006 WL 5127620, at *6 (E.D. Tex. Jan. 26, 2006) (noting plaintiff's argument that "whether or not there is a 'functional relationship' between products is a question of fact[,]" and agreeing that factual disputes as to this issue warranted leaving for the jury the question of whether plaintiff was entitled to convoyed sales damages) (citations omitted).[17]

---

[17]    It is also worth noting that the damages Interrogatory request asked Plaintiffs to "[d]escribe with particularity all damages for which Plaintiffs contend Teva is liable, including . . . the form" of such damages—and that in response, Plaintiffs had, *inter alia*, stated that they were

For all of the above reasons, the Court determines that Plaintiffs' convoyed sales theory, first articulated in the Maness Report, was untimely. The Court must next determine whether the relevant portions of the report should be stricken by applying the *Pennypack* factors.[18]

## B.    Application of *Pennypack* Factors

The Court agrees with Defendants that the first *Pennypack* factor clearly weighs in their favor. Plaintiffs' failure to disclose their convoyed sales theory prior to service of the Maness Report could clearly have surprised Defendants. And this late disclosure could cause some prejudice to them. If the convoyed sales theory remains in the case, Defendants will be required to address it at a "disruptive" time, when the parties are otherwise busy finishing expert discovery and preparing for the filing of case dispositive motions. (Tr. at 26)  Defendants have suggested that to do so, they will need to spend time re-reviewing discovery documents with an eye towards this new theory, and that they may need to take some limited additional discovery. (*Id.* at 22, 26, 68-69)  Defendants' experts may then need to prepare supplemental expert reports based on the discovery. (*Id.* at 69)

---

"seeking lost profits only on infringing sales[.]" (*Teva Action*, D.I. 205, ex. D at 4, 10)  The idea that Plaintiffs would not need to supplement the record as to their response to such an interrogatory—when they now *would* be seeking lost profits on something other than "infringing sales"—is hard to understand.

[18]    As previously noted, the Court has herein been largely assessing the issue of timely disclosure by referring to the facts in the *Teva* Action. The facts supporting a finding of untimely disclosure are certainly stronger in that case, where the record demonstrates that Teva repeatedly requested the relevant information and sought and obtained a court order compelling disclosure of same. But the Court also finds that Plaintiffs' disclosure was untimely in the *Glenmark* Action too, as Glenmark (like Teva) had early on propounded an interrogatory seeking information with respect to Plaintiffs' damages theories. Plaintiffs should have further supplemented their response to Glenmark's interrogatory prior to the release of the Maness Report, so that their response to that interrogatory was complete.

However, a greater number of *Pennypack* factors redound in Plaintiffs' favor.

As to the second and third *Pennypack* factors, for example, the Court believes that any prejudice Defendants face can be cured, and that a cure can come in sufficient time so as not to unduly disrupt the order and efficiency of trial. For one thing, as Teva itself notes, Plaintiffs' convoyed sales theory does not seem especially complex, as it is "substantively described" in only five paragraphs of the 223-paragraph Maness Report. (*Teva* Action, D.I. 205 at 3) And during oral argument, Defendants acknowledged that their experts have already provided initial responses to the convoyed sales theory in rebuttal reports. (Tr. at 18) Of course, as noted above, these responses were provided without the benefit of discovery. But even by Defendants' estimate, any supplemental discovery could be completed in a short timeframe. (*Id.* at 68-69; *see also id.* at 26-27) With trial in one of the two cases scheduled for mid-June 2017, there should be sufficient time for Defendants to take the focused discovery they need without derailing trial preparations. *See, e.g.*, *Insight Equity v. Transitions Optical, Inc.*, No. 10-cv-635 (RGA), 2016 WL 7031281, at *1 (D. Del. Nov. 30, 2016) (noting that the *Pennypack* factors concerning (1) the ability of any prejudice to be cured and (2) the extent to which permitting evidence would disrupt the orderly and efficient trial of the case both militated in favor of allowing the plaintiff the opportunity to "revise its damages theory[,]" where "trial is not scheduled for seven months" which would allow "ample time to allow Plaintiff to prepare an alternative damages theory and for Defendant to test it").

With respect to the fourth *Pennypack* factor—whether Plaintiffs acted willfully or in bad faith by failing to supplement their response to the damages Interrogatory request—courts have tended to reserve a finding of willfulness or bad faith for clear, egregious examples of

20

misconduct. *See Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *11 (D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 1006 (D. Del. 2013) (citing cases). Under this *Pennypack* factor, courts may also consider the non-movant's justifications for failing to timely disclose the relevant information. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012).

Here, as explained above, Plaintiffs should have served a supplemental interrogatory response articulating their convoyed sales damages theory, and should have done so well before the submission of the Maness Report.[19] And the Court is not fully satisfied with Plaintiffs' explanation for their failure to timely supplement the damages Interrogatory request. But there is not the record to conclude that this failure was the result of a willful intent to sandbag Defendants (as opposed to mere negligence). And so the record falls short of the type of heightened or "egregious" showing of bad faith required by the caselaw in this Circuit. *See, e.g., Cmty. Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp., Inc.*, Civil No. 1:09-CV-0257, 2013 WL 3510714, at *4 (M.D. Pa. July 11, 2013) (noting that while the court was displeased with the plaintiff's untimely production of an expert report and unsatisfied with its explanation in support thereof, the record did not reflect bad faith, but instead negligence "at worst").

---

[19] In light of the Court's conclusion in this regard, the Court will entertain motions from the respective Defendants for reasonable expenses, including attorney's fees. Such requests should be limited to recovery for those expenses relating to Plaintiffs' convoyed sales theory that Defendants would not have incurred were Plaintiffs to have timely disclosed the theory (such as, for instance, expenses relating to the re-review of discovery documents with an eye toward this theory). *See, e.g., Grote v. Wright Med. Grp., Inc.*, No. 12-CV-2002-LRR, 2013 WL 4670311, at *6 (N.D. Iowa Aug. 30, 2013); *cf. Oceans Cuisine, Ltd. v. Fishery Prods., Int'l, Inc.*, No. 05-CV-3613 (DRH)(AKT), 2006 WL 1071578, at *2, *4 (E.D.N.Y. Apr. 21, 2006); *Holden Metal v. Wismarq*, No. 00 C 191, 2004 WL 1498152, at *1 (N.D. Ill. July 1, 2004).

21

As to the final *Pennypack* factor, it cannot be seriously disputed that Plaintiffs' convoyed sales theory is very important to the cases, as Plaintiffs seek, pursuant to the theory, ███████ ███████ in damages in the *Teva* Action, and ███████████ in damages in the *Glenmark* Action. (*See Teva* Action, D.I. 205 at 3 (Teva acknowledging that the ███████ ███████ tied to the convoyed sales theory it seeks to exclude ███████); *see also Teva* Action, D.I. 209 at 1) This is also the *Pennypack* factor that concerns the Court the most here. With such a substantial portion of Plaintiffs' damages case at stake, the Court is hesitant to exclude the evidence unless the law indicates that such exclusion is clearly warranted. And here it does not.

## IV.   CONCLUSION

With most of the *Pennypack* factors militating against granting the "extreme sanction" called for by Defendants' motions, the Court hereby ORDERS that the motions are DENIED. The portions of the Maness Reports relating to Plaintiffs' convoyed sales theory will not be stricken. However, Defendants may take discovery with respect to this theory, and the Court expects that the parties will work cooperatively to complete this focused discovery as expeditiously as possible. To the extent the parties need to adjust the deadlines relating to any dispositive motion that may be filed with respect to Plaintiffs' convoyed sales damages theory only, the parties shall meet and confer and file a joint submission to that effect.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **January 17, 2017** for review by the Court, along with a motion

for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: January 9, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE