1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -
  GLAXOSMITHKLINE, LLC,                    :   CIVIL ACTION NO.
4  SMITHKLINE BEECHAM (CORK), LIMITED,     :
                                           :
5                  Plaintiffs,             :
  v                                        :
6                                          :
  TEVA PHARMACEUTICALS USA, INC.,          :
7                                          :   14-878-LPS-CJB
                  Defendant.               :
8                          - - -

9                    Wilmington, Delaware
                     Tuesday, June 20, 2017
10                   *Jury Trial - Volume G*

11                          - - -

12  BEFORE:   HONORABLE LEONARD P STARK, Chief Judge, and a jury

13                          - - -
  APPEARANCES:
14
              FISH & RICHARDSON, P.C.
15            BY:  DOUGLAS McCANN, ESQ., and
                   SANTOSH V. COUTINHO, Ph.D., ESQ.
16                 ELIZABETH M. FLANAGAN, ESQ.

17                 and

18            FISH & RICHARDSON, P.C.
              BY:  MICHAEL J. KANE, ESQ.,
19                 PHILLIP W. GOTER, ESQ., and
                   WILLIAM R. WOODFORD, ESQ.
20                 (Minneapolis, Minnesota)

21                 and

22            FISH & RICHARDSON, P.C.
              BY:  JUANITA BROOKS, ESQ.,
23                 JONATHAN E. SINGER, ESQ.,
                   MICHAEL A. AMON, ESQ., and
24                 ROBERT M. YEH, ESQ.
                   (San Diego, California)

25                 Counsel for GlaxoSmithKline, LLC

```
 1    APPEARANCES:  (Continued)

 2
              SHAW KELLER, LLC
 3            BY:  JOHN W. SHAW, ESQ.,
                   KAREN E. KELLER, ESQ., and
 4                 JEFFREY CASTELLANO, ESQ.

 5                 and

 6            GOODWIN PROCTER, LLP
              BY:  J. ANTHONY DOWNS, ESQ.,
 7                 DARYL L. WIESEN, ESQ.,
                   CHRISTOPHER T. HOLDING, ESQ.,
 8                 ELAINE HERRMANN BLAIS, ESQ.,
                   LANA SHIFERMAN, ESQ., and
 9                 ROBERT FREDERICKSON, III, ESQ.
                   (Boston, Massachusetts)
10
                        Counsel on behalf of
11                      Teva Pharmaceuticals USA, Inc.

12

13    Valerie J. Gunning                 Brian P. Gaffigan
      Official Court Reporter            Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            - oOo -

 2                      P R O C E E D I N G S

 3               (REPORTER'S NOTE:  The following jury trial was

 4    held in open court, beginning at 8:33 a.m.)

 5               THE COURT:  Good morning.

 6               (The attorneys respond, "Good morning, Your Honor.")

 7               THE COURT:  Are there any issues that GSK wants

 8    to raise this morning?

 9               MS. BROOKS:  Nothing from us, Your Honor.  Thank

10    you.

11               THE COURT:  Did you want to respond to the bench

12    brief that was filed yesterday?  It has to do with the

13    opening or your comments following up on the opening and

14    what might happen in closings.  Did you see their filing?

15               MS. BROOKS:  Apparently, I did not.

16               THE COURT:  Let me see if they want to say

17    anything.

18               Did you want to address that this morning, from

19    Teva?

20               MR. WIESEN:  Your Honor, I don't think beyond

21    what we put in there.  And we're hoping that there will be

22    no issue.

23               THE COURT:  Right.

24               MR. WIESEN:  But we wanted to -- our goal is not

25    to object during the closing.
```

```
 1                    THE COURT:  Right.

 2                    MR. WIESEN:  But we want to make sure things are

 3      not going to arise.  We don't have any opportunity to speak

 4      after that.

 5                    THE COURT:  It's a short two-page filing.  We'll

 6      give you a chance to look at it and see if there is anything

 7      you want to say.

 8                    So nothing else from GSK?

 9                    MS. BROOKS:  No, Your Honor.

10                    THE COURT:  How about from Teva?  Anything else?

11                    MR. WIESEN:  No, Your Honor.

12                    THE COURT:  On the verdict sheet, thank you for

13      sending that to us.  We just have one further refinement

14      that I think will not be controversial but I wanted to check

15      before we printed it out.

16                    On the damages, Option A, Option B, Option C,

17      now that we have had the one question that says, first, has

18      GSK proven by a preponderance that it is entitled to lost

19      profits?

20                    The instruction after that says:  If you

21      answered yes to question 8, for example, go to question 9.

22      I think in an abundance of caution it should be go to

23      questions 9 and 10, that is the lost profits and the

24      reasonable royalties question, and then repeat that

25      throughout.
```

```
 1              Do you agree with that, GSK?

 2              MS. FLANAGAN:  Yes, Your Honor.

 3              THE COURT:  And Teva, do you agree with that?

 4              MR. FREDERICKSON:  Yes, Your Honor.

 5              THE COURT:  All right.  I hope someone will be

 6    able to given Ms. Brooks a copy of that filing, and I'll

 7    send Mr. Looby in a few minutes to see if you want to be

 8    heard on that.  Otherwise, we'll be back with the jury.

 9              MS. BROOKS:  Thank you, Your Honor.

10              THE COURT:  We will be in recess.

11              (Brief recess taken.)

12              *     *     *

13              (Proceedings reconvened after recess.)

14              THE COURT:  We sent in copies of the verdict

15    sheet.  Did you each receive them?

16              (Counsel nod "yes.")

17              THE COURT:  Okay.  Great.  So the jury is here.

18    We're going to bring them in.

19              (Jury returned.)

20              THE COURT:  Good morning, everyone.  It is nice

21    to see you all again.  Welcome back.

22              We will begin this morning by Mr. Looby passing

23    around some paper to you all.  There are two documents you

24    will be receiving.  The larger one is the final jury

25    instructions, and the smaller one is the verdict sheet.
```

1    What I'm going to do this morning is read to you

2    most of the final jury instructions.  Then you will hear the

3    closing argument.  Then I will complete the remainder of the

4    reading of the jury instructions.  Then we'll finish with

5    the reading of the verdict sheet.  That is what we have in

6    store with you today.

7    Without any further ado, I will begin with the

8    longer of the two documents the final jury instructions.

9    I will start on page 1.  Section 1, General

10   Instructions.

11   1.1.  Introduction.

12   Members of the jury, now it is time for me to

13   instruct you about the law that you must follow in deciding

14   this case.  Each of you has been provided a copy of these

15   instructions.  You may read along as I deliver them if you

16   prefer.

17   I will start by explaining your duties and the

18   general rules that apply in every civil case.  Then I will

19   explain some rules that you must use in evaluating

20   particular testimony and evidence.

21   Then I will explain the positions of the parties

22   and the law you will apply in this case.  And last, I will

23   explain the rulings that you must follow during your

24   deliberations in the juryroom, and the possible verdicts

25   that you may return.

1       Please listen very carefully to everything I

2  say.

3       You will have a written copy of these

4  instructions with you in the juryroom for your reference

5  during your deliberations.  You will also have a verdict

6  form, which will list the questions that you must answer to

7  decide this case.

8            1.2.  Jurors' Duties.

9       You have two main duties as jurors.  The first

10 is to decide what the facts are from the evidence that you

11 will see and hear in court.  Deciding what the facts are is

12 your job, not Mylan, and nothing that I have said or done

13 during this trial was meant to influence your decision about

14 the facts in any way.  You are the sole judges of the facts.

15       Your second duty is to take the law that I give

16 you, apply it to the facts, and decide under the appropriate

17 burden of proof which party should prevail on any given

18 issue.  It is my job to instruct you about the law, and you

19 are bound by the oath you took at the beginning of the trial

20 to follow the instructions that I give you, even if you

21 personally disagree with them.  This includes the

22 instructions that I gave you before and during the trial,

23 and these instructions.  All of the instructions are

24 important, and you should consider them together as a whole.

25       Perform these duties fairly.  Do not guess or

1 speculate, and do not let any bias, sympathy, or prejudice

2 you may feel toward one side or the other influence your

3 decision in any way.

4            1.3.  Evidence Defined.

5           You must make your decision based only on the

6 evidence that you saw and heard here in court.  Do not let

7 rumors, suspicions or anything else that you may have seen

8 or heard outside of court influence your decision in any

9 way.

10           The evidence in this case includes only what

11 the witnesses said while they were testifying under oath

12 (including deposition transcript testimony that has been

13 played by video or read to you), the exhibits that I allowed

14 into evidence, and the stipulations to which the lawyers

15 agreed.

16           Certain charts and graphics have been used to

17 illustrate testimony of witnesses.  Unless I have

18 specifically admitted them into evidence, these charts and

19 graphics are not themselves evidence, even if they refer to,

20 identify, or summarize evidence, and you will not have these

21 demonstratives in the juryroom.

22           Nothing else is evidence.  The lawyers'

23 statements and arguments are not evidence.  The arguments of

24 the lawyers are offered solely as an aid to help you in your

25 determination of the facts.  Their questions and objections

1    are not evidence.  My legal rulings are not evidence.  You

2    should not be influenced by a lawyer's objection or by my

3    ruling on that objection.  Any of my comments and questions

4    are not evidence.

5                   During the trial I may have not let you

6    hear the answers to some of the questions that the lawyers

7    asked.  I also may have ruled that you could not see some of

8    the exhibits that the lawyers wanted you to see.  And,

9    sometimes I may have ordered you to disregard things that

10   you saw or heard, or that I struck from the record.  You

11   must completely ignore all of these things.  Do not

12   speculate about what a witness might have said or what an

13   exhibit might have shown.  These things are not evidence,

14   and you are bound by your oath not to let them influence

15   your decision in any way.

16                   Make your decision based only on the evidence,

17   as I have defined it here, and nothing else.

18                   1.4, Direct and Circumstantial Evidence.

19                   You may have heard the terms direct evidence and

20   circumstantial evidence.

21                   Direct evidence is simply evidence like the

22   testimony of an eyewitness which, if you believe it,

23   directly proves a fact.  If a witness testified that he saw

24   it raining outside, and you believe him, that would be

25   direct evidence that it was raining.

1    Circumstantial evidence is simply a chain of

2    circumstances that indirectly proves a fact.  If someone

3    walked into the courtroom wearing a raincoat covered with

4    drops of water and carrying a wet umbrella, that would be

5    circumstantial evidence from which you could conclude that

6    it was raining.

7    It is your job to decide how much weight to give

8    the direct and circumstantial evidence.  The law makes no

9    distinction between the weight that you should give to

10   either one, nor does it say that one is any better evidence

11   than the other.  You should consider all the evidence, both

12   direct and circumstantial, and give it whatever weight you

13   believe it deserves.

14   1.5, Consideration of Evidence.

15   You should use your common sense in weighing the

16   evidence.  Consider it in light of your everyday experience

17   with people and events, and give it whatever weight you

18   believe it deserves.  If your experience tells you that

19   certain evidence reasonably leads to a conclusion, you are

20   free to reach that conclusion.

21   1.6, Statements of Counsel.

22   A further word about statements of counsel and

23   arguments of counsel.  The attorneys' statements and

24   arguments are not evidence.  Instead, their statements and

25   arguments are intended to help you review the evidence

1    presented.

2            If you remember the evidence differently from

3    the way it was described by the attorneys, you should rely

4    on your own recollection.

5            1.7, Credibility of Witnesses.

6            You are the sole judges of each witness'

7    credibility.  You may believe everything a witness says, or

8    part of it, or none of it.  You should consider each

9    witness' means of knowledge; strength of memory; opportunity

10   to observe; house reasonable or unreasonable the testimony

11   is; whether it is consistent or inconsistent; whether it has

12   been contradicted; the witness' biases, prejudices, or

13   interests; the witness' manner or demeanor on the witness

14   stand; and all circumstances that, according to the

15   evidence, could affect the credibility of the testimony.

16           In determining the weight to give to the

17   testimony of a witness, you should ask yourself whether

18   there is evidence tending to prove that the witness

19   testified falsely about some important fact or whether there

20   was evidence that at some other time the witness said or did

21   something, or failed to say or do something, that was

22   different from the testimony he or she gave at the trial in

23   person or by deposition testimony played by video or read to

24   you.  You have the right to distrust such witness' testimony

25   and you may reject all or some of the testimony of that

1  witness or give it such credibility as you may think it

2  deserves.

3  You should remember that a simple mistake by a

4  witness does not necessarily mean that the witness was not

5  telling the truth.  People may tend to forget some things or

6  remember other things inaccurately.  If a witness has made a

7  misstatement, you must consider whether it was an innocent

8  lapse of memory or an intentional falsehood, and that may

9  depend upon whether it concerns an important fact or an

10  unimportant detail.

11  1.8, Number of Witnesses.

12  One or point about the witnesses.  Sometimes

13  jurors wonder if the number of witnesses who testified makes

14  any difference.

15  Do not make any decisions based only on the

16  number of witnesses who testified.  What is more important

17  is how believable the witnesses were, and how much weight

18  you think their testimony deserves.  Concentrate on that,

19  not the numbers.

20  1.9, Expert Witnesses.

21  Expert testimony is testimony from a person who

22  has special skill or knowledge in some science, profession

23  or business.  The skill or knowledge is not common to the

24  average person but has been acquired by the expert through

25  special study or experience.

1    In weighing expert testimony, you may consider

2  the expert's qualifications, the reasons for the expert's

3  opinions, and the reliability of the information supporting

4  the expert's opinions, as well as the factors I have

5  previously mentioned for weighing testimony of any other

6  witness.  Expert testimony should receive whatever weight

7  and credit you think appropriate, given all the other

8  evidence in the case.  You are free to accept or reject the

9  testimony of experts, just as with any other witness.

10    1.10, Deposition Testimony.

11    During the trial, certain testimony was

12  presented to you by the reading of a deposition transcript

13  or the playing of video excerpts from a deposition.  If

14  played by video, the deposition testimony may have been

15  edited or cut to exclude irrelevant testimony.  You should

16  not attribute any significance to the fact that the

17  deposition videos may appear to have been edited.

18    Deposition testimony is out of court testimony

19  given under oath and is entitled to the same consideration

20  you would give it had the witnesses personally appeared in

21  court.

22    1.11, Rule 30(b)(6) Deposition Testimony.

23    In this trial, there were certain witnesses

24  identified as Rule 30(b) witnesses for the parties.  These

25  Rule 30(b)(6) witnesses were designated to speak on certain

1   topics on behalf of the entities which designated them as

2   Rule 30(b)(6) witnesses.  These witnesses include Jill

3   Pastore, Jennifer King, and Jamie Berlanska (designated by

4   Teva) and Charles Kinzig, Mary Ann Lukas, and Bart Murray

5   (designated by GSK).  Rule 30(b)(6) witnesses are required

6   to testify about information known or reasonably available

7   to the designating entity related to those particular

8   topics.  For answers within the designated topics, the

9   entity is bound by the answers provided by its Rule 30(b)(6)

10  witness.

11          If these witnesses also provided testimony

12  outside of their designated topics based on their personal

13  knowledge and/or provided their personal opinions in

14  addition to testifying factual information on behalf of the

15  designating entities, the designating entities are not bound

16  by answers that provide personal knowledge and/or personal

17  opinions that are outside of the designated topics.

18          1.12, Demonstrative Exhibits.

19          During the course of the trial, you have seen

20  many exhibits.  Many of these exhibits were admitted as

21  evidence.  You will have these admitted exhibits in the jury

22  room for your deliberations.  The remainder of the exhibits

23  (including charts, PowerPoint presentations and animations)

24  were offered to help illustrate the testimony of the various

25  witnesses.  These illustrative exhibits, called

1  demonstrative exhibits, have not been admitted, are not

2  evidence, and should not be considered as evidence.  Rather,

3  it is the underlying testimony of the witness that you heard

4  when you saw the demonstrative exhibits that is the evidence

5  in this case.

6          In some instances, certain charts and summaries

7  may have been received into evidence to illustrate

8  information brought out in the trial.  You may use these

9  charts and summaries as evidence, even though the underlying

10  documents and records are not here.  You should give them

11  only such weight as you think they deserve.

12          1.13, Burdens of Proof.

13          In any legal action, facts must be proven by a

14  required standard of evidence, known as the burden of proof.

15  In a patent case such as this, there are two different

16  burdens of proof that are used.  The first is called

17  preponderance of the evidence.  The second is called clear

18  and convincing evidence.

19          GSK contends both that Teva induced infringement

20  of the '000 patent and that Teva induced infringement

21  willfully.  GSK also contends that it is entitled to damages

22  related to the '000 patent.  A party asserting patent

23  infringement has the burden of proving infringement by a

24  preponderance of the evidence.  A preponderance of the

25  evidence is evidence that, when considered in light of all

1   of the facts, leads you to believe that what that party

2   claims is more likely true than not.  To put it differently,

3   if you were to put the parties' evidence on opposite sides

4   of a scale, the evidence supporting GSK's claims must make

5   the scales tip somewhat toward its side.  If the scale

6   should remain equal or tip in favor of Teva, you must find

7   for Teva.

8          If you decide that Teva has induced

9   infringement, you must go on and address the additional

10  issue of whether or not this infringement was willful.  GSK

11  has the burden of proving that the infringement was willful

12  by a preponderance of the evidence, meaning it is more

13  likely true than not.

14         GSK also has the burden to establish the kind of

15  money damages -- lost profits or reasonable royalties -- and

16  amount of its money damages by a preponderance of the

17  evidence.  If GSK persuades you that Teva has infringed a

18  valid patent, GSK is entitled to damages in an amount to

19  compensate GSK for that infringement.

20         Teva denies that it has infringed, and denies

21  that any such infringement was willful.  Teva also contends

22  that the '000 patent is invalid.  A party challenging the

23  validity of a patent has the burden of proving that the

24  patent is invalid by clear and convincing evidence.  Clear

25  and convincing evidence is evidence that produces an abiding

1    conviction that the truth of a factual contention is highly

2    probable.  Proof by clear and convincing evidence is, thus,

3    a higher burden than proof by a preponderance of the

4    evidence.

5            Some of you may have heard the phrase proof

6    beyond a reasonable doubt.  That burden of proof applies

7    only in criminal cases and has nothing to do with a civil

8    case like this one.  You should therefore not consider it in

9    this case.

10           1.14, Use of Notes.

11           You may use notes taken during trial to assist

12   your memory.  However, as I instructed you at the beginning

13   of the case, you should use caution in consulting your

14   notes.  There is generally a tendency I think to attach

15   undue importance to matters which one has written down.

16   Some testimony which is considered unimportant at the time

17   presented, and thus not written down, takes on greater

18   importance later in the trial in light of all the evidence

19   presented.  Therefore, you your notes are only a tool to aid

20   your own individual memory, and you should not compare notes

21   with other jurors in determining the content of any

22   testimony or in evaluating the importance of any evidence.

23   Your notes are not evidence, and are by no means a complete

24   outline of the proceedings or a list of the highlights of

25   the trial.

1    Above all, your memory should be the greatest

2 asset when it comes time to deliberate and render a decision

3 in this case.

4    THE COURT:  Section 2.  The Parties and Their

5 Contentions.

6    2.1.  The Parties.

7    I will now review for you the parties in this

8 action, and the positions of the parties that you will have

9 to consider in reaching your verdict.

10    As I have previously told you, the plaintiffs in

11 this case are GlaxoSmithKline LLC and SmithKline Beecham

12 (Cork) Limited.  I will refer to the plaintiffs collectively

13 as "GSK."

14    The defendant in this case is Teva

15 Pharmaceuticals USA Inc., which I will refer to as "Teva".

16    2.2.  The Parties' Contentions.

17    There is one patent at issue in this case:

18 United States Patent No. RE40,000.  Because these numbers

19 are so long, patents are usually referred to by their last

20 three digits.  You heard the lawyers and witnesses in the

21 case refer to GSK's patent as the '000 patent or the triple

22 zero patent.  A copy of the '000 patent has been given to

23 you.

24    GSK contends that Teva induced infringement of

25 the '000 patent and that the infringement was willful.  GSK

also contends that it is entitled to damages related to the

'000 patent.  Teva denies that it induced infringement of

the '000 patent, and denies that any such infringement was

willful.  Teva also contend that the '000 patent is invalid

for several independent reasons.  Teva also denies that GSK

is entitled to recover any damages related to the '000

patent.

2.3.  Summary of the Patent Issues.

I will now summarize the patent issues that you

must decide and for which I will provide instructions to

guide your deliberations.  Here are the issues you must

decide:

1.  Whether GSK has proven by a preponderance of

the evidence that Teva induced infringement of the '000

patent.

2.  Whether GSK has proven by a preponderance of

the evidence that Teva's infringement was willful.

3.  Whether Teva has proven by clear and

convincing evidence that one or more asserted claims of the

'000 patent are invalid due to anticipation, obviousness, or

lack of written description.

4.  If you find that Teva is liable for

infringement of one or more asserted claims of the '000

patent and you do not find the that the infringed claims are

invalid, then you must determine the amount of money damages

1    to be awarded to GSK.  GSK has the burden to establish the

2    amount of its damages by a preponderance of the evidence.

3            I will provide more detailed instructions on

4    each of the issues you must decide throughout elsewhere in

5    these jury instructions.

6            3.  The Patent Claims.

7            3.1.  Patent laws.

8            At the beginning of the trial, I gave you some

9    general information about patents and the patent system and

10   a brief overview of the patent laws relevant to this case.

11   I will now give you more detailed instruction about the

12   patent laws that specifically relate to this case.

13           3.2.  Patent Claims Generally.

14           Before you can decide many of the issues in

15   this case, you will need to understand the role of patent

16   "claims."

17           The patent claims are the numbered paragraphs at

18   the end of each patent.  The claims are important because it

19   is the words of the claims that define what a patent covers.

20           The claims are intended to define, in words, the

21   bounds of the invention.  The figures and text in the rest

22   of the patent provide a description and/or examples of the

23   invention and provide a context for the claims, but it is

24   the claims that define the breadth of the patent's coverage.

25   Each of the asserted claims must be considered individually.

1    Each claim of a patent effectively acts as if it

2    were a separate patent, and each claim may cover more or

3    less than another claim.   Therefore, what a patent covers

4    depends, in turn, on what each of its claims covers.

5    You will first need to understand what each

6    claim covers in order to decide whether or not there is

7    infringement of the claim and to decide whether or not the

8    claim is invalid.

9    3.3.   Construction of the Claims.

10    It is the Court's duty under the law to define

11    what the patent claims mean.   As I instructed you at the

12    beginning of the case, I have made my determinations, and I

13    will now instruct you on the meaning of the claim terms.

14    You must apply the meaning that I give in each patent claim

15    to decide if a claim is infringed or invalid.   You must

16    accept my definitions of these words in the claims as being

17    correct.   You must ignore any different definitions used by

18    the witnesses or the attorneys.

19    You are advised that the following definitions

20    for the following terms must be applied:

21    For the claim term "decreasing mortality caused

22    by congestive heart failure"/"to decrease a risk of

23    mortality caused by congestive heart failure", the

24    construction is "attempting to reduce the probability that a

25    patient will die as a result of congestive heart failure."

1    For the claim term "maintenance period", the

2  construction is "period of time over which the maintenance

3  dose is taken into a patient's body."

4    For the claim term "maintenance dosage," the

5  construction is "dosages in the therapeutic amount given

6  during the maintenance period."

7    For the claim term "administering," the

8  construction is "prescribing, dispensing, giving or taking

9  (such that what is prescribed, dispensed, given or taken is

10  actually taken into a patient's body)."

11    For the claim term, "have been shown to

12  statistically decrease", the construction is "have been

13  shown to reduce mortality by a statistically significant

14  amount."

15    And for the claim term, "congestive heart

16  failure", the construction is "a condition that occurs as a

17  result of impaired pumping capability of the heart and is

18  associated with abnormal retention of water and sodium."

19    For any words in the claim for which I have not

20  provided you with a definition, you should apply the plain

21  and ordinary meaning to a person of ordinary skill in the

22  art.

23    3.4.  Independent and Dependent Claims.

24    There are two different types of claims in the

25  patent.  The first type is called an "independent claim."

1   An independent claim does not refer to any other claim of

2   the patent.  An independent claim is read separately to

3   determine its scope.  In this case, claim 1 of the '000

4   patent is an independent claim.  You know this because it

5   mentions no other claims.  Accordingly, the words of claim 1

6   of the '000 patent are read by themselves in order to

7   determine what claim 1 covers.  The remaining claims of the

8   '000 patent are dependent claims.

9           A "dependent claim" refers to and depends upon

10  at least one other claim in the patent and thus incorporates

11  all of the requirements of the claims to which it refers.

12  Accordingly, to determine what a dependent claim covers, you

13  must read both the dependent claim and the claim to which it

14  refers.  Here, for example, claim 2 of the '000 patent is a

15  dependent claim.  You know this because it refers to

16  independent claim 1.  Accordingly, the words of claims 1 and

17  2 are read together in order to determine what claim 2 of

18  the '000 patent covers.

19           3.5.  Effect of Reissue.

20           When a patent owner submits a patent to the

21  United States Patent Office for reissue, the surrender of

22  the original patent takes effect at the moment when the

23  reissue patent is granted.  In other words, surrender and

24  reissuance go hand in hand.  Once the Patent Office grants

25  the reissue patent, the original patent is no longer

 1  enforceable.

 2        I'm up to page 25.  We're at Section 4, called

 3  Infringement.

 4        4.1 is Infringement Generally.

 5        I will now instruct you how to decide whether

 6  GSK has proven by a preponderance of the evidence that Teva

 7  infringed the asserted claims of the '000 patent.

 8        Recall that GSK must prove infringement by a

 9  preponderance of the evidence, i.e., that it is more likely

10  than not that infringement has occurred.

11        You have heard evidence that both sides own

12  other patents related to carvedilol.  As I stated earlier,

13  there is only one patent at issue in this case:  The '000

14  patent.  Ownership of a patent is not a defense to patent

15  infringement, nor is ownership of other patent evidence of

16  infringement.  Instead, for purposes of infringement, you

17  must only consider the '000 patent.

18        You must determine whether GSK has proven that

19  Teva induced infringement for two time periods.  The first

20  time period is from January 8, 2008 through April 30, 2011.

21  The parties have referred to this time period as the "Skinny

22  Label Period" or "Partial Label Period."  The second time

23  period is from May 1, 2011 through June 7, 2015, when the

24  '000 patent expired.  The parties have referred to this time

25  period as the "Amended Label Period" or "Full Label Period."

1    **4.2, Induced Infringement.**

2         GSK alleges that Teva is liable for infringement

3    by actively inducing physicians to engage in acts that

4    directly infringe the '000 patent.  You must determine

5    whether there has been active inducement on a claim-by-claim

6    basis.  Induced infringement may be shown by direct or

7    circumstantial evidence.  Teva is a liable for active

8    inducement of a claim only if GSK proves by a preponderance

9    of the evidence each of the following:

10        One, that allegedly infringing acts are actually

11   carried out by physicians that directly infringed one or

12   more of the asserted claims of the '000 patent.

13        Two, that Teva took some affirmative action, or

14   that Teva continued to take an action that began before the

15   '000 patent issued, after the '000 patent was issued on

16   January 8, 2008, intending to cause the physicians to

17   directly infringe by administering Teva's carvedilol

18   product.

19        Three, that Teva was aware of the '000 patent --

20   and that Teva new that the infringing acts, if taken, would

21   constitute direct infringement of the '000 patent by the

22   physicians, or Teva believed that there was a high

23   probability that the actions taken by others infringed the

24   '000 patent and took deliberate steps to avoid learning of

25   that infringement.

1    And, four, that Teva's alleged inducement, as

2  opposed to other factors, actually caused the physicians to

3  directly infringe.

4    I will now instruct you further as to the law

5  for each of these elements.

6    4.2.1, Direct Infringement.

7    As I mentioned, a finding of induced

8  infringement requires a showing that someone has directly

9  infringed.  However, a patentee is not required to present

10 hard proof that any individual third-party direct infringer

11 was actually persuaded to infringe, but may instead present

12 evidence of inducement directed to an entire class of direct

13 infringers.

14    GSK alleges that doctors as a class directly

15 infringe the '000 patent.  In order to prove direct

16 infringement, GSK must prove by a preponderance of the

17 evidence, i.e., that it is more likely than not, that

18 doctors used Teva's carvedilol product in a manner that

19 meets all of the requirements of a claim.

20    Deciding whether a claim has been directly

21 infringed is a two-step process.  The first step is to

22 decide the meaning of the patent claim.  I have already made

23 this decision and I have already instructed you as to the

24 meaning of some terms of the asserted patent claims.  The

25 second step is to decide whether any uses of Teva's generic

1   carvedilol product are covered by an asserted claim.

2          To decide whether any uses of Teva's generic

3   carvedilol product directly infringe an asserted claim, you

4   must compare that use with the patent claim and determine

5   whether every requirement of the claim is included in that

6   use.  If so, then that use of Teva's generic carvedilol

7   product directly infringes that claim.  If not, then the use

8   does not directly infringe that claim.

9          You must determine, separately for each asserted

10   claim, whether or not there is any infringement.  There is

11   one exception to this rule.  If you find that an independent

12   claim on which other claims depend is not infringed, there

13   cannot be infringement of any dependent claim that refers to

14   that independent claim.  On the other hand, if you find that

15   an independent claim has been infringed, you must still

16   decide, separately, whether the use meets additional

17   requirements of any claims that depend on the independent

18   claim, and thus, whether those claims have also been

19   infringed.  A dependent claim includes all the requirements

20   of any of the claims to which it refers plus additional

21   requirements of its own.

22          You may find direct infringement based on as

23   little as one instance of the claimed use being performed.

24   Proof of direct infringement may be based on circumstantial

25   evidence.

1          4.2.2, Affirmative Actions Intended to Cause

2    Infringement.

3          GSK must prove by a preponderance of the

4    evidence that Teva took actions after January 8, 2008 with

5    specific intent to cause physicians to engage in infringing

6    acts.   This can be shown through direct or circumstantial

7    evidence.

8          In order to establish active inducement of

9    infringement, it is not sufficient that physicians directly

10   infringe the '000 patent.   Nor is it sufficient that Teva

11   was aware of acts by others that would directly infringe.

12   Rather, in order to find inducement, you must find that Teva

13   intended others to use its products in at least some ways

14   that would infringe the asserted claims of the '000 patent,

15   took affirmative acts to encourage direct infringement, and

16   that those actions actually caused the direct infringement

17   of the asserted claims of the '000 patent.

18         The parties do not dispute that a substantial

19   percentage of the uses of carvedilol do not infringe the

20   claims of the '000 patent.   GSK must prove by a

21   preponderance of the evidence that Teva took affirmative

22   actions intending to induce infringement.

23         Among the evidence on which GSK has relied in

24   attempting to show that Teva induced infringement of the

25   '000 patent is evidence of statements in Teva's label for

1    its generic carvedilol product.  I remind you that there are

2    two labels at issue in this case.  The first is the

3    so-called Skinny-Label or Partial Label from January 8, 2008

4    through April 30, 2011.  The second label has been referred

5    to as the Amended Label or Full Label, which was available

6    from May 1, 2011 through the expiration of the '000 patent

7    on June 7, 2015.  You will need to consider each label

8    separately.

9            GSK has also relied on the fact that Teva's

10   generic product has an AB rating.  The fact that Teva

11   obtained an AB rating for its generic product is not by

12   itself a sufficient basis to find that Teva had an intent to

13   infringe.

14           4.2.3, Knowledge That the Acts, If Taken, Would

15   Constitute Infringement.

16           GSK must prove by a preponderance of the

17   evidence that Teva was aware of the '000 patent.  GSK must

18   also prove by a preponderance of the evidence that Teva knew

19   that the acts it induced physicians to take would, if taken,

20   constitute infringement of the '000 patent, or that Teva

21   believed that there was a high probability that the actions

22   taken by physicians would infringe the '000 patent and

23   took deliberate steps to avoid learning of that

24   infringement.

25           Inducing infringement cannot occur

1    unintentionally.  It is not enough for the accused inducer

2    to lead another to engage in conduct that happens to amount

3    to infringement.  Rather, to induce infringement, the

4    accused inducer must persuade another to engage in conduct

5    that the inducer knows -- or believes with high probability,

6    but deliberately avoided confirming -- is infringement.

7                   4.2.4, Inducement Must Cause Direct

8    Infringement.

9                   Finally, GSK must prove that Teva's alleged

10   inducement, as opposed to other factors, actually caused

11   physicians to directly infringe the '000 patent.  This means

12   that Teva cannot be liable for induced infringement where

13   GSK does not show that Teva successfully communicated with

14   and induced a third-party direct infringer and that the

15   communication was the cause of the direct infringement by

16   the third-party infringer.

17                   Like all other disputed issues in this case,

18   this final element of induced infringement can be proven by

19   circumstantial evidence.  GSK is not required to present

20   hard proof of any direct infringer physician stating, for

21   example, that she read Teva's labels or other Teva materials

22   and that these labels or other Teva materials caused her to

23   prescribe Teva's generic carvedilol in an infringing manner.

24   GSK must prove that Teva's actions led physicians to

25   directly infringe a claim of the '000 patent, but GSK may do

1    so with circumstantial -- as opposed to direct -- evidence.

2                    4.3, Willful Infringement.

3                    If you have decided that Teva has induced

4    infringement, you must go on and address the additional

5    issue of whether or not this infringement was willful.  To

6    prove willful infringement, GSK must prove by a

7    preponderance of the evidence that Teva had knowledge of the

8    '000 patent, and that Teva's conduct was reckless, willful,

9    wanton, malicious, committed in bad faith, deliberate,

10   consciously wrongful, flagrant, or as it may be described --

11   characteristic of a pirate to determine whether Teva acted

12   willfully, consider all of the facts.

13                   If you do decide that there was willful

14   infringement, that decision should not affect any damages

15   award you give in this case.

16                   That brings us to page 33, .5, Invalidity.

17   Section 5.1, Invalidity Generally.

18                   The granting of a patent by the United States

19   Patent and Trademark Office carries with it the presumption

20   that the patent is valid.  The law presumes that the Patent

21   and Trademark Office acted correctly in issuing the patent.

22   Each of the asserted claims is presumed valid independently

23   of the validity of each other claim.  This presumption puts

24   the burden on Teva of proving invalidity by clear and

25   convincing evidence on a claim-by-claim basis; that is, you

must be left with an abiding conviction that the asserted

claims of the '000 patent are invalid.  This burden may be

more difficult to meet when the accused infringer attempts

to rely on prior art that was before the Patent Examiner

during prosecution.

Patent invalidity is a defense to patent

infringement.

Even though the Patent Office examiner allowed

the claims of the patent, you have the ultimate

responsibility for deciding whether the claims of the patent

are proven to be invalid.  For a patent to be valid, the

subject matter claimed in the individual claims of the

patent must be new, nonobvious, and the specification of the

patent must contain a sufficient written description of the

claimed invention.  A patent cannot take away from the right

of anyone who wants to use what was already known or used by

others, or what would have been obvious to those of skill in

the art at the time the invention was made.

Teva alleges that the '000 patent is invalid

because:

One, claims 1 to 3 and 6 to 9 are anticipated by

David Kelly's 1993 article, "Carvedilol in Heart Failure,"

which I will refer to as "Kelly 1993."

Two, claims 1 to 3 and 6 to 9 are obvious in

light of the prior art.

1    And, three, claim 8 lacks an adequate written

2    description because the specification does not suggest the

3    inventors were in possession of methods for reducing

4    mortality caused by CHF using carvedilol.

5    I will now instruct you in more detail why Teva

6    alleges that the asserted claims of the '000 patent are

7    invalid.

8    5.2, Level of Ordinary Skill.

9    Patent invalidity defenses are evaluated from

10   the perspective of a hypothetical person of ordinary skill

11   in the art.  The hypothetical person of ordinary skill in

12   the art is presumed to be aware of all the prior art at the

13   time of the invention.  You are to determine the level of

14   ordinary skill in the art to which the claimed invention

15   pertains at the time the claimed invention was made.  In

16   deciding what the level of ordinary skill in the relevant

17   field is, you should consider all the evidence introduced at

18   trial, including but not limited to:  The levels of

19   education and experience of other persons actively working

20   in the field.

21   5.3, Anticipation.

22   In order for someone to be entitled to a patent,

23   the invention must actually be new.  In general, inventions

24   are new when the identical invention as claimed has not been

25   used or disclosed before.  If the claim is not new, we say

that it was anticipated by prior art.  Prior art is the

general body of knowledge in the public domain, such as

articles or other patents before the claim was made.  A

claim that is anticipated by the prior art is not entitled

to patent protection.

Anticipation must be proved on a claim-by-claim

basis.  In this case, Teva alleges that claims 1 to 3 and 6

to 9 of the '000 patent are anticipated by the Kelly

reference.  Teva must convince you of this by clear and

convincing evidence, i.e., that the evidence leaves you with

an abiding conviction that it is highly probable that the

claims are invalid.  To anticipate a claim, each and every

element in the claim must be present in a single item of

prior art, and arranged or combined in the same way as

recited in the claim.  You may not combine two or more items

of prior art to find anticipation.

To anticipate the invention, the disclosure in

the prior art reference does not have to use the same words

as the claim, but all of the requirements of the claim must

be there, either stated expressly or inherently, so that

someone of ordinary skill in the art to which the claimed

invention pertains, looking at that one reference, could

make and use the claimed invention.  Thus, for purposes of

anticipation, you should consider that which is expressly

stated or present in the item of prior art, and also that

1    which is inherently present.

2            A party claiming inherent anticipation must

3    prove by clear and convincing evidence that the allegedly

4    inherent element necessarily is present.  Occasional results

5    are not inherent.  A claim is inherently anticipated when

6    the claimed invention inherently (necessarily) results from

7    practice of what is disclosed in the written reference, even

8    if the inherent disclosure was unrecognized or unappreciated

9    by one of ordinary skill at the time of the reference.

10           In assessing Teva's anticipation defense, you

11   must decide whether Teva has proven by clear and convincing

12   evidence that Kelly expressly or inherently discloses to a

13   person of ordinary skill in the art all the physical steps

14   of the claimed treatment method.  Thus, you must compare the

15   physical steps of the patent with the physical steps of the

16   prior art method and assess whether there is a manipulative

17   difference between them.  One example of a manipulative

18   difference would be if a patented method and the prior art

19   method are directed to treatment of two different patient

20   populations.  If there is no difference between the steps of

21   the prior art and patented method, then the result is

22   inherent and the claim is anticipated.

23           Prior art that discloses a generic use can

24   anticipate a claim applying a more specific use that falls

25   within the generic use.  The question is whether one of

1  ordinary skill in the art is able to "at once envisage" the

2  more specific use provided in the asserted claim based on

3  the more generic use provided in the prior art.

4  　　　　In addition, in order for a prior art reference

5  to anticipate a claim, it must enable a person of ordinary

6  skill in the art to make and use the invention without

7  undue experimentation.  The prior art reference must be

8  sufficiently described to place the public in possession of

9  the invention such that persons of skill would know how to

10  practice or carry out the claimed method in light of the

11  reference.  For purposes of anticipation, a prior art

12  printed publication, such as Kelly, is presumed to be

13  enabling.  GSK bears the burden of proving nonenablement of

14  Kelly by a preponderance of the evidence.  With respect to

15  nonenablement of Kelly, the sole question for you to decide

16  is whether Kelly is too theoretical to be enabled.  Teva

17  bears the ultimate burden to show anticipation by clear and

18  convincing evidence.

19  　　　　When considering the question of enablement of

20  the prior art, you may consider other prior art references.

21  Anticipation does not require actual performance of

22  suggestions in a disclosure.  Proof of efficacy is not

23  required for a prior art reference to be enabling.  You

24  must make your decision whether or not the degree of

25  experimentation required is undue based upon all of the

1    evidence presented to you.  You should determine whether or

2    not, in the context of the Kelly publication and the state

3    of the art at the time of GSK's patent application, a person

4    having ordinary skill would need to experiment unduly to

5    make and use the full scope of the printed publication.

6            Some factors you may consider in determining

7    whether it would take undue experimentation to practice the

8    claimed method include:  (1) the quantity of experimentation

9    necessary; (2) the amount of direction or guidance required;

10   (3) the presence or absence of working examples; (4) the

11   nature of the invention; (5) the state of the prior art; (6)

12   the relative skill of those in the art; (7) the

13   predictability or unpredictability of the art; and (8) the

14   breadth of the claims.

15           Finally, in considering Teva's anticipation

16   defense, you must take into account the following rulings

17   that I have made:

18           1.  Kelly discloses administering carvedilol

19   with an ACE inhibitor as required by claim 1 of the '000

20   patent.

21           2.  Kelly discloses administering a

22   "therapeutically acceptable amount" of carvedilol in "daily

23   maintenance dosages" as required by claim 1 of the '000

24   patent.

25           3.  The inherency arguments advanced by

1    applicants to the Patent Office during prosecution are not

2    the same inherency arguments now being advanced by Teva in

3    this case.

4              5.4.   Obviousness -- Generally.

5              Even though an invention may not have been

6    identically disclosed or described before it was made by an

7    inventor, in order to be patentable, an invention must not

8    have been obvious to a person of ordinary skill in the art

9    at the time the invention was made.

10             Teva contends that the asserted claims of the

11   '000 patent are invalid for obviousness.  Teva bears the

12   burden of proving obviousness by clear and convincing

13   evidence.  To establish that a patent claim is invalid for

14   obviousness, Teva must show, by clear and convincing

15   evidence, that the claimed invention would have been obvious

16   to a person having ordinary skill in the art at the time

17   the invention was made.  In determining whether the claimed

18   invention was obvious, you must consider each claim

19   separately.  You should not use hindsight, such as by using

20   the '000 patent as a roadmap to select from the prior art

21   and retrace the path of the inventors.  In other words, you

22   should only consider what was known prior to the invention

23   date, without the benefit of the later '000 patent and what

24   that patent teaches.

25             In order to be patentable, an invention must

1  not have been obvious to a person of ordinary skill in the

2  art at the time the invention was made.  The issue is not

3  whether the claimed invention would be obvious today to you,

4  as a layperson, to me as a judge, or to a genius in the art,

5  but whether it would have been obvious to one of ordinary

6  skill in the art at the time it was made.  The existence of

7  each and every element of the claimed invention in the prior

8  art does not necessarily prove obviousness.  Most, if not

9  all, inventions rely on building blocks of prior art.  To

10 show obviousness, the law does not require that the prior

11 art provide proof, to a statistical certainty, that the

12 claimed result would work.  In the context of obviousness,

13 only a reasonable expectation of success is required, not

14 conclusive proof or absolute predictability.

15         You must put yourself in the place of a person

16 of ordinary skill in the art at the time of invention.  In

17 addition, you may consider whether there was a reason to

18 combine or modify the prior art references in the fashion

19 claimed by the patent at issue.  To find that the prior art

20 rendered a claimed invention obvious, you must find that a

21 person having ordinary skill in the art would have had a

22 reasonable expectation of successfully accomplishing the

23 claimed method.

24         In determining obviousness or nonobviousness of

25 the subject matter of each of the asserted claims, you

should take the following steps:

        1.   Determine the scope and content of the prior art;

        2.   Identify the differences, if any, between each asserted claim and the prior art;

        3.   Determine the level of ordinary skill in the pertinent art at the time the invention of the patent was made; and

        4.   Consider objective factors of nonobviousness.

        Against this background, you will then decide whether the subject matter of each asserted claim would have been obvious or nonobvious to a person of ordinary skill in the pertinent art.

        5.4.1.  Scope and Content of the Prior Art.

        As I just instructed you, in deciding whether or not the claimed invention is obvious to one of ordinary skill in the art, you must first determine the scope and content of the prior art.  This means that you must determine what prior art is reasonably pertinent to the particular problem with which the inventor was faced.  Prior art is reasonably pertinent if it is in the same field as the claimed invention or is from another field that a person of ordinary skill would look to in trying to solve the problem the named inventor was trying to solve.

### 5.4.2.  Differences Between the Claimed
Invention and Prior Art.

You should analyze whether there are any
relevant differences between the prior art taken as a whole
and the asserted claims of the '000 patent from the view of
a person of ordinary skill in the art as of February 8,
1995.  Your analysis must determine the impact, if any, of
such differences on the obviousness or nonobviousness of the
invention as a whole, and not merely some portion of it.
Keep in mind that a claim is not proved obvious merely by
demonstrating that each of the elements existed in the prior
art.  Most, if not all, inventions rely on building blocks
of prior art.  Therefore, you should consider the prior art
as a whole and determine whether a reason existed at the
time of the invention that would have prompted a person of
ordinary skill in the art in the relevant field to combine
the known elements in the way the claimed invention does.

The reason could come from the prior art, the
background knowledge of one of ordinary skill in the art,
the nature of the problem to be solved, market demand, or
common sense.  You may also consider whether the problem or
need was known, the possible approaches to solving the
problem or addressing the need were known and finite, and
the solution was predictable through use of a known option.
Accordingly, you may evaluate whether there was some

1    teaching, suggestion, or motivation to arrive at the claimed

2    invention before the time of the claimed invention although

3    proof of this is not a requirement to prove obviousness.

4    Teachings, suggestions, and motivations may be found in

5    written references including the prior art itself.  However,

6    teachings, suggestions, and motivations may also be found

7    within the knowledge of a person with ordinary skill in the

8    art, including inferences and creative steps that a person

9    of ordinary skill in the art would employ.  Additionally,

10   teachings, suggestions, and motivations may be found in the

11   nature of the problem solved by the claimed invention, or

12   any need or problem known in the field of the invention at

13   the time of and addressed by the invention.

14           In analyzing the relevance of the differences

15   between a claimed invention and the prior art, you do not

16   need to look for precise teaching in the prior art directed

17   to the subject matter of the claimed invention.  On the

18   other hand, if the combination of known elements yielded

19   unexpected or unpredictable results, or if the prior art

20   teaches away from combining the known elements, then this

21   evidence would make it more likely that the claim that

22   successfully combined those elements was not obvious.

23           5.4.4.  Level of Ordinary Skill.

24           I have already given you instructions about how

25   to determine the level of ordinary skill at Instruction 5.2.

1          **5.4.4.   Objective evidence of nonobviousness.**

2          You must also take into account any objective

3    evidence (sometimes called "objective indicia" or "secondary

4    considerations") that may shed light on whether the claims

5    were obvious.  "Objective indicia" or "secondary

6    considerations" must be considered before a conclusion on

7    obviousness is reached.

8          "Objective indicia" or "secondary

9    considerations" can include:

10         (A)  Whether the invention was commercially

11   successful at least in part as a result of the merits of the

12   claimed invention (rather than the result of design needs or

13   market-pressure advertising or similar activities);

14         (B)  Whether the invention satisfied a long-felt

15   need;

16         (C)  Whether others copied the invention;

17         (D)  Whether the invention achieved unexpected

18   results compared to the closest prior art; evidence of

19   unexpected results may be used to rebut a case of

20   obviousness even if that evidence was obtained after the

21   patient's filing or issue date; there is no requirement that

22   an invention's properties and advantages were fully known

23   before the patent application was filed, or that the patent

24   application contains all of the work done in studying the

25   invention;

1        **(E)   Whether others tried and failed to make the**

2     **invention;**

3        **(F)   Whether others in the field praised the**

4     **invention;**

5        **(G)   Whether persons having ordinary skill in**

6     **the art of the invention expressed surprise or disbelief**

7     **regarding the invention;**

8        **(H)   Whether the inventor proceeded contrary to**

9     **accepted wisdom in the field; and**

10        **(I)   Whether others invented the invention at**

11     **roughly the same time.**

12        **GSK has the burden to show evidence of**

13     **"objective indicia" or "secondary considerations" and to**

14     **show that there is a connection, sometimes called a "nexus,"**

15     **between the evidence showing any of these factors and the**

16     **claimed invention, if this evidence is to be given weight by**

17     **you in arriving at your conclusion on the obviousness issue.**

18     **However, Teva always maintains the ultimate burden to show**

19     **obviousness by clear and convincing evidence, taking into**

20     **account any objective indicia that you may find.**

21        **5.5.   Written Description.**

22        **Teva contends that the asserted claims of the**

23     **'000 patent are invalid for lack of an adequate written**

24     **description.   Teva has the burden of proving lack of**

25     **adequate written description for each asserted claim by**

1    clear and convincing evidence.

2              The law requires that a patent application

3    contain an adequate written description of the invention to

4    ensure that the inventor was in possession of the invention

5    at the time the patent application was filed.

6              The written description requirement is satisfied

7    if a person having ordinary skill reading the patent

8    application would have recognized that the application

9    describes the full scope of the claimed invention as it is

10   finally claimed in the issued patent and that the inventor

11   actually possessed that full scope by the filing date of the

12   relevant application.

13             In the patent application process, the applicant

14   may keep the originally filed claims, or expand, narrow or

15   change the claims between the time the patent application is

16   first filed and the time a patent issued.  An applicant may

17   amend the claims or add new claims.  The written description

18   requirement ensures that the issued claims correspond to the

19   scope of the written description that was provided in an

20   application.

21             In deciding whether a specification satisfies

22   this written description requirement, you must consider the

23   description from the viewpoint of a person having ordinary

24   skill in the field of technology of the patent when the

25   application was filed.  The written description requirement

1    may be satisfied by any combination of words, structures,

2    figures, diagrams, formulas, experiments, data, et cetera,

3    contained in the patent application.

4          I'm now at Section 6 on Page 48.  Section 6 is

5    Patent Damages.

6          6.1.  Damages Introduction.

7          If you find that Teva induced infringement of

8    any valid claim of the '000 patent, you must then consider

9    what amount of damages to award to GSK.  I will now instruct

10   you about the measure of damages.  By instructing you on

11   damages, I am not suggesting which party should win this

12   case, on any issue.  If you find that each of the asserted

13   claims is either invalid or not infringed, then you need not

14   address damages in your deliberations.

15         The damages you award must be adequate to

16   compensate GSK for the infringement.  They are not meant to

17   punish an infringer.  Your damages award, if you reach this

18   issue, should put GSK in approximately the same financial

19   position that it would have been in had the infringement not

20   occurred.

21         GSK has the burden to establish the amount of

22   its damages by a preponderance of the evidence.  In other

23   words, you should award only those damages that GSK

24   establishes that it more likely than not suffered.  GSK must

25   prove the amount of damages with reasonable certainty, but

1    need not prove the amount of damages with mathematical

2    precision.  You may not award damages that are speculative,

3    damages that are only possible, or damages that are based on

4    guesswork.

5              There are different types of damages that GSK

6    may be entitled to recover.  In this case, GSK seeks lost

7    profits.  Lost profits consist of any actual reduction

8    in business profits GSK suffered as a result of Teva's

9    infringement.  Teva contends that lost profits are not

10   available to GSK, and a reasonable royalty is the proper

11   measure of damages.  A reasonable royalty is defined as

12   the money amount GSK and Teva would have agreed upon as a

13   fee for use of the invention at the time prior to when

14   infringement began.

15             I will now give you more detailed instructions

16   regarding damages.

17             6.2.  Date Damages Begin and End.

18             GSK filed this lawsuit on July 3, 2014.  GSK may

19   seek damages for up to six years before this lawsuit was

20   filed.  The '000 patent expired on June 7, 2015.  Therefore,

21   the maximum period over which GSK may recover damages is

22   from July 3, 2008 through June 7, 2015.

23             In determining damages, you must determine when

24   the damages began.  There are two potential damages starting

25   dates in this case.  The first date is July 3, 2008, which

1    is when Teva was selling its generic carvedilol with the

2    Skinny Or Partial Label, and which under the law is the

3    maximum time period for which GSK may collect damages

4    against Teva for infringement of the '000 patent.  The

5    second date is May 1, 2011, which is the date that Teva

6    amended to its full label.  You must decide which of these

7    damages starting dates to apply based on the facts.

8                    6.3, Lost Profits.

9                    GSK is seeking lost profits damages in this

10   case.  To prove lost profits, GSK must show a causal

11   relationship between Teva's induced infringement and GSK's

12   loss of profits.  GSK must show that, but for Teva's

13   infringement, GSK would have made additional profits through

14   the sale of all or a portion of the sales of carvedilol made

15   by Teva.  GSK must prove this by a preponderance of the

16   evidence, more likely than not.  Part of your job is to

17   determine what the customers who purchased carvedilol from

18   Teva would have done if the alleged infringement had not

19   occurred.  It is important to remember that the profits I

20   have been referring to are the profits allegedly lost by

21   GSK, not the profits, if any, made by Teva on the allegedly

22   infringing sales.

23                    6.3.1, Lost Profits -- the Panduit Factors.

24                    GSK has proven its lost profits if you find

25   that, with respect to the sale of Teva's product that were

1    used to infringe the '000 patent and for which the

2    infringement was caused by Teva's inducement, GSK has proven

3    each of the following factors by the more likely than not

4    standard:

5          One, there was a demand for the patented method.

6          Two, GSK would have captured infringing sales

7    made by Teva, despite the availability of other acceptable

8    noninfringing substitutes.

9          Three, that GSK had the manufacturing and

10    marketing ability to make the sales of Teva's carvedilol

11    actually made by Teva and for which GSK seeks an award of

12    lost profits -- in other words, that GSK was capable of

13    satisfying the demand.

14          And, four, the amount of profit that GSK would

15    have made if Teva had not infringed.

16          I will now explain each of these factors.

17          6.3.2, Lost Profits -- Demand.

18          The first factor asks whether there was demand

19    for the patented method in the relevant market.  GSK can

20    prove demand for the patented invention by showing

21    significant sales of GSK's Coreg for accomplishing a claimed

22    method or significant sales of Teva's carvedilol for

23    accomplishing a claimed method but not for sales of these

24    products for purposes of accomplishing a use that is not

25    claimed in the '000 patent.

1           6.3.3, Lost Profits -- Acceptable Noninfringing

2    Substitutes.

3           The second factor asks whether there were

4    noninfringing, acceptable substitutes for the patented

5    products in the marketplace and the impact of such

6    substitute products on the marketplace absent the sale of

7    Teva's carvedilol.  If the realities of the marketplace are

8    that competitors other than GSK would likely have captured

9    some or all of the sales made by Teva, even despite a

10   difference in the products, then GSK is only entitled to

11   lost profits on those sales that it would have captured, not

12   those sales that would have been captured by others.

13          To be an acceptable substitute, the products

14   must have had one or more of the advantages of the patented

15   invention that were important to the actual buyers of the

16   infringing products, not the public in general.  The use of

17   the acceptable substitutes also must not infringe the patent

18   because they did not include all the features required by

19   the patent.  For example, the use of generic carvedilol

20   supplied by companies other than Teva was not an acceptable

21   noninfringing substitute.  The acceptable substitutes, in

22   addition, must have been available during the damages

23   period.  An acceptable noninfringing substitute is available

24   if, during the damages period, a competitor or Teva had all

25   the necessary equipment, materials, know-how, and experience

1    to design and manufacture the acceptable noninfringing

2    substitute.  The substitute need not have actually been sold

3    at that time.  If you determine that some of Teva's

4    customers would just as likely have purchased a

5    noninfringing acceptable product, then GSK has not shown it

6    lost those sales but for Teva's sales.

7                6.3.4, Lost Profits -- Capacity.

8                The third factor asks whether GSK had the

9    manufacturing and marketing ability to actually make the

10   sales it allegedly lost due to Teva's infringement.  GSK

11   must prove that it could have supplied the Coreg needed to

12   make the sales GSK said it lost.  GSK must also prove that

13   it is more likely than not it had the ability to market and

14   sell the additional Coreg.

15               6.3.5, Lost Profits -- Amount of Profit.

16               A patent holder may calculate its lost profits

17   on lost sales by computing the lost revenue for sales it

18   claims it would have made but for the infringement, and

19   subtracting from that figure the amount of additional costs

20   or expenses it would have ignored in making those lost

21   sales, such as cost of goods, sales costs, packaging costs,

22   and shipping costs.  Certain fixed costs that do not vary

23   with increase in production or scale, such as taxes,

24   insurance, rent, and administrative overhead, should not be

25   subtracted from a patent holder's lost revenue.

1        GSK is not entitled to lost profits based on any

2    infringement of the '000 patent that was not caused by

3    Teva's inducement.  GSK has the burden of proving the amount

4    of any direct infringement that was caused by Teva's

5    inducement with reasonable certainty.  However, GSK need not

6    provide direct evidence that Teva induced any specific use

7    of Teva's carvedilol according to the patented method to

8    obtain lost profits damages.  In other words, GSK need not

9    demonstrate a one-to-one correspondence between Teva's sales

10   of carvedilol and directly infringing physicians.  GSK may

11   introduce circumstantial evidence of direct infringement by

12   the entire class of physicians prescribing Teva's generic

13   carvedilol for the patented method.

14             6.4, Reasonable Royalty -- Generally.

15        A reasonable royalty is the royalty that would

16   have resulted from a hypothetical negotiation between the

17   patent owner and the alleged infringing just before the

18   infringement began.  In considering this hypothetical

19   negotiation, you should focus on what the expectations of

20   the patent holder and the infringer would have been if they

21   had entered into an agreement at that time, and if they had

22   acted reasonably in the negotiations.  You should assume

23   that both parties to the hypothetical negotiation believed

24   the patent to be valid and infringed and that both parties

25   are willing to enter into a license.  You should also

1    assume that the patent holder and the infringer would have

2    acted reasonably and would have entered into a license

3    agreement.

4              Having that in mind, you may consider any

5    relevant fact in determining the reasonable royalty for the

6    use of a patented invention, including the opinion testimony

7    of experts.  The reasonable royalty you determine must be a

8    royalty that would have resulted from the hypothetical

9    negotiation, and not simply a royalty either party would

10   have preferred.

11             A reasonable royalty is typically made up of,

12   one, a base and, two, a rate (or percentage) that is applied

13   to that base.  The ultimate combination of royalty base and

14   royalty rate must reflect the value attributable to the

15   infringing features of the product, and no more.

16             So that takes us through page 56.  I'm going to

17   stop there and save the rest of the instructions for later.

18   I'm also going to give you a short break at this time before

19   we hear closing arguments.

20             Still no talking about the case during the break

21   and we'll get you back here shortly.

22             (The jury was excused for a short recess.)

23             THE COURT:  We will try to keep the break

24   short.

25             Ms. Brooks, it will be you giving the opening.

1    Is that correct?

2             MS. BROOKS:  Yes Your Honor.

3             THE COURT:  Is it Mr. Downs?

4             MR. DOWNS:  Yes.

5             THE COURT:  You'll be giving the closing?

6             MR. DOWNS:  Yes.  I'm going first though.

7             THE COURT:  You're going first?  What do you

8    mean you're going first?

9             MR. DOWNS:  I thought it was defense first and

10   plaintiffs last.

11            THE COURT:  I'm sorry?  On what basis did you

12   think that?

13            MR. DOWNS:  Oh, I thought from the pretrial.  It

14   doesn't matter.  I will do it either way, Your Honor.

15            THE COURT:  All right.  Was this GSK's

16   understanding?

17            MS. BROOKS:  No, Your Honor.  My understanding

18   was that I would go first and then Mr. Downs would go, and

19   then I would have an opportunity for brief rebuttal to

20   anything he said in his closing.

21            MR. DOWNS:  I guess -- I'm sorry, Your Honor but

22   I do remember a discussion where you asked whether we were

23   going to do defense first and then plaintiff and I thought

24   that was what was agreed upon.  Is it set out in an order

25   otherwise?  I'm sorry if it is.

```
 1                THE COURT:  If you want to point me to

 2   something.  I don't recall offhand.

 3                MR. DOWNS:  All right.  We'll discuss it during

 4   the break.

 5                THE COURT:  All right.  We'll take a short

 6   recess and then we'll check in with you.

 7                (Short recess taken.)

 8                       -  -  -

 9                (Proceedings resumed after the short recess.)

10                THE COURT:  Mr. Downs, I see during the break

11   you've been reminded we're following the ordinary practice.

12   Correct?

13                MR. DOWNS:  Yes.

14                THE COURT:  All right.  Then we will bring the

15   jury in.

16                MS. BROOKS:  Your Honor, may I stand here the

17   way I was for opening?

18                THE COURT:  Yes, you may.

19                MS. BROOKS:  Thank you.

20                (The jury entered the courtroom.)

21                THE COURT:  Ladies and gentlemen, we're now

22   ready to hear closing argument.  We'll first hear from

23   GSK.

24                Good morning, Ms. Brooks.

25                MS. BROOKS:  Good morning.  May I proceed, Your
```

1    Honor?

2              THE COURT:  Yes?

3              MS. BROOKS:  Good morning ladies and gentlemen.

4    It was just over a week ago when I stood right here.  I bet

5    for some of you that seems like a lot longer, but thank you

6    from the bottom of our heart for the attention that you have

7    paid.  It has been amazing.

8              And our whole system, our whole judicial system

9    only works because citizens like you are willing to take

10   time out of their really busy lives to give a company like

11   GlaxoSmithKline and Mary Ann Lukas and Bob Ruffolo and all

12   the men and women that worked for a decade on the Coreg team

13   their day in court.  And during that time, this past six

14   days, you've learned some cardiology.  You've learned some

15   FDA, pharmaceutical regulatory law.  You've even learned

16   some patent law.  I'm sure some of it was more interesting

17   than others, but at the end of the day, what this case

18   really comes down to is choices, choices that a company

19   makes and whether or not they're willing to be held

20   responsible for those choices and the actions that they

21   take.

22             So this was the slide Teva showed in opening,

23   and Teva as you can see has both a branded side to the

24   company and a generic side.  And so Teva's first choice was,

25   do we copy GlaxoSmithKline's Coreg drug, or do we do our own

1    research and development, do our own new drug application?

2    And Teva chose to go ahead and copy.

3            Now, there is nothing wrong with that.  That's

4    how we have generics on the market.  By doing so, they

5    obtained a tremendous advantage.  This is the testimony of

6    Dr. Maness, who tells us that it takes -- it's about

7    $2.6 billion to develop a new drug, and it takes somewhere

8    between 10 and 15 years.  So Teva, by deciding to go the

9    abbreviated new drug application route, saved themselves

10   about $2.6 billion and 10 to 15 years of time.  Once they

11   made that choice, they had certain things they had to do to

12   hold up their end of the bargain.

13           We heard from two regulatory experts, professor

14   Erika Lietzan and Kurt Karst, and they both told us the same

15   thing -- that under this regulatory system, there are

16   certain things that once a company makes a choice to go the

17   ANDA, abbreviated new drug application route, there are

18   certain things once they do that, they have to do.  And here

19   is the slide that I showed in opening.

20           We heard that both the innovator and a company

21   like Teva could go the NDA route, but if they go the ANDA

22   route and there are patents that cover the drug, which

23   you've now learned there are in this case, then they've got

24   to make a choice.  Do they do a paragraph III, which means

25   wait their turn.  Do they do a Paragraph IV, which means

1    challenge the patent or somehow say they're not infringing

2    the patent, or do they do Section viii carveout?  Teva

3    told two.  For the '067 original molecule patent, they chose

4    to go paragraph III and wait their turn.  For the '069

5    patent, which would turn into the '000, they chose to go

6    paragraph 4, and I hope I said paragraph III for the first

7    one -- they chose to go paragraph 4 and challenge the

8    patent.  And so they sent their paragraph 4 challenge to GSK

9    in 2002.

10              Now, we heard from the regulatory experts that

11   once that happens, GSK has actually a right to sue to bring

12   Teva to court and say, if you do that, your generic version

13   of Coreg will be infringing our patent, and then we'll have

14   a lawsuit just like this with all of these lawyers and all

15   of this time and all of this money, or GSK could choose to

16   take the patent that Teva has challenged and send it to the

17   Patent Office along with Teva's challenge and say, Patent

18   Office, I know you've looked at this patent before and you

19   issued it, but look at it again, if you would, in light of

20   what Teva is saying, and see whether or not we can get a

21   patent reissued that addresses Teva's challenges.

22              And so rather than rush to court and do a

23   lawsuit, GSK took the more conservative approach and sent

24   Teva's challenge along with all of the references in Teva's

25   challenge to the Patent Office.

1   Now, I want to digress for a moment because in

2   opening, as a result of GSK sending the patent for reissue

3   at the Patent Office, this is what Teva's attorney argument

4   to you in opening.  He showed you this very slide and he

5   argued to you that once we did that, we, GSK, had no patent

6   protection for the Coreg drug.  And he showed you right

7   here.  He said, gap in patent protection.  They had no

8   patent protection from September of '07 all the way through

9   December of '07.  And he didn't just show you the slide.  He

10  said this to you in opening statement.  Well, it made a huge

11  difference because there was a gap in the patent protection,

12  and so we didn't do anything wrong because their patent was

13  invalid.  And in the case where the patent wasn't there,

14  then there was -- there could be no infringement.

15  In the gap, the problem is they lost their

16  patent protection.  They created the problem.  This is the

17  first of the pointing fingers.  GSK created the problem of

18  not having a patent during the gap.

19  During the gap, there was no patent protection.

20  These are verbatim quotes of what counsel for Teva said to

21  you.

22  Now, the Judge has already instructed you that

23  arguments of counsel are not evidence.  And they're not.

24  But you know what they are?  They are promises.  As officers

25  of the court, we are promising you that this is what we

1    believe the evidence will show.  We're not here to try to do

2    a bunch of hand waving or smoke screen or deflection.  We're

3    here to promise you that at least this is what we have a

4    good faith belief the evidence will show.

5           And this may have been confusing to you when you

6    heard this from Teva's counsel.  Because I had just stood up

7    and said the opposite.  I had just stood up and said, so

8    now, the '069 and the '821 are no more.  That is because the

9    '000 had issued.  They're called the '000, but they were

10   absolutely enforceable, absolutely alive and well until the

11   moment that the '000 came out.

12          And I said, until the '000 issues, it is still

13   known as the patent, as the '069 patent because it is still

14   alive until the one issues and then it kind of takes its

15   place.

16          Now, you must have been thinking, okay, one of

17   you is not giving it to me straight.  One of you is saying

18   it's alive and well and there is patent protection and one

19   of you is saying there is a gap and there is no patent

20   protection.

21          Well, you just heard which one gave it to you

22   straight.  This was the jury instruction, one of them that

23   was just read to you:  3.5.  Effect of Reissue.

24          When a patent owner submits a patent to the

25   United States Patent Office for reissue, the surrender of

1    the original patent takes effect at the moment the reissue

2    is granted.

3              There was no gap.  The '069 was alive and well

4    until the '000 issued in January of '08.  In other words,

5    surrender and reissuance go hand in hand.  Once the Patent

6    Office grants the reissued patent, then the original patent

7    is no longer enforceable.

8              So now let's get back to Teva's choices.

9              Teva choose to go Paragraph IV on the '069

10   and by doing so, they challenged the patent.  But in the

11   meantime, they're allowed to get tentative approval.  And

12   the tentative approval was received on June 9th, 2004.  And

13   Teva says in this press release that they're going to get

14   final approval in 2007.  And that indeed is what happened.

15   They ended up launching in 2007 up.

16             But at this point in time, Teva is telling the

17   world.  This is a press release to everybody, including that

18   class of doctors that the jury instruction talked about:

19   Carvedilol tablets are AB rated and they are the generic

20   equivalent of GlaxoSmithKline's Coreg tablets and are

21   indicated for the treatment of heart failure.

22             So Teva has represented to the world that

23   their drug that they gotten tentative approval on, that

24   they expect final approval in 2007, is indicated for the

25   treatment of heart failure.

1    So now we have, we fast forward to January of

2    '07.  Teva learns that their attempt to basically kill the

3    '069 patent has failed.  Because the '069 patent, according

4    to the Patent Office, is going to reissue.  And this says

5    Notice of Allowance.  We have looked at everything.  It has

6    taken us four years to do it.  We looked at it and it is

7    going to reissue as the '000.  And,

8    In fact, this is the front page of that Notice

9    of Allowance.  It's got the gold seal from the Patent and

10   Trademark Office.  It is a certified copy.  And it tells the

11   world that there was a filing date of the reissue, November

12   25th, 2003 and the new patent number is going to be the '000

13   and it is going to issue on January 8th, 2008.  So Teva

14   knows this when it makes its next group of choices.

15   And here comes its next choice.  It is now July

16   30th, 2007.

17   Teva has represented to the Patent Office

18   repeatedly that they want to be full label.  They're doing a

19   Paragraph IV certification.  And then, all of a sudden, on

20   July 30th of 2007, Teva decides they don't want to go that

21   way anymore.  They want to take back that choice and now

22   they want to choose the Section viii.

23   And so this is the internal e-mails that I

24   believe Ms. Pastore talked about.

25   And it says:  Betty -- I know that we are

1    waiting for the BPCA language -- I'm not sure what that

2    acronym means -- from the FDA for carvedilol.  But in the

3    meantime we need to carve out congestive heart failure ASAP

4    because we are going to change the way we are filing.

5              And now Teva says that once we did that, then we

6    have no choice about what our label was going to look like

7    because the FDA was going to decide that.

8              No, Teva was actively trying to find another

9    generic label that had carved out so they could copy it.

10             Jane -- IVAX has withdrawn their ANDA for

11   carvedilol.  Could you please send us a copy of the insert

12   ASAP?  I think you were originally going fo file it with CHF

13   carved out?  Please also send any labeling review comments

14   that you received.

15             So this is Teva actively making a choice that

16   they're going to carve out and actively deciding what their

17   label is going to look like.

18             And they did this -- I got ahead of myself.

19   There we go.

20             So now what happens?  That is on July 30th of

21   2007.

22             Now, on August 1st of 2007, Teva gets a letter

23   from McKesson, that e-mail from McKesson.  I talked about it

24   in opening.  And I don't know if you remember, I said they

25   searched -- we searched and searched, and Teva says they

1    did, and we never could find an answer to this e-mail.  And

2    it may be Ms. Pastore when she comes to court will give us

3    an answer because she couldn't remember at her deposition.

4    And she couldn't remember here in court either ever

5    answering.

6            I think we know now why, because there never was

7    an answer.  And here is why there wasn't an answer.

8            This is McKesson saying I have read that Teva

9    filed a Paragraph IV challenge to the two patents in the

10   Orange Book relating to the use of the drug for congestive

11   heart failure for Coreg.  It looks like the other generics

12   did a carveout.  So their product will not include an

13   indication for the use of the drug for congestive heart

14   failure, unlike yours.

15           This is what their largest customer McKesson is

16   saying to them:

17           Does this mean that only your product would be

18   "correct" to dispense in the place of the brand Coreg?

19           And so what McKesson is saying is we have been

20   led to believe by you, Teva, that your drug is going to be

21   approved for the use for treatment of congestive heart

22   failure?  And Teva doesn't want to disabuse their biggest

23   customer.  They don't want to say, well, actually two days

24   ago, we decided we were going to carve out and take that off

25   the label.

1       They not only didn't want McKesson to know it,

2  as I walk through the evidence, you are going to see they

3  didn't want the doctors to know it.  They wanted the world

4  to continue to believe as they told the world in 2004 that

5  they had been approved for congestive heart failure.

6       And how do we know that?  Let's compare the 2004

7  press release to the 2007.

8       2004, they're saying we have been approved.

9  Tentatively approved for congestive heart failure.  And we

10  expect final approval in 2007.

11       2007, they get the final approval.  They tell

12  the world that.  They say U.S. Food and Drug Administration

13  has granted final approval -- and they choose their words

14  very carefully here -- for a generic version of GSK's

15  cardiovascular agent Coreg.

16       Not one word about it not having been approved

17  for heart failure.  Not one word.

18       And what does Dr. McCullough tell us that that

19  means to a physician?  That class of doctors you read about

20  in the jury instruction.  They're looking at the side by

21  side press releases.  What are they told?

22       Dr. McCullough tells us, well, looking at the

23  present release of 2007, what is Teva telling you, Dr.

24  McCullough?

25       Well, Teva is telling doctors right in the title

1    that they have approval and actual shipment of generic Coreg

2    tablets, that the FDA granted final approval.

3              Now, what did that tell you, Dr. McCullough, and

4    your colleagues, as a physician about what Teva's generic

5    carvedilol, what indications it could be used for?

6              Answer:  It could be used for all the

7    indications.

8              Teva wanted the doctors to believe that so they

9    would prescribe generic carvedilol in lieu of our drug for

10   the treatment of heart failure patients.

11             And I asked him further:  Would that include

12   heart failure in your mind?

13             Sure.

14             Well, Dr. McCullough, I don't see the word

15   "heart failure" in this press release?  So what makes you

16   think they had been approved for heart failure?

17             Well, they use the term "cardiovascular agent."

18             Which has significance to the doctors.

19             And in looking at this press release, Dr.

20   McCullough, did Teva convey to you that it had not been

21   approved for that?

22             Answer:  No.

23             So now, there is one other thing they put in

24   that press release.  Remember it said that Coreg had sold

25   $1.7 billion?  That was another choice they chose to put

1  that in there because Jill Pastore asked:  I included IMS

2  data for the brand.  That is the $1.7 billion.  But please

3  note that we did a carveout of the brand indications from

4  the insert ... not sure what the current company policy is

5  about including data when we've omitted an indication.

6            Well, we found out what the company policy was,

7  which is once again try to lead the world to believe and all

8  the doctors to believe that they had been approved for

9  congestive heart failure.

10            And so from 2007 until 2011, even though Teva

11  had not been approved, their generic carvedilol had not been

12  approved for congestive heart failure, they led doctors to

13  believe that it had, thereby inducing them to prescribe

14  generic carvedilol for the treatment of congestive heart

15  failure.

16            Now we come to 2011.  Teva has another choice to

17  make.  They have been notified by FDA that the patents they

18  carved out around are no longer there.  They're no longer

19  listed in the Orange Book.  Why?  Because the '069 has now

20  turned into the '000, so you can't carve out around patents

21  that are no longer in the Orange Book.  So now Teva has

22  another choice to make.

23            And the FDA asks them what their position is on

24  the '000.  There is a new patent listed in the Orange Book.

25  Please provide information regarding your position on the

1   '000 due to expire December 7, 2015.

2            And as you may remember, when I talked about in

3   opening, I guess they could have chosen to pull their drug

4   off the market until the expiration of the '000, and they're

5   not about to do that.

6            They could have, and should have, as we're going

7   to see in a minute from the regulatory experts, done another

8   Paragraph IV and said, well, we're going to challenge the

9   validity of the '000 patent.

10           Or we're going to -- and/or we're going to say

11  we don't infringe the '000 patent.

12           They didn't choose that either.

13           Or they could have tried to carve out around it

14  again.  But for whatever reason, they saw this as their

15  opportunity to now go full label so that there could be no

16  doubt in anyone's mind that they were practicing the claimed

17  method.

18           What was Teva's response?  Teva's response is

19  it is our belief we received final approval prior to this

20  patent listing.  We're not required to provide certification

21  to this patent.  Is that true?

22           Dr. Lietzan said no.

23           So she was asked this question:

24           From a regulatory perspective, what is Teva

25  telling FDA with that statement?

1    This is a statement I just showed you.

2    She says:  From a regulatory perspective, what

3    they are saying is that they do not have an obligation to

4    pick one of those three, meaning Paragraph III -- and this

5    is a typo, it should be of Paragraph IV.  What they're

6    saying is we don't have to pick one of these options; is

7    that correct?

8    Answer:  No.

9    That was her expert opinion:  No, that's not

10   correct.

11   Why not?

12   Because in this particular instance, they were

13   adding back a new use to their package insert.  After

14   approval, if a generic company is amending or supplementing

15   its approved application to add a new indication back in,

16   they are required, required to address the new patent.

17   So, right here, Teva chose to break the

18   regulatory regulations, to break the rules, and to not hold

19   up their end of the bargain that the FDA relies upon to make

20   this whole system work.

21   And Dr. Lietzan wasn't the only one that told us

22   that.

23   Kurt Karst told us the same thing.

24   Now, I'd like to walk you through this slowly.

25   I know you heard the testimony, but there was some really

1       clever almost slight of hand that happened here.

2                    I'm not saying by Mr. Karst.  He was only going

3       to answer the questions he was asked.  Here was the question

4       put to him:

5                    Can you explain why receiving final approval

6       before the patent was listed in the -- before the '000

7       patent was listed in the Orange Book matters here?

8                    And he is telling the truth.  He says:  Yes.  So

9       there's actually an FDA regulation that says, where patents

10      that go into the Orange Book after you have received

11      approval of your ANDA, you're not required to certify to

12      those patents.

13                   Now, wait a minute.  I thought Dr. Lietzan just

14      said you are.  And he is saying you are not.  But he is

15      talking about if you have full label approval, you don't

16      need to now certify to a new patent.

17                   Because in the very next question, he was asked

18      this:

19                   Now, does that regulation apply to supplemental

20      application?

21                   That is what they call it when you are adding a

22      new indication.

23                   And he says:  No, it wouldn't apply to a

24      supplement for a new condition of use.

25                   That's this case.

1    So, right there, he is admitting, although

2    they're trying to make it sound like he is not, he is

3    admitting that, yes, Teva had to certify.

4    So you were here when Ms. Lietzan testified that

5    the FDA policy required an applicant to address patents when

6    the applicant filed a supplement adding a new indication?

7    I was.

8    Do you agree with her that FDA has followed --

9    again, careful word choices -- has followed such a policy?

10    Answer:  Yes, I agree that the FDA has

11    ordinarily followed that policy.

12    And then he is asked this question:

13    All right.  Now, did FDA require Teva to certify

14    to the '000 patent when Teva filed this supplement?

15    Answer.  No, they did not.

16    Of course they did.  It is part of the

17    regulations.  Of course they were required to.  And he just

18    told us in the previous breath that they were required to.

19    Now, did FDA write to Teva and say you are

20    required to?

21    No, Teva as a pharmaceutical company knows what

22    those regulations are.  And we know they know how to file a

23    Paragraph IV because they had done it in 2002 against the

24    '069.

25    But Teva chose none of the above, which means

 1    they were in violation, clear violation of FDA regulations

 2    at that point in time.

 3              And once the label went full label in 2011, that

 4    label reads directly on claim 1 of the '000 patent.

 5              So now let's go to what we're required to prove

 6    as far as inducement is concerned.

 7              This is the inducement jury instruction and it

 8    is very long.  His Honor has already read it to you.

 9              I'm just going to blow out the steps.  There are

10    basically four steps we have to do:

11              First, that there was essentially direct

12    infringement by physicians.

13              Second, that Teva took some affirmative action,

14    either before the '000 patent issued, but then also after.

15    So we've got to show you both actions before and after

16    intending to cause the physicians to infringe.

17              Third, that Teva was aware of the '000 patent,

18    and they knew that infringing acts, if taken, would be

19    direct infringement of the '000, and that there was a high

20    probability those actions were going to -- that that

21    infringement was going to take place.

22              And, fourth, that Teva's inducement, as opposed

23    to other factors, actually caused the physicians to directly

24    infringe.

25              So I boiled them down to this is what we need to

show you:

One.   That doctors directly infringe.

Two.   That Teva took action and continued action after the '000 patent issued intending to cause doctors to infringe.

Three.   They were aware of our patent, they knew there was a high probability that the doctors would infringe, and they induced those doctors to infringe.

Our burden here is by a preponderance of the evidence, more likely than not, 51 percent.  And what did we bring to you, Dr. McCullough?  After he walked, as you may recall, carefully, element by element, claim by claim.

So in your expert opinion, Dr. McCullough, does Teva's partial label and full label both, because we covered both as we marched through the claims, do they meet each and every limitation of claim 1 of the '000 patent?

Yes, it meets each and every one of them.

And so a doctor performing a method of decreasing mortality caused by congestive heart failure in a patient in need thereof would be the direct infringer?

Yes.  And he admitted he, himself, had performed that very method.  Now, to be clear, we are not suing doctors.  We are not -- because they're unknowingly infringing.  They have no idea whether patents are covering drugs.  That's not their responsibility.  That's the company

1  who manufactures the drug's responsibility.

2          So this is what Dr. McCullough said in his

3  expert opinion.  Well, guess what Dr. Zusman said?  He

4  never -- and I would ask you to check your notes on this --

5  he never told you there was not direct infringement by

6  physicians of either the partial label or the full label.

7  He never said it.  Instead what he said was this -- and this

8  is me asking the question.  Remember I put the claim up here

9  on a board.  It was bigger than I was.

10          I said, and so the person that would directly

11  infringe a method claim would be the physician who practices

12  this method of administering carvedilol for more than six

13  months in daily maintenance doses in order to reduce the

14  risk of death in someone suffering from congestive heart

15  failure?

16          Answer:  That is my understanding.

17          Question:  Who, of course, was also taking

18  either an ACE inhibitor or digoxin or a diuretic?

19          That's correct.

20          And he never said, but not in this case.  So he

21  admitted there's direct infringement.  We can check that

22  box.

23          So then Dr. McCullough walked you through and

24  compared -- remember how -- I won't do it again because it

25  took us about an hour-and-a-half to do.  We would look at

1   the partial label and see whether these limitations were in

2   the partial label.  If they were, we'd go to the full label.

3   They were.  And then he checked off each and every box and

4   Dr. Zusman never removed one of these checkmarks.

5               Next, does Teva have knowledge of the patent?

6   This one is an easy one.  Teva said they did.  Right here.

7   This is called an interrogatory response.  Teva became aware

8   of the patent, the '000 patent, on or about January 8, 2008.

9   That's the very day it issued.  So clearly, Teva had been

10  carefully monitoring what was going on in the Patent Office.

11  But besides, they knew it was coming in here earlier when

12  the notice of allowance came out.

13              And Ms. Pastore admitted the same at her

14  deposition.

15              And so how else did they have knowledge of

16  infringement?  Well, these are their labels.  In the full

17  label, heart failure is right on there.  In the partial

18  label, we have left ventricular function following

19  myocardial infarction, where you've got an ejection fraction

20  of less than 40 percent with or without, but with

21  symptomatic heart failure.  That's heart failure.  So even

22  if they took this indication off, they still have plenty of

23  information on their label in order for the partial label to

24  also infringe.  And we've got the dosing and administration

25  for the heart failure, or if that one had been taken off on

1   the partial label, we've still got it here for the left

2   ventricular dysfunction.  And we know that it's for over six

3   months, because there was exposure, meaning to carvedilol.

4   6.3 months for carvedilol, and in the mild to moderate heart

5   failure.  10.4 months in the severe heart failure.  Each and

6   every limitation of claim 1 is met by those labels.

7              But we can do better than that.  Jennifer King

8   told us what Teva's intention was.  There would be patients

9   being treated with Teva's generic who were suffering from

10  congestive heart failure?  And I don't know if you remember

11  her in the deposition when he said it.  She goes, yes, but

12  it was really not given much thought.  Well, it should have

13  been because it's infringement and they were aware of that,

14  and they are supposed to give it thought rather than just

15  trot all over our property.

16             Teva was aware in 2007, when they first

17  launched, that the drug was being prescribed by physicians,

18  its carvedilol generic were being prescribed by physicians

19  for congestive heart failure, and she went, oh, well, yes.

20  Actually, that's a big deal.  That admission is huge.  Teva

21  knew it and they knew they were inducing it, and they never

22  stopped it.

23             The website, Ms. Collier admits that starting in

24  2007, Teva's website advertised to doctors that their drug

25  was, in fact, AB rated.

1    Now, let me stop there for a minute, because in

2    the jury instructions, the Court said that the fact that

3    Teva said they were AB rated isn't enough to prove

4    inducement, and it's not, because what the whisper part is,

5    well, we're AB rated for the indications on the label and

6    they don't tell you that they've carved out.

7    So we have to show you more than just the AB

8    rating.  We have to show you a continuing course of conduct

9    of how Teva, in what context Teva advertised that AB rating

10   and whether or not how it was used and in what way it was

11   used and in what kind of materials it was used over this

12   course of time.

13   So we will.  Here's Teva's website starting in

14   2007, and based on what we showed you in evidence, which is

15   this one, going all the way through to the expiration of the

16   patent.

17   Carvedilol tablets, generic of Coreg tablets.

18   Rating, AB.  Now, if you're a doctor and you're looking at

19   this product catalog, what are you led to believe by this?

20   You are led to believe that Teva is a generic version of

21   Coreg, and Coreg is approved for the treatment of congestive

22   heart failure, and there's nothing in here that disabuses

23   you if what turns out to be not accurate.

24   Now we're building our course of conduct.

25   Spring 2008, product catalog.  Product name, carvedilol

1    tablets.  Brand name, Coreg tablets, AB rated.  You are led

2    to believe they're fully substitutable.

3            October 2009.  This is the generic product

4    reference guide, and this is probably pretty hard to read,

5    so I will read it to you, the top one that's highlighted

6    right here.  Teva Pharmaceuticals is the leading generic

7    pharmaceutical provider.  Teva markets the most generic

8    products, over 400, in fact, exclamation point.  One out of

9    every six prescriptions is filled with a Teva product, one

10   out of six.

11           And what do those prescriptions contain?

12   Identical active ingredients as brand name drugs.  Only the

13   appearance, shape, label and inactive ingredient may differ

14   slightly.  I'm sorry, Teva.  There's another significant

15   difference.  They may not have been approved for all the

16   indications of the branded drug, but Teva doesn't tell you

17   that.  In fact, they say, visit Teva's website,

18   www.TevaUSA.com for more information.  And then in this

19   catalog, what do they have?  The brand equivalent is Coreg.

20   The Teva generic is carvedilol with nary a word that at this

21   point in time in 2009, has not been approved for heart

22   failure.

23           It goes on in their product reference guide.

24   I've already read you that one.  Here is another page.

25   Again, we have the brand equivalent.  It says here it's

1    Coreg, Teva's generic carvedilol, again, never telling you

2    that this was not for use with heart failure patients.

3            We've got a 2009 product catalog.  We got a 2011

4    product catalog.  Carvedilol tablets, AB rated and

5    bioequivalent to Coreg tablets.

6            Now, this one right here is kind of interesting,

7    the context in which they use it, because we heard witnesses

8    from Teva say, oh, all AB rating means is we're

9    bioequivalent.  Well, if that's all you want the public to

10   think, then why are you saying both of them?  Why are you

11   saying you're both AB rated and bioequivalent?  You are

12   saying that because you want to induce the doctors to

13   believe that they should prescribe Teva's generic carvedilol

14   for the treatment of heart failure.

15           The Monthly Prescribing Reference.  Now we are

16   post 2011, so let me stop there for a moment because this is

17   significant.

18           So pre-2011, Teva is basically telling you,

19   look, our label doesn't say to use with congestive heart

20   failure, so if the doctors do that, that's their problem,

21   not ours.  We can't be held responsible for that.

22           But now post 2011, their label does say it.  So

23   now they have a different defense.  Their defense for post

24   2011 is doctors don't read the label.  Remember Dr. Zusman

25   said that.  Doctors do not read the label.  Well, Teva sure

1    as heck is telling doctors to read the label.  Dear

2    Healthcare Professional -- that's a doctor -- Teva is

3    committed to the continuing professional development of

4    clinicians by offering high quality educational tools to

5    serve as convenient authoritative references and daily use,

6    and then they tell them how the MPR systems -- and

7    apparently, poor Dr. Zusman was the only one that didn't get

8    this compliments of Teva.  They are telling you that this

9    guide can be used in your armamentarium.

10              Again, I apologize for the really small print up

11   here, so I will read it to you.  The first one highlighted

12   on the right says, the MPR health systems pharmacy drug

13   reference is an up-to-date pharmacy drug reference to

14   commonly prescribe pharmaceuticals as well as certain OTC,

15   meaning over-the-counter, products.

16              The next highlighting.  If any questions arise

17   about information in the MPR, the clinician should verify it

18   against labeling.  They are telling them, read the label, or

19   by contacting the company manufacturing it, Teva.

20              And, lastly, they say, the clinician must --

21   this isn't even optional -- must be familiar with the full

22   product labeling provided by -- it doesn't say familiar with

23   the originator or the innovator, it says provided by the

24   manufacturer, that's Teva, of every product he or she

25   prescribes.

1           They are telling the doctors, read our label.

2    And their label is full label, and their defense of doctors

3    never read our label, so how can we possibly be held

4    responsible for infringement after 2011?  I guess you can

5    decide that for yourself.  Oh, by the way, they didn't just

6    say this in 2012.  They said it again in the 2013 edition.

7    And they invite you again to go on their website where we

8    know it talked about how they're AB rated.

9           So here is the timeline.  You read the jury

10   instruction and compare it to what this shows.  Starting in

11   2004, press release.  Now, I don't have as much as

12   inducement yet because the product is not on the market yet.

13   But starting in 2007, Teva engaged in years of active

14   inducement of physicians, inducing them to prescribe

15   generic carvedilol for the treatment of congestive heart

16   failure.  These are all the things I just talked to you

17   about through all the years and, in addition to that, that

18   entire time on Teva's website, we have them talking about

19   their carvedilol tablets being the generic equivalent of

20   Coreg, which we all know is approved for the treatment of

21   congestive heart failure.

22           So what are we required to do?  This is the

23   Judge's instruction.  So we're not required to present hard

24   proof of any direct infringer physician stating, for

25   example, that she read Teva's labels or other Teva materials

```
 1    and that these labels or other Teva materials caused her to

 2    prescribe Teva's generic carvedilol in an infringing manner.

 3    And the reason we're not required to do that is because you

 4    heard how the pharmacy system works.  The physician doesn't

 5    specify Teva.  The physician just would write Coreg, and

 6    unless it's said DAW, dispense as written, it's going to be

 7    generic carvedilol, or they could write carvedilol and so

 8    it's going to be generic carvedilol.  They don't get to pick

 9    Teva's specifically.

10              So if we had to show this, we couldn't.  It

11    would be an impossible burden.  But what do we have to show?

12    We must prove that Teva's actions led the physician to

13    directly infringe a claim of the '000 patent, but we may do

14    so with circumstantial evidence as opposed to direct

15    evidence.

16              And what does that mean?  Direct evidence would

17    be bringing in a hundred doctors to tell you.  But we did

18    bring in Dr. McCullough who told you about it.

19              Circumstantial evidence, it's actually in this

20    case hard numbers that I'm about to show you.  That's the

21    evidence we brought to show you how much Teva induced.

22              There it is.  Teva knew that by inducing doctors

23    to prescribe generic carvedilol for congestive heart

24    failure, the lion's share of those prescriptions would go to

25    them.  Okay.  Maybe in their inducement we might have --
```

1   let's see.  We might have, oh, a company called Sun over

2   here that might actually sell .1 percent.  They might

3   get a .1 percent market share, or we might have a company --

4   let's see what is one of the bigger once.  Mylan.  Mylan

5   over here, and I'm sorry.  We had to stretch this out

6   because they don't exactly match, so I'll mash them up for

7   you.

8           So Mylan might get 15 percent.  So Teva knows

9   that, look, we're not going to grab it all, but you know

10  what we are going to grab?  We are going to grab the lion's

11  share.  We are going to grab 57 percent of all generic

12  carvedilol tablets, prescriptions written, we, Teva, are

13  going to get that.  Hence, why we're willing to advertise in

14  order to induce doctors to write generic carvedilol

15  prescriptions.  Even if some of our competitors get a little

16  bit of it, we get most of the action, and that's why they're

17  willing to do the inducement.  And this proves that they

18  actually induced to the tune of a market share of almost

19  60 percent.

20          Now, I want to show you very briefly the

21  testimony of Jennifer King.  Remember, we played her

22  testimony.  She kind of wraps it all up, Teva's actions and

23  why they do what they do.

24          So let's look at what Ms. King said.

25          (The video excerpt of Ms. King was played as

1   follows.)

2               "Question:  So is it your expectation of Teva

3   that when you carve out a particular indication, that Teva

4   will still get sales of that for that indication once it's

5   launched its product?

6               "Answer:  It's a legal strategy, not a

7   commercial strategy.

8               "Question:  But as a commercial person, is it

9   your expectation that Teva will get sales for the carved out

10  indication?

11              "Answer:  Yes.

12              "Question:  And so to make it specific to the

13  issues here, if Teva has carved out congestive heart

14  failure, but not hypertension and not post-MI LVD, Teva

15  still expects to get sales where the doctor prescribed

16  carvedilol for congestive heart failure; is that correct?

17              "Answer:  Yes, unless the doctor feels

18  strongly --

19              "Question:  Writes brand only?

20              "Answer:  Yes.

21              "THE WITNESS:  We knew it would be substituted

22  out for the brand Coreg IR.

23              "Question:  So there would be patients being

24  treated with Teva's generic who suffered from congestive

25  heart failure?

1             "THE WITNESS, yes.  But it's not given much

2  thought, right?

3             "Question:  No, I'm saying you do have an AB

4  rating?

5             "Answer:  Yes.

6             "Question:  But your approved indications

7  don't include the congestive heart failure.  Is there some

8  reason why you couldn't put AB as labeled in your product

9  label?

10             "THE WITNESS:  I think that's just something

11  that we don't do, right.  It's just a matter of doing

12  business.

13             "Question:  Coming at it from the other

14  perspective, to your knowledge, what communications, if any,

15  does Teva engage with in doctors or healthcare providers

16  about how you use a drug like carvedilol?

17             "Answer:  Zero.

18             "Question:  To the degree nothing here indicates

19  that Teva has carved out a congestive heart failure case

20  from its label?

21             "Answer:  No.

22             "Question:  Is there anything in this product

23  catalog that would tell a healthcare professional, don't

24  use Teva's generic carvedilol to treat congestive heart

25  failure?

```
 1              "Answer:  No.

 2              "Question:  Sure.  To your knowledge, has Teva

 3    ever said to a healthcare professional or publicly, you

 4    should not use Teva's generic carvedilol for congestive

 5    heart failure?

 6              "Answer:  No.

 7              "Question:  Sure.  So, again, without legal,

 8    commercially speaking, if you used a Section viii carveout

 9    and because of that are able to avoid a patent fight, avoid

10    a 30-month stay that sometimes comes with patent fights and

11    get to market sooner, it stands to reason there's an

12    economic advantage to that?

13              "Answer:  Yes.  My understanding was, though,

14    that we weren't even sued so -- at the time, so...

15              "Question:  I'm just asking generally.

16              "Answer:  So, generally, yes, if you don't have

17    to fight patents, having patent challenges are expensive, if

18    you can come to market earlier, yes, that's what you want to

19    do.

20              "Question:  Do you know how Teva among other

21    generic companies in the United States?

22              "Answer:  Yes:

23              "Question:  How does it rate?

24              "Answer:  It's number one."

25              (End of videotaped excerpt.)
```

1      MS. BROOKS:  And you can only imagine why.  So

2  we had also confirmation from Dave Rekenthaler, who is also

3  with Teva.  He was asked again, are you aware of any

4  communications from Teva between 2007 and 2011, telling

5  healthcare professionals they should not use Teva's generic

6  carvedilol for the unapproved heart failure indications?

7      No.

8      Are you aware of any discussions within

9  Teva from 2007 to 2011 about telling physicians in the U.S.

10  they should not use Teva's generic carvedilol for the

11  unapproved heart failure indication?

12      Answer:  I'm not aware of anything.

13      Question:  Are you aware of anything that

14  prevented Teva, that prevented Teva from warning its

15  customer, I think that's got to be a typo, from 2007 to 2011

16  that its generic carvedilol was not approved for all the

17  indications that Coreg was approved for?

18      Answer:  I'm not aware of anything that would

19  have prevented them."

20      So what could Teva have done to let doctors know

21  that it had not been approved for the treatment of

22  congestive heart failure at least up until 2011?  What could

23  they have done?  This is their 2007 press release.  They

24  deliberately put in the whole market, including heart

25  failure right here.  They deliberately call it

1    GlaxoSmithKline's cardiovascular agent Coreg and that they

2    are the generic version of it.  All they had to do is that.

3    If they had done that, we would not be here today.  Now,

4    they didn't even have to do it in red.  They could save ink

5    and do it in black.  They could even do it in fine print if

6    they want to and then put the onus on the doctor to read it

7    more carefully.  They could have done it.  They didn't do

8    it.

9              Here's their product catalog.  And, by the way,

10   Teva may get up here and say, well, FDA wouldn't let us

11   change the label.  It had to be the label FDA sent to us.

12   Well, Dr. Lietzan disagreed with that and said Teva could

13   have asked FDA if they could put that disclaimer on.  Dr.,

14   or Mr. Karst said it.  No, they wouldn't be allowed to do

15   it.  Let's take the label out of it.  Let's look at the

16   other things that they used to convey to doctors.

17             Their product catalog, what could they have

18   done?  Right there.  That's it.  Simple.  Asterisk.  We

19   don't want to mislead you.  Not approved for the treatment

20   of congestive heart failure, because this is in 2008, so it

21   had not been approved at that point.

22             Here is their website, AB rating.  What could

23   they have done?  Just say not approved for the use of

24   congestive heart failure, but they didn't do it.

25             And so what is the import of that?  The import

1   is they induced doctors to infringe.

2            Dr. McCullough, had you known that Teva had

3   not been approved -- I got my words jumbled, so I started

4   again.

5            Teva's generic carvedilol had not been approved

6   for the use of congestive heart failure, would you have used

7   it any way to treat congestive heart failure?

8            Answer:  No, I would not have.  That is

9   unequivocal, unrebutted expert testimony that Teva's actions

10  induced doctors to use Teva's generic carve for the

11  treatment of congestive heart failure from the get-go,

12  starting in 2007.  And it is also showing that but for those

13  actions, the doctors wouldn't have used it.  All the doctor

14  had to do if they knew they hadn't been approved is write

15  Coreg DAW and then dispense as written.  Teva could not get

16  those sales, but that's why they didn't tell them, because

17  then they wouldn't have gotten 57 percent lion's share of

18  the market.

19           Now, who did Teva bring to up in rebuttal just

20  quickly to rebut Dr. McCullough?  Dr. Zusman, the man who

21  has never read a label.

22           And until this case, had you ever read a generic

23  drug label?

24           No, I had not.

25           Really?  Okay.

1    So, and would you rely on Teva's amended label

2   which had all the indications in it?

3    So now we're talking about the 2011 label.  So

4   he had been trained don't say you read the label because in

5   2011, it is all in there.  So whatever you do, don't read

6   the label.

7    So in 2011, when the amended label appeared,

8   again, as he is talking about himself and so on:  If I had a

9   question -- this is right here.  If I had a question -- here

10   is what he would do.  He would go back to the original

11   research.  He would go back to the guidelines.  He would go

12   back to the textbooks.  He would go back to his experiences,

13   conferences, lectures.  He would even call a friend before

14   he would look at the label attached to the pills.

15    Is that credible?  You get to reject a witness's

16   testimony if you find it incredible.  This sounds like the

17   game show, Who Wants to Be a Millionaire.  He uses lifeline

18   to call a friend before he would look at the label.  It is

19   up to you to decide if that is credible.

20    And, in fact, we did it again.  I'm asking him

21   here:  Did Teva ever tell physicians -- now we're talking

22   about the earlier time period -- that their drug from 2007

23   to 2011, did they ever tell physicians that their drug for

24   use with congestive heart failure patients had not been

25   approved in any mailing, advertising, product catalog, press

1    release, anywhere else?  Did they tell them that?

2                And the man who doesn't read labels said:  Of

3    course, in the label.

4                To which I said:  The label that you don't read?

5                And he said:  Right.

6                But we entered perhaps the most existential

7    discussion had in a patent case.  Dr. Zusman kept saying,

8    well, if you knew the Coreg label and then you looked at,

9    this was the partial label, you would know right away what

10   was not in the partial label.  And he went back and forth

11   about that.

12               And so I said:  But Dr. Zusman, if you didn't,

13   if you weren't familiar with the Coreg label, then you

14   wouldn't know what you didn't know, meaning what is not in

15   there.

16               And he said:  No, I think they would know what

17   they didn't know.

18               You get to use your common sense in determining

19   whether this is credible.

20               So if you choose, and again, just more likely

21   than not, more likely than not that Dr. McCullough is

22   accurately telling you how it is or it's Dr. Zusman.  If you

23   find that it is Dr. McCullough, then we have proven our

24   case.

25               And so in that case, your next thing you are

1    going to be asked is, was that infringement willful?

2              Did Teva -- we only have to prove this by a

3    preponderance of the evidence -- did they have knowledge of

4    the '000 patent?  Yes, they did.

5              Was their conduct reckless?  Absolutely.

6              Was it willful?  You bet.

7              Was it wanton?  I'm not sure exactly what that

8    word means.

9              But malicious, that is for you to decide.

10             Committed in bad faith?  You saw Jennifer King.

11   She admitted blatantly, we didn't do it because it is just

12   business.  We didn't let the doctors know.  It was just

13   business but we fully expected to get that entire market.

14   And we did nothing to make sure that we -- they wanted to

15   get it.

16             Was it consciously wrongful?  Absolutely.  They

17   knew, in 2011, they were supposed to certify, and they

18   didn't.  Of course it was conscious.

19             Was it deliberate?  Absolutely.

20             Flagrant?  Couldn't have been more.

21             Characteristic of a pirate?  I'm not going to

22   call names.  That is what the jury instruction says.

23             So what does Teva say then?  If they truly

24   believed they didn't infringe, if they truly believed that,

25   why would they then come in here and try to take away the

1       life's work of Mary Ann Lukas and Bob Ruffolo?

2                   That is what their invalidity case is saying is

3       that they didn't invent anything.  That Kelly did it first.

4                   If they truly believed they didn't infringe, why

5       on earth would they do that?  And the answer is because they

6       know they infringed so they have to go to Plan B, which is,

7       yes, we're on your property.  We got caught red handed on

8       your property but it shouldn't have been your property in

9       the first place.

10                  What is their burden on this?  It's not the

11      same.  It is clear and convincing.  It is the highest

12      standard.  The Judge told you it is not beyond a reasonable

13      doubt because that is criminal.  But in a civil case, it is

14      the highest standard of proof there is.

15                  And what does that mean?  That you have an

16      abiding conviction that the asserted claims of the '000

17      patent are invalid.

18                  And why is that standard so high?  Because

19      patents are presumed valid.  Examiners who work clearly very

20      hard over a lengthy period of time are presumed to have done

21      his or her job.

22                  And there is something else to this jury

23      instruction, if you look at the last line.  This burden,

24      this clear and convincing burden may be more difficult to

25      meet when the accused infringer, that is Teva, attempts to

1   rely on prior art that was before the Examiner during the

2   prosecution.

3           And was it?  Absolutely.

4           I won't read all these names again, but the only

5   one missing on this list is Garg, when they do that

6   combination.  There is Kelly and every other piece of art

7   that they talked about.

8           And I think Teva is going to probably get up

9   here and say you saw that box.  How could a human being have

10   actually gone through all of that paper?  Well, I don't

11   know, because they had four years to do it.  And one must

12   assume that they did their job.  For fours years, the

13   reissue took place.  And that is why it's so big.

14           So now let's look just quickly, even though it

15   is their burden, I can just not say anything and sit down

16   right now and you are probably all thinking, okay, sure, why

17   don't you.  But I need to cover and make sure I kind of tie

18   it all together and respond.

19           So here is all the art that they relied upon.

20   This is their slide.  And Dr. Rosendorff started by saying,

21   oh, it was obvious as early as 1975, you can use beta

22   blockers for congestive heart failure treatment.

23           And what Mr. McCann, and I turned it into a

24   little bit prettier because you couldn't quite read his

25   handwriting.

1           What Mr. McCann pointed out is from 1975, when

2   this work began -- and I think Dr. Rosendorff referred to

3   this work as the Swedes.  Up until the first trial here

4   where they tried a beta blocker to treat congestive heart

5   failure, there had been no FDA approved beta blocker.  And

6   then in 1990, some scientist tried a beta blocker to treat

7   congestive heart failure xamoterol and 32 patients died.

8           Obviously, these were well meaning doctors that

9   thought they would be advancing in science.  They just got

10  it wrong.

11          And then we have all these pilot trials and no

12  approval until GlaxoSmithKline, in 1995, and Mary Ann Lukas

13  and Bob Ruffolo did it.  And they did it against all odds.

14          The gold standard in cardiology is Braunwald's

15  Heart Disease.  What did Braunwald say in 1992?  Beta

16  blocker agents must be used with extreme caution in patients

17  with heart failure.  We agree with Shanes that beta blocker

18  therapy should not be considered part of the management of

19  patients with heart failure until the results of larger

20  randomized trials are available.

21          The guidelines say under cardiac failure in

22  1993, don't use beta blockers.

23          And for Dr. Rosendorff to come in here now, that

24  is pure hindsight.  Absolutely pure hindsight.

25          So now let's talk quickly about Kelly and

1   anticipation.

2          In order for a reference to anticipate, every

3   single element of the claim must be found in that reference,

4   in one reference, and they must show it to you by clear and

5   convincing evidence.

6          Well, first, is this a method for treating

7   congestive heart failure?  Kelly doesn't call it that.

8          Later, he calls a different study they're not

9   relying on, that that study is for congestive

10  cardiomyopathy.  Here, he does not.

11         Does this teach that the patients are going to

12  be on a maintenance dose of carvedilol for a maintenance

13  period of over six months?

14         Kelly just talks about 6 and 18 months of

15  follow-up in the study they're relying on.

16         In other studies in the Kelly paper that are

17  different, he knows how to say how long the patients are

18  actually on the medication.  He says 8 weeks of carvedilol,

19  4 to 6 months of therapy -- that means they're on the

20  drug -- after 3 months of carvedilol.

21         I would submit that the fact that he says this

22  in other parts of the paper means this shows this does not

23  mean that they're still on carvedilol.  This is just

24  follow-up.

25         I don't know if any of you have ever had a

1    serious illness where you had to get therapy.  For example,

2    God forbid this would ever happen to you, but sometimes you

3    have something called chemotherapy.  And it's for a set

4    period of time but they do a six month follow-up, and they

5    do a 12-month follow-up, and they do a 18-month follow-up.

6    You are not on the chemo anymore.  You haven't been for

7    quite some time but they do the follow-ups.

8              That has meaning especially when it doesn't have

9    the other words to it.  And so Kelly does not contain all of

10   the terms in one reference.

11             So let's look quickly as obviousness.

12             Here we have, as late as 1996, talking about a

13   clear need for some additional treatment because how

14   difficult it is.  The short term symptom relief may be fine,

15   but that doesn't do anything.  In fact, it shortens life

16   expectancy.

17             And what did we do?  Just the opposite.

18   65 percent.  This is the Packer paper published in the top

19   medical journal in the country about the inventions of

20   Dr. Lukas and Dr. Ruffolo.

21             And so what do we hear from Clive Rosendorff

22   about that?

23             He says:  A relative risk of reduction of

24   decrease of mortality of 65 percent versus 20 percent for

25   ACE inhibitors?  I don't think those numbers are

1    particularly significant.

2              Seriously?  They were very significant to

3    Dr. Lukas.

4              And I will tell you who else they were very

5    significant to.  Lacey Angioletti.  She was the patient, the

6    one who won the Discoverers Award.  Imagine if she had been

7    in the 40 percent, the difference between ACE inhibitors and

8    Coreg.  She wouldn't have her picture up here today.

9              Now, I was going to go through these, but I have

10   been told I went 55 minutes, and I want to save some time

11   for rebuttal.

12             So there are objective indicia of

13   nonobviousness, long-felt need, praise, et cetera.  You can

14   look.  It talks about the long-felt need.  It talks about

15   skepticism.  It talks about failure of others.

16             Dr. Ruffalo thought he failed when he got the

17   call when he was asleep in London when, in fact, it was just

18   the opposite.

19             Unexpected results.  The Packer paper said that

20   their invention exceeded all conventional boundaries.

21             Praises, awards.

22             Let's talk quickly about damages.

23             GSK comes in here and tells you -- this is their

24   slide from opening statement -- that at most they should pay

25   $1.4 million, but maybe nothing at all.  That is their

1    opening statement.

2            How could they think they can get away with

3    saying something like that?  That means if the patent is

4    valid and infringed, we should pay nothing.

5            They are counting on the argument they're going

6    to make to you which is we're generic and we bring up

7    inexpensive drugs and therefore we're good and so therefore

8    you shouldn't make us pay.

9            They do not have their drugs out there out of

10   the goodness of their heart.

11           Teva, in fact, prices its drugs as high as it

12   can.  You don't have to take my word for it.  Let's hear

13   Jennifer King.

14           "Question:  Is one of those reasons possibly

15   price competition?

16           "Answer:  Yes, but, I mean, I guess you could

17   cannibalize the market, like you could destroy the market,

18   but that's typically not something that Teva tries to do.

19   We try to -- if anything, I think Teva is very good at

20   keeping price up in the market as high as we can."

21           MS. BROOKS:  Teva keeps price up in the market

22   as high as they can, to make the most profits that they can.

23   So if they get up here and argue to you don't make us pay

24   anything because we're a generic and we're good for you,

25   just remember what Jennifer King told us.

1    Why about the innovators then?  They're going to

2    say, oh, it is ridiculous what innovators charge for drugs.

3    You heard that in the year Teva launched, we

4    spent $6.4 billion in research and development and we heard

5    that from Mr. Vojir.

6    And Mary Ann Lukas talked about it took her ten

7    years on the carvedilol project before approval.  But she

8    told us about another one:  The next ten years of her life

9    were spent on another drug that failed.

10    We're talking about billions of dollars and

11    decades of work, and that is what the struggle is.

12    And here, again, Dr. Ruffalo is talking about

13    how this is one of the best days of his life, and frankly he

14    thought he had actually been wrong when he first got that

15    call, and he turned out of course to be right.

16    And so as innovators, as I mentioned in opening,

17    we rely on the drugs that are successful in order not just

18    to make back what we invested in that drug but to be able to

19    make up for all of the failures so that we can keep doing

20    our research and development.

21    Lastly, and you can read these yourself.

22    They'll be with you in the juryroom.  Whether or not we are

23    justified in receiving lost profits or not, and I will end

24    with that part.

25    I want to very quickly walk you through the

1    verdict form.  I'm not going to try to tell you how to fill

2    it out but it is really complicated so I wanted to help you

3    figure out what it is actually saying.

4              The reason it is so complicated is that Teva has

5    multiple defenses.  It reminds me of an old story I heard

6    once.  We're talking about serious things.  For just a

7    moment, maybe a little levity.

8              One man accuses another man, he sues him in

9    court because he says your goat ate my cabbages.

10             And the defendant says:  You didn't have any

11   cabbages.

12             And if you did, they weren't eaten.

13             And if they were eaten, they weren't eaten by a

14   goat.

15             And if it was a goat, it wasn't my goat.

16             But if it was my goat, he was insane at the

17   time.

18             And that unfortunately is what we're hearing

19   from Teva.

20             So let me walk quickly through the verdict form.

21             So the first question is just about infringement

22   of the "partial" or "skinny" label.  So that is from 2007 to

23   2011.

24             So if you answered yes, there was infringement,

25   then you go to the dependent claims and see whether we have

1    proved there was infringement of those.

2            If you answer no, there was not infringement,

3    you don't have to worry about those claims because if you

4    don't infringe the independent claim, you don't infringe the

5    dependent claims.

6            The next question, Question 2, is about the

7    period of post-2011 until the time the patent expired.

8            Same rules apply there.

9            Then ask yourself, if you do find infringement,

10   and only if you found infringement, ask whether it was

11   willful, again, for the partial label, and was it willful

12   for the full label.

13           And then you turn to Teva's defenses of

14   anticipation.  And, again, if you answer yes, they have

15   proven by clear and convincing evidence, there would be a

16   check here, no for GSK.

17           Now, if you say no, they haven't proven it, then

18   you don't have to answer any of these because if they don't

19   prove anticipation for the independent claim, they can't

20   prove it for the dependent claims.

21           Then we come to obviousness.  And it's basically

22   the same thing.  If you find they haven't proven it, then

23   they can't prove it for the dependent claims.

24           And then there is this one that Dr. Zusman

25   raised.  I don't know if you remember this.  He said

1    something about claim 8 was invalid for lack of written

2    description in the specification.  He never did explain to

3    how he did that analysis.  He took about five seconds to do

4    it.

5              So, again, if that doesn't meet clear and

6    convincing, you can check off no.

7              Then you get to damages, and it is a little bit

8    more complicated.  There are three damages periods.

9              So if you found any of the asserted claims of

10   the '000 patent to be valid and infringed, any of them, then

11   you have three options.

12             So Option A is if you found only the

13   infringement of the partial label, then you are going to

14   look at Option A.

15             I'm sorry.  This is actually if you found

16   infringement of both the partial label and the full label.

17   That is Option A.

18             Option B is if you found infringement only for

19   the partial label, that is Option B.

20             Option C is if you found infringement only of

21   the full label.  So does that make sense, I hope.

22             So Option A is both.

23             Option B is if it is only the partial label.

24             Option C is if it is only the full label.

25             So if you found infringement of both,

1   Mr. Maness, his expert opinion is that the damages, the lost

2   profits to GSK would be $477.2 million, and he walked you

3   through how he got there.

4           If you found infringement only of the partial

5   label, then it's $103.3 million.

6           If you found the infringement only of the full

7   label, then it's $373.9 million is what Mr. Maness -- or

8   Dr. Maness told us.

9           So I thank you for your time.  I hope I have got

10  a couple minutes left to be able to address right at the

11  end.

12          And now, counsel for Teva will get to do its

13  closing.

14          THE COURT:  All right.  Thank you very much,

15  Ms. Brooks.  Before we hear from Teva, I'm going to give of

16  the ladies and gentlemen of the jury a short break.  Still

17  no talking about the case.  I'll get you back here shortly.

18          (Jury left courtroom.)

19          THE COURT:  We will be in recess.

20          (Brief recess taken.)

21          *     *     *

22          (Proceedings reconvened after recess.)

23          THE COURT:  All right.  We will bring the jury

24  in.

25          MR. WIESEN:  Your Honor, if I may, before you

1    bring the jury in, is it possible to provide a corrective

2    instruction based on the fact that it's Teva's fault that

3    the verdict form looks as it was, was the Court's order and

4    was based on GSK's verdict form check.

5              THE COURT:  You can request one.  Is that your

6    request?

7              MR. WIESEN:  It is our request, Your Honor.  We

8    think that was an inappropriate suggestion, that the jury is

9    there filling out the form because of Teva.

10             MS. BROOKS:  Your Honor, my response to that

11   would be that what I said is, it was so long is because Teva

12   had all these defenses, which they do, so I was just telling

13   it accurately.

14             THE COURT:  Mr. Wiesen?

15             MR. WIESEN:  Your Honor, I think it's so long

16   because they've asserted the number of claims they have and

17   the damages assertion.  That's actually longer than the

18   anticipation and obviousness questions.

19             THE COURT:  All right.  Well, I'm denying the

20   request for a curative instruction.  I think it's not quite

21   warranted.

22             I think Ms. Brooks walked right up to the line

23   and was very, very close to where a curative instruction

24   would be warranted, but she did not, in my opinion, step

25   right over it, so the request is denied.

1           (The jury entered the courtroom.)

2           THE COURT:  All right.  We are ready to hear

3   Teva's closing argument.  Good morning to you, Mr. Downs.

4           MR. DOWNS:  Good morning Your Honor.

5           THE COURT:  You may proceed when you are ready.

6           MR. DOWNS:  Thank you.  This is the second time

7   in about ten days where I've had the singular honor of

8   coming up to speak after Ms. Brooks and trying to digest the

9   world that she depicted from her opening statement today, a

10  world in which everything is dark and people all have

11  serious, sinister motives, and occasionally people TEAR up

12  at the drop of a hat.  And I don't think that's the world

13  you saw from Teva's witnesses.  I just want to put you back

14  in the court when we had Dr. Rosendorff on the stand

15  yesterday.  We had Jill Pastore on the stand early on,

16  and she testified about why she did what she did with the

17  FDA regulations.  And I want to think about and talk about

18  the evidence and the witnesses and address I think the

19  heart of the story, which is that Teva, when we started out

20  filing for the FDA approval and then we decided to change to

21  certification where we would carve out the skinny label, we

22  relied on the use codes that GSK itself had certified,

23  and I will go through this in a little more detail, but I

24  don't know if you remember the testimony about the use

25  codes.

```
 1              GSK said itself under oath multiple times, the
 2    use code for this patent, the '069, which became the '000,
 3    was congestive heart failure.  It wasn't the other
 4    indications.  It wasn't hypertension or post-MI LVD.  And so
 5    when we carved out in the skinny label, when we carved it
 6    out, we were relying on things that GSK had said under oath
 7    was the actual use that should be carved out.
 8              Now, they want to make it look like it was all a
 9    sinister scheme where we were trying to set things up to
10    induce doctors to infringe and thereby reap huge profits.
11    That wasn't the case.  We were carving out based on what
12    they told us.  And then years later, when the FDA came by
13    and said, we want you to amend your label, it wasn't that of
14    any desire to capture sales.  It was, we amended it because
15    the FDA told us to.  And they say, oh, you did something
16    wrong.  You should have done a Paragraph IV at that time.
17    The FDA didn't think so.  Their expert came up and said so,
18    but the FDA didn't think so.  The FDA said what we did is
19    fine.
20              And so all throughout this time we played by the
21    rules, and we also were subject to things that were not in
22    our control, and those include, for example, the state
23    substitution laws.  And you heard Ms. Kinsey who used to
24    work at WalMart and ran one of the largest pharmacies in the
25    world talk about how they have substitution rules that cover
```

1    all 50 states so that when orders come in, they're

2    automatically changed to generic, and that's all done

3    without any inducement that we can't have anything to do

4    with because all the states either require or permit that

5    kind of substitution to go on.

6           So even if we put an asterisk somewhere on

7    their label, or even if we put an asterisk on our press

8    release or an asterisk on our website, it would not stop

9    the fact that generic drugs that are out there are going to

10   be used and substituted for branded drugs.  It could not

11   stop that.

12          So the notion that Teva has somehow caused or

13   induced doctors to lose all of these sales that they say

14   they've lost, that's the heart of the matter, that they

15   don't really have any evidence to show that it was the

16   things we said or did that caused the sales to go up or the

17   sales to be for that indication.  It was because of the

18   substitution and the price.

19          So let me just start back where we started

20   before when I was here for the opening, and that is that

21   Congress did create the statutory scheme so that we could

22   have both branded and generic drugs, and that there would be

23   a transition process where the branded drugs get their time

24   when they are making a lot of money, they earn back the

25   money they need for their research and development, but then

1   when their patents are coming off, they can't maintain their

2   monopoly by getting lots and lots and lots of little patents

3   and then squeezing out the generics and preventing people

4   from getting benefit and for the value of these generic

5   drugs.

6          And GSK, there's no dispute they had a good,

7   long, ten-year period when they were making billions of

8   dollars over all of their expenses.  I mean, they spent

9   billions of dollars promoting their drugs, but they were

10  making billions more, and they were doing it because there

11  was a patent on the compound and they had gotten a five-year

12  extension of it.  I'm sorry.  They had gotten a five-year

13  extension on it and then they got another six-month

14  extension.  So they got a good long run that lasted a long

15  time and they made a lot of money, and they knew their

16  patent was expiring.

17         And the generics knew it, too, and Teva was one

18  of them, and they saw an opportunity in 2002 to file for a

19  generic version of carvedilol.  And here again, we played by

20  the rules.  We filed.  We told GSK what we were doing.  We

21  sent them a letter saying, your patents are invalid.  All

22  right?  And we did that in March 2002.  And shortly

23  thereafter, GSK itself recognized they had a problem with

24  their patents.  Now, she likes to say, oh, we did it

25  voluntarily, but they had a problem with their patents, and

1  that's why they put it into the reissue, so they could try

2  to change their claim language so they could make it a

3  stronger patent.

4        And as we'll talk about for invalidity, this is

5  one instance where sometimes the Patent Office does get it

6  wrong.  They had a patent, but it turned out to be not valid

7  and they put it back in the reissue.  They added more

8  language and it came out as the '000.  But they also put a

9  second patent into reissue at the same time, and then that

10  reissue kept going for four years, and it was continuing all

11  the way up until the issuance of the '000 patents.

12        Now, in the meantime GSK told the FDA that its

13  patents covered only the congestive heart failure indication

14  in the label of Coreg, only that one, not the post-MI LVD,

15  not the hypertension.  And these are their statements here.

16  I'm not very good with this.  These are the statements here:

17  Treatment of mild-to-severe heart failure, treatment of

18  mild-to-severe heart failure, and that's in the Coreg label.

19  Just the mild-to-severe heart failure, not the other two

20  indications that we heard so much about.

21        And this is important, that they now are

22  contending, oh, you should have carved out more.  You should

23  have carved out the post-MI LVD, but they never said that to

24  us.  They never told us that.  They never took that

25  position.

1    And the question that was asked of Mr. Karst --

2    and I'm sure you remember him.  He was an FDA expert.  And

3    he was asked:  Did GSK ever submit additional patent

4    information to identify any patents as covering the method

5    of using Coreg to treat post-MI LVD?

6    And he said, GSK never, ever submitted any

7    patent information to the FDA with respect to the post-MI

8    LVD indications, yet then you saw Dr. McCullough stand up

9    and say, oh, well, you should have carved that out.  Now you

10   are infringing, and that is wrong.

11   What is the skinny label?  And we heard the

12   story.  I'm sorry.  We heard testimony about how the skinny

13   label is designed to work, and its very purpose is to make

14   the branded companies identify the uses that their patents

15   cover so that when you have a method of use claim, you can

16   work with the FDA to carve out that use and then you can

17   proceed with the drug using the indications that are not

18   disclosed by the other side.

19   It's not supposed to be that they identify the

20   use, then you carve it out according to the use, and then

21   they come in and sue you for it.  All right.  And that's

22   what's happening here with GSK.

23   And the reason you do that is to allow the

24   generic company to market and use the drug for non-patented

25   uses and the branded company retains their patent on a

1      particular use.

2              And so this is really an attack, this case is

3      really an attack on this whole skinny label system.  They

4      are saying, we can tell you that, you know, we only use two,

5      but then we can turn around and sue you for using three and

6      claim large profits that are basically going to drive the

7      generics out of the market because, if you remember, we only

8      made about 75 million.  We actually lost some money on these

9      products.  But if we have to pay huge dollars, people are

10     just going to not do this carveout and the patents won't be

11     available, or the drugs won't be available.

12             So we've also got -- I don't know what the right

13     term is.  There was a lot of discussion about why we moved

14     to the carveout.  And the reality is that we were getting

15     very close to the date of the launch of the, of the

16     expiration of the drug patent, of the drug compound patent.

17     And there were 14 other companies in the pipeline ready to

18     get launched, and they all had skinny labels.  And we

19     decided, well, we'd better launch with a skinny label, so we

20     skinnied it down.  It wasn't a scheme.  It was just we

21     wanted to launch on the same footing, and there was a chance

22     that the '069 patent might come out of re-exam and we wanted

23     to be carved out.  And that's the testimony you heard from

24     Jill Pastore, right here.

25             Now, how did Teva know what information it

1    needed to omit from its label relating to those two use

2    codes?  It's because we knew exactly, we got the marked-up

3    version from the FDA telling us what to remove.  We didn't

4    decide ourselves.  It was the FDA that told us what to do.

5    We followed the rules and there was nothing wrong with that.

6    It's not evidence of any intent to induce anybody to do

7    anything.

8           And the FDA got it back from us, and we had

9    marked out all the things that should be marked out, the

10   heart failure indication, which is what they -- GSK had

11   directed us to mark out, and then Teva was approved by the

12   FDA and with each usage carved out.

13          So what happened right then is that shortly

14   thereafter, the FDA actually approved all the generics.  And

15   the day before Teva's press release, which you heard a lot

16   from Ms. Brooks about Teva's press release in

17   September 2007.  The day before that, September 5th, the FDA

18   announces -- by the way, the FDA is a little more

19   influential in its press releases than Teva is in its.

20          Everybody looks at the FDA press releases, Dr.

21   McCullough said at some point.  And the FDA calls all the

22   generics the first generic versions of Coreg.  So, again,

23   that's just the terminology people use.  It is not meaning

24   that anything -- that you are trying to induce anybody to do

25   anything.  But these are, in fact, drugs with the same

composition, the same bioequivalence.  They're very much

like Coreg, so they are in a way generic versions of Coreg.

And that's the way the system works.

And there is no question that those drugs were

safe, they were effective, they were all approved by the

FDA, and the FDA says we're guaranteeing their safety.  And

there's 14 of them listed here.  Teva is one of them.

And the FDA notified the world that the labeling

of the generic products may differ from that of Coreg

because parts of the Coreg labeling are protected by patent

or exclusivity.  So the FDA is telling the world, look at

the label of those products.  Look at the labels.

And so there was, again, nothing sinister in

this because the things that drive the state substitution

laws is what the FDA says and what it puts in its Orange

Book.  And so when we get to talking about that, that is

important as well.

Teva's press release uses the same language

basically, generic version of Coreg, cardiovascular agent.

I don't know why that is so important.  Everybody knows it's

a heart agent.  So it's a generic version of Coreg.  And

then it just says, the brand product had annual sales of

1.7 billion in the U.S.  Well, nobody is expecting Teva to

make 1.7 billion in sales, but the fact is that the uses of

Coreg for hypertension and for post-MI LVD, which were not

1    the carved-out uses, those were huge.  I mean, as Dr. Zusman

2    testified, there's so many more people with hypertension

3    that the actual sales for hypertension dwarf those of

4    congestive heart failure.  And if you remember Maness' pie

5    chart with his damages, there's all of these sales except

6    for really a pretty small sliver is what's possibly

7    infringing.

8              So in the real world, whatever sales Teva was

9    going to get from its generic carvedilol was primarily for

10   all of these other noninfringing uses.  So the thought that

11   somehow we would be knowingly driving to do something that

12   we were going to get sued for by following what GSK said

13   just to get that little sliver of the market -- and you saw

14   Professor Addanki draw it out yesterday.  Right?  That it

15   really was a little tiny sliver there that was represented

16   by the congestive heart failure use that might infringe this

17   patent.

18             And so this isn't driving, this isn't saying

19   that we want to dominate the market in this area, but we

20   expect legitimately to make as much money as we can in a big

21   market in which most of our sales of carvedilol are going to

22   be for other uses.

23             And then you saw that testimony from Jen King,

24   which they put up there.  Maybe she looks like she just

25   crawled out of bed, she had a bad day.  All right.  But that

1   is not the point.  The point is, look, we are a business.

2   Teva is a business.  So when she says, we want to make

3   money, all right, yes, Teva wants to make money.  There's

4   nothing wrong with that.  And also when she talks about, oh,

5   yes, we expected to be off label, that's because of the

6   state substitution laws.  Everybody knows that the states

7   are going to require the pharmacies or permit the

8   pharmacies, and the insurance companies are going to demand

9   that they substitute the generic for the branded regardless

10  of what we have to say.

11          Now, Ms. Pastore was asked, because of all of

12  these innuendoes about why we launched and how one of our

13  customers had sent us an e-mail that nobody could remember

14  or answer, it was ten years ago -- I mean, really?  What he

15  said is, did we have -- at the time we were approved in

16  2007, did Teva plan to add the congestive heart failure

17  indication back on the label prior to the expiration of the

18  method-of-use patents?  No, we did not.  There was no intent

19  to do that.  In fact, we left the skinny label in there as

20  long as we could until we were told to by the FDA to change

21  it and add it back.

22          Now, the other thing that's important is that

23  eight companies were approved by the FDA and were launched

24  all together in September 2007.  All of them were AB rated.

25  Every drug that comes on the market is AB rated to

1    something, and it's AB rated to the generic, the branded

2    drug, because an AB rating is an equivalency rating.  It's

3    saying, I'm equivalent to something that's already there,

4    and so you can't -- you can't just say, I'm AB.  I'm a drug.

5    I'm AB.  That doesn't make any sense.  You have to be a drug

6    that's AB rated to the branded.  Basically, what did she use

7    the word, copying?  We're not copying.  We're just preparing

8    a generic version of it.

9            So the notion that somehow combining the word

10   "AB" with the words "Coreg" is somehow inducing people to do

11   something, again, that is just the way to express things.

12           But all of these drugs were AB rated.  They were

13   all equivalent and safe.  And I think you heard testimony

14   from several witnesses that when doctors prescribe

15   carvedilol or Coreg, whatever they put on the label, on

16   their prescription, they don't know which companies drug

17   they're going to get because it really depends on what the

18   pharmacies stocks.  And you heard that again from Ms. Kinsey

19   from Wal-Mart.  But that is just the way it operates, and

20   things change.

21           Now, of course, Teva did have a market share

22   that went up but, remember, that market share you saw.  They

23   were telling you 57 percent.  Again, that is the whole

24   world.  That is hypertension, that is the noninfringing

25   uses, whereas the actual infringing uses are just a tiny

1  part of that.

2  So that is perfectly fine, and we had a large

3  market share.  There is nothing wrong with that.

4  But anyway, these were all competing in the

5  market at the same time, and doctors would not know which

6  one they were going to get.

7  So just the fact that a doctor is induced to

8  prescribe a generic is -- or a doctor may prescribe, I'm

9  sorry, without any inducement, a doctor may prescribe a

10  generic and get Teva is not evidence that Teva induced that

11  sale in any way.  Because a doctor could prescribe generic

12  without ever having looked at anything for Teva, any

13  marketing materials, anything, and they write Coreg, and it

14  may be that just the pharmacy substitutes Teva in for it.

15  So the notion that every sale, every sale is

16  induced by Teva through doctors is simply wrong.  There is

17  no evidence for it.

18  And when we get to what the witnesses said, I

19  don't know if you can remember, Dr. McCullough actually

20  saying anything about what caused, what really caused

21  doctors to prescribe Teva's generic.  Because he didn't, he

22  didn't actually say anything about that.  And we'll get to

23  that in a minute.

24  So the other thing you need to know is that GSK

25  was actually following what Teva was doing.  And this was

1    Mr. Murray from GSK.  And he said that they were monitoring

2    press releases for Teva, and that was their standard

3    practice.

4              So they knew what Teva was doing.  They knew

5    Teva was launching the skinny label.  They knew it was 14

6    others were launching, and they were watching their drug

7    fall off the cliff; right?  They knew that because they were

8    monitoring it.

9              And then we know what happened here.  We know

10   that Coreg dropped and the generics took over and it all

11   happened before the '000 patent issued.

12             Now, I got a little bit tired I think for how I

13   characterized the gap, what I called the patent gap.  And my

14   bad; all right?

15             But the real issue and the reason we were

16   talking about it is that this patent, which is the one that

17   is being enforced here, had not issued and therefore could

18   not be infringed during this time period.  So for purposes

19   of you guys thinking about what happened, it is true and not

20   really rebutted that all of this did happen, this changeover

21   happened without any infringement of the '000 patent.

22             And so the question for you is, after the

23   January 2008 patent, what actions were taken by Teva to

24   induce infringement by the doctors, and did those actions

25   actually cause the doctors to infringe?  As opposed to not

1    in conjunction with something else, not by virtue of the

2    doctors having knowledge of the guidelines and things like

3    that where they were able to prescribe without ever having

4    seen any of the Teva materials.

5              And as we have already talked about, the state

6    substitution laws, this is the picture I got in Wilmington.

7    And here it says it is permissive, the state law permits

8    pharmacists to substitute.  But in general, it means you are

9    automatically substituted because in almost every instance

10   you will.

11             And you heard from Ms. Kinsey that as long as

12   products are AB rated, you can substitute in every state.

13   And that when the FDA designates a product as AB rated, it

14   lists that information in the Orange Book and, frankly, that

15   is the only thing that matters to the pharmacist.

16             If it's listed by the FDA in the Orange Book,

17   you can call yourself ABC rated and they wouldn't care

18   unless in the Orange Book you are listed by the FDA.  That

19   is where they make the determination that we're going to

20   substitute.  And she also said we're going to substitute

21   matter no matter what you have on your label.  That is what

22   she said.

23             And I think she was pretty credible about it.

24   She ran a pretty big pharmacy.

25             Now, Dr. McCullough, when he testified, when he

1  finally -- actually, I think this was toward the end.  When

2  he finally talked about whether or not he was, had actually

3  read Teva's labels and it turned out he hadn't before he

4  started prescribing, he said:

5          When the generics launched, you switched your

6  patients over -- right? -- to the generic?

7          No, I didn't actively switch.  I continued to

8  prescribe it.  It was automatically switched.

9          So here is somebody, a doctor already admitting

10  that this changeover, maybe it was Teva.  If it was a Teva

11  sale, it had nothing to do with anything Teva said.  It was

12  just the result of an automatic switching mechanism.

13          So that one can't be placed on us for inducing.

14  That sale, that use.  Oops.  Sorry.  (Adjusts remote

15  control.)

16          And then he said:  And so you were aware that

17  your patients were going to be switched from the branded

18  Coreg to generic carvedilol in September 2007?

19          Yes, I was.

20          And then you were perfectly comfortable with

21  that?

22          Yes.

23          You felt like the generics were safe and

24  effective and could be given; is that right?

25          Correct.

1            You had no concerns that something that wasn't

2    in the Teva's label meant that you were somehow committing

3    malpractice by prescribing a generic drug or what might be a

4    generic drug?

5            No, I didn't think I was committing malpractice.

6            That is because the drugs were safe.  But he

7    didn't know.  He didn't know what drugs he was getting.  He

8    was just writing prescriptions like he always did.  Not

9    induced by anybody to do so.  If it happened to be filled

10   with a Teva prescription, that is not an induced sale

11   because it has nothing to do with Teva.

12           Now, Ms. King also, she was talking about the

13   effect of this automatic substitution.  And the fact that

14   physicians, they can also prescribe for off-label

15   indications.

16           And this is something I think Ms. Kinsey also

17   confirmed.

18           But the physician can insist on having the

19   branded there, but if he doesn't feel that there's a need,

20   if he does not write dispense as written, then the automatic

21   substitution at the state level allows for that to occur.

22   So there is a substitution.

23           And I think when we get closer to looking at the

24   Court's claim construction of "cause," the cause has to be

25   something that Teva did and not in combination with

1    something else.  We'll look at that.

2               But the other factor is, of course, that the

3    generic prices were way, way, way lower than the Coreg

4    price.

5               And so after the launch, in 2008, it was huge

6    incentive for the insurance companies who were making the

7    co-pays, who were actually buying, paying a lot of the costs

8    of the drug to try to switch you to generics, and

9    Dr. Addanki talked about that just yesterday, right?  And he

10   was talking about how the co-pays were being, would change

11   depending on how much generic were available or not.

12              And the other thing that influence the doctors

13   prescribing decision, and this was really undisputed are

14   things like the guidelines that Dr. Zusman, even Dr.

15   McCullough testified about that they were highly influential.

16   They taught people how to prescribe carvedilol in the way that

17   is claimed in the '000 patent.  So there is an independent

18   source of doctors knowing how to practice the claimed method

19   in Teva's label and that is just the guidelines.  People have

20   been using it for years.

21              And, in addition, there was all that evidence

22   about all the promotion that GSK had been doing over the

23   years, about teaching people how to practice the invention

24   so that by the time the generics were launched, everybody

25   already knew how to prescribe Coreg.  And Dr. Zusman talked

1    about how he taught his students at the hospital to

2    prescribe patients who have congestive heart failure because

3    it is a very common disease.

4         So there is tons of knowledge out there, that

5    doesn't have anything to do with Teva, about how to

6    prescribe Teva's carvedilol.

7         And I don't know if you remember, but during the

8    opening, I did ask you to think about, as you sat there,

9    what is the evidence that things that something Teva did

10   actually caused the doctors to infringe, as opposed to other

11   things like the guidelines, like teachings, other things,

12   automatic substitution that really had nothing to do with

13   Teva.

14        And that is where I think if you look at the

15   evidence that you just heard about and you think about all

16   the evidence that you have heard over the week, did they

17   ever really prove that something Teva did or something

18   actually caused a doctor to prescribe Coreg, or carvedilol

19   in the specific way required?

20        And it isn't because there is all these other

21   causes.  They didn't prove that.

22        So now, Dr. McCullough also admitted during the

23   launch, he relied on other things.  You know, we had talked,

24   he was asked about what did you rely on before 2007 to

25   prescribe?

1       And he said that would be the Coreg label and

2   other things he knew the guidelines.

3       And then in September of 2007, you relied on all

4   those same things?

5       Yes.

6       So he relied on the guidelines, he still relied

7   on research, he still relied on his experience.  And he also

8   relied on GSK coming in and detailing and marketing and

9   advertising Coreg.

10      So all those things were driving doctors to

11  prescribe.

12      So what happened here is the patent issues in

13  January 8th, 2008.  And that is a line for purposes of

14  determining inducement as well because acts of inducement,

15  unless they are a continuing act from in the past, acts

16  of inducement require knowledge of the patent and then

17  generally required to be occurring after the issuance of the

18  patent.

19      So things that occurred long ago like the 2004

20  press release that she put up on her chart, that is not an

21  inducement.  It's just the patent didn't exist and you can't

22  take it into account.

23      And we also heard, when we had Dr. Maness on the

24  stand, that the reason there is so many years of damages and

25  why the damages amount is so large is that GSK waited six

1    and-a-half years to sue.

2           And I think if you may remember Ms. Brooks at

3    the end of her opening statement, she said, she said Glaxo's

4    house was getting burned down.  Teva was burning down

5    Glaxo's house.  And she, she said that is what we were doing

6    to them.

7           Well, if they were getting burned down, why did

8    they wait for six and-a-half years to do anything?  The

9    reason is that they didn't have a claim, and that they knew

10   that we were relying on their own use codes, and so there is

11   good reason for them to delay until they thought of a theory

12   and decided to bring a suit.

13          Now, let's talk about induced infringement.  And

14   I think you are all familiar with the language of claim 1 so

15   I'm not going to march through it, okay?  I know you have

16   seen it a lot.

17          But we have the different categories there.

18   Every one of them has to be met in order for a doctor to

19   infringe.

20          The Court's claim construction on induced

21   infringement has four categories.  And one of them is that

22   Teva took some affirmative action after the patent was

23   issued intending to cause the physicians to directly

24   infringe.  All right?

25          Another was that Teva was aware of the patent,

1    which it was after January 8th, 2008.

2              And then, finally, Teva's alleged inducement, as

3    opposed to other factors, actually caused the physicians to

4    directly infringe.

5              And so when the chart was put up by GSK earlier

6    during the opening, or during the closing, their chart left

7    out the "as opposed to other factors" in their construction,

8    in what they told you the Court's instruction was.

9              They left that out.  They just said that Teva's

10   alleged inducement actually caused the physicians to

11   directly infringe.

12             So one of the key things you are going to be

13   looking for is to whether or not there were other factors

14   that went to potential infringements by the doctors.

15             Now, at our trial, during the trial, this is

16   the slide that we put up on what we were proving to show

17   inducement when we had Dr. Zusman talk.  And it pretty much

18   matches what we just saw in the Court's construction.

19             Now, we didn't realize at the time that it would

20   be "as opposed to other things" so we had this language

21   here, but with it was a requirement that we were proving,

22   when we put on the evidence that the doctors -- that the

23   inducement actually caused the physicians to infringe.

24             But let's look at the induced infringement

25   instruction that GSK used when they were putting on their

1    evidence to you at trial.

2              And, here, they put on there is a direct

3    infringing, we're aware of the patent, Teva took action and

4    failed to take action.

5              Now, they say that we infringed, now we're

6    inducing infringement now because we failed to put an

7    asterisk on a bunch of our documents and say not approved

8    for congestive heart failure.

9              Well, that "failed to take action" is not in

10   the Coreg instructions from the Court.  So failure to take

11   action is not an inducement according to the instructions

12   that you will see in your notebooks.

13             And then they say Teva knew that the acts of the

14   other party would constitute infringement of the patent, but

15   there is no cause.  There is no line for cause.

16             So all the evidence they put on when Dr.

17   McCullough was talking about that, they didn't even try to

18   satisfy their proof that it was Teva that caused all these

19   things because they were applying a different standard.

20             Now, again, look at section -- I'm not saying do

21   this right now, but as you are deliberating, I want you to

22   focus on the instruction for 4.2.2 which is the affirmative

23   actions intended to cause infringement, because you will

24   see the language there that, "actions must actually cause

25   the infringement."

```
 1              And I want you to look at 4.2.4, which is more

 2     on causation, which is that GSK must prove that the alleged

 3     inducement, as opposed to other factors, actually caused

 4     physicians to directly infringe.

 5              And where GSK does not show that Teva

 6     successfully communicated with and induced a third-party

 7     direct infringer and that the communication was the cause of

 8     the direct infringement by the third-party infringer, then,

 9     sorry, Teva cannot be liable for induced infringement.

10              So causation is a really big issue in this case.

11              So let me go quickly through the skinny label

12     period.

13              First, Dr. Zusman was really, I don't know what

14     is the right word, really criticized by Ms. Brooks for not

15     having read the labels.

16              Now, he has been practicing law at Harvard

17     Medical School for many years and at the Mass General

18     Hospital, which is one of the best hospitals in the country.

19     I say that because I'm from Boston, but, you know, he knows

20     what he is talking about, about how doctors can practice

21     using the tools they learn in college or in the medical

22     school.  And that he relied on other things and didn't rely

23     on generic drug labels.  I mean he just didn't.

24              And so to suggest that he is somehow lying or

25     not credible, I think you can assess that yourself.  You
```

1    have seen the man.

2              Dr. McCullough was asked, now, and this was

3    right in the last set of testimony, that before you started

4    administering generic carvedilol to your patients, whether

5    you bought it as Coreg or not, did you read Teva's generic

6    label.

7              No, I didn't.

8              Why not?

9              I just assumed they were the same.

10             So he never read them, he never read the label.

11             And, Dr. Rosendorff, now admitted he might be a

12   little old school.  But he said he has been practicing for a

13   long time.

14             Have you relied on generic labels in prescribing

15   carvedilol?

16             He said:  Never.

17             Have you ever reviewed a generic product label

18   in your practice?

19             Not that I can recall.

20             And he said:  I would rely on published material

21   and other sources.

22             All right?  And that is the way a lot of doctors

23   practice medicine.

24             So let's go to some of the things that GSK says

25   are actually inducing.  And I will try to do this quickly.

1    Here is a press release from September 2007.

2    Again, there was no knowledge of the '000 patent, knowledge

3    in terms of the Court's construction because it hadn't

4    issued yet.  We already talked about that.

5    And with respect to the notion that we should

6    put an asterisk on some of our documents, this is Professor

7    Lietzan who testified for GSK as an expert.  And she said:

8    Are you aware of a regulation that explicitly

9    required that a generic company state in its labeling that

10   it is not approved for use that has been carved out?

11   No, I am not.

12   And can you identify any example of a package

13   insert or a label where they included a disclaimer about an

14   indication?

15   And she said basically no, I can't identify any

16   example.

17   So there is no requirement that that be done.

18   You heard testimony from Dr. Zusman also about

19   why this post-MI LVD or the post-heart attack is not really

20   congestive heart failure.  And, again, if GSK had believed

21   that their patent covers the treatment of that, they could

22   have let the FDA know, and we could have carved it out, and

23   they didn't do that.

24   And Dr. Lukas herself testified that the

25   patients who had the post-MI LVD, they were excluded from

1   the clinical trials that resulted in the '000 patent.  And

2   so she said, I don't agree that those patients, -- what I do

3   agree, that those patients were not in the clinical trials

4   and therefore that was not the basis -- that was not the

5   basis of the patent.  The post-MI LVD was not the basis of

6   the patent.

7           This is more from Dr. Zusman.  He also pointed

8   out that for congestive heart failure patients, the clinical

9   study that relates to the post-MI LVD was not statistically

10  significant so it wouldn't benefit the congestive heart

11  failure patients.

12          And also said that doctors would not piece

13  together little pieces from here and there and use it to

14  treat congestive heart failure.

15          The product catalog.  Here again, their only

16  criticism that we have AB rated to Coreg in one setting.

17          Well, of course it is AB rated to Coreg, and

18  that is what the FDA says it is, and there is nothing wrong

19  with saying that.

20          And it does not induce anybody to infringe

21  because it doesn't tell you how to practice the method of

22  claim 1.  And some of these were, you know, product

23  catalogs.  You know, maybe doctors looked at them, maybe

24  they did not, but they were generally directed to the

25  customer.

1       This goes basically to the notion here that

2   AB-rated means therapeutically equivalent to the branded

3   drug, and that was testimony you heard from Mr. Karst.  This

4   is a page in the Orange Book which shows that Teva is listed

5   as AB rated to Coreg in the Orange Book, and that's what

6   this little plus sign there is.  So there's nothing wrong

7   with being AB rated to Coreg.  That's something that the FDA

8   does and everyone relies on that.

9       Could the FDA have approved the ANDA without an

10  AB rating?  In fact, no.  It was required.

11      And what is your opinion regarding the various

12  statements that Teva made that its product was AB rated to

13  Coreg?

14      Those statements were absolutely correct and

15  accurate.

16      Teva also relies on this generic product

17  reference guide from 2009.  That is directed to families, as

18  you can see, and there wasn't any dispute about that, and it

19  also just lists the product available.  It does not tell you

20  how to use it or anything.  The product reference guide,

21  this is more of the same.

22      Then we get to the amended label period, and

23  this is what I was talking about earlier, which is that the

24  FDA had asked Teva to revise the labeling to include

25  information with those use codes.  And Jill Pastore

1   testified about that.

2          And then we did it.  Teva amended the label and

3   they sent it back to the FDA.  And the FDA said, we have

4   completed the review of your applications and they're

5   approved.  There was no problem.  There was nothing wrong

6   with that, and that's how the label got there.  It was not

7   any intent to expand it.  It was the FDA requiring us to do

8   that.  Now, the FDA never said we should have done what they

9   say now we should have done.

10         And Dr. Zusman was asked, well, why wouldn't the

11  doctors read and rely on the amended Teva label in 2011?

12  That's because carvedilol had been out there for so many

13  years, doctors know how to prescribe it.  And Dr. McCullough

14  testified that there was no difference in his habits from

15  when Teva went from the skinny to the full label.

16         This Health System Drug Reference Guide, it has

17  a disclosure about carvedilol in it, and part of that

18  relates to generic.  This relates to Coreg CR.  But it

19  doesn't teach you how to practice the method of the patent,

20  so it is not inducing.

21         The website we've talked about.  So the evidence

22  we submit shows that there really was no willful

23  infringement, no willful inducement of doctors, and said,

24  this is the kind of thing that the inducement, the

25  prescriptions of Teva's carvedilol were mostly driven by

1    causes that had nothing to do with any inducement.

2              We're not characteristics of a pirate, whatever

3    that means, but we're not being reckless, willful, wanton or

4    malicious.  We did what GSK said we should do, which is

5    carve out the congestive heart failure label during the

6    skinny label period, and then we did what the FDA told us to

7    do in the later period.

8              So now we get to the question of invalidity, and

9    this is a subject I think you guys -- you listened to the

10   testimony the last couple of days.  Right?  I mean, you

11   heard about the references.  And even though the Patent

12   Office has already looked at least Kelly, it hasn't looked

13   at Garg, and you have, the jury, has the ultimate

14   responsibility for deciding whether the claims of the patent

15   are proven to be invalid.  And we know because patents go

16   back into the Patent Office every once in a while.  The

17   Patent Office doesn't always get it right.

18             And also we know that as the anticipation

19   instruction talked about in your booklet, that our arguments

20   about inherency that we're arguing now were not the same

21   as the arguments that were advanced -- were not the same as

22   the inherency arguments that were in the Patent Office

23   before.  So this is something new that's really up to you to

24   decide.

25             And for anticipation, the Court had an

1    instruction about what you're to consider, and I think you

2    heard testimony about what the physical steps of the patent

3    are, and those are the things that you focus on, the

4    physical steps.

5              And the anticipation comes from the Kelly

6    reference in 1993.  And the basic law of invalidity by

7    anticipation is that if it's already published somewhere, if

8    it's already known, let's say a recipe.  If it's already

9    known, you can't then patent it if it's already out there in

10   the world, and that's what the instruction says on

11   invalidity generally.

12             And we submit that it was known from Kelly 1993,

13   which is an argument about heart failure.  So it's somewhat

14   surprising that GSK is saying, well, Dr. Kelly's study is

15   not really -- he reports it's not really about heart

16   failure, it's about something else.

17             And the only two issues that are left in the

18   case based on Dr. McCullough's testimony is whether or not

19   there was a maintenance period of greater than six months

20   and whether there was a method of decreasing mortality.

21             And Dr. Rosendorff testified, and I think we

22   went through this pretty carefully yesterday -- testified

23   why the ischemic heart disease is actually congestive heart

24   failure as defined by the Court, and part of it was that

25   you're measuring the function and size of the heart, which

1    is enlarged only in cases where there is congestive heart

2    failure.  And there is no rebuttal on that point.

3            So now Dr. Rosendorff, here he says that the

4    reference in the Kelly article to measuring size is a

5    giveaway because it's only in heart failure with reduced

6    ejection fraction that heart size is increased.  So we

7    submit that that limitation should be checked off as

8    disclosed in Kelly.

9            And then the question is, just the maintenance

10   dosages where you're talking about the first long-term

11   study.  So it's a long-term study.  Six months is not a

12   long-term study.  Six and eighteen months is a long-term

13   study.  And the term followup was used to describe what's

14   being done, but it made no sense to Dr. Rosendorff to say

15   you'd be doing it for 18 months, but not actually treating

16   them during the entire time period.  And I think you

17   remember Dr. Rosendorff's testimony.

18           With respect to the full label infringement --

19   that seems to be out of order.  Sorry.

20           I'm sorry.  Mr. Wiesen has reminded me.  During

21   the testimony about what is in the full label, he pointed to

22   the fact that the heart failure indication used the word 7.5

23   to 15 months of double-blind followup as showing that there

24   actually were drugs being administered for that time period,

25   and then he took the opposite position when it came to

1   reading Kelly.

2           So when it suited him, he interpreted that

3   description of the same study, the same study as here

4   referring to actual treatment for the time period, and Kelly

5   not.  So he was being inconsistent.  And when you take all

6   of those, all of the evidence, especially Dr. Rosendorff's

7   testimony, that is clearly anticipating.

8           And so the last question is whether or not Kelly

9   is enabled, and the evidence is going to be that even Dr.

10  McCullough realized that the Sharpe study is underway and

11  it's not theoretical anymore, it's actually enabled.

12          So obviousness, and the issue is that here we

13  had the Swedish people have, the Swedes have success.  We

14  then had a whole bunch of other studies.  Remember that

15  chart that shows all the reference, and all of them were

16  actually successful except for the one study of Xamoterol,

17  where people died, and Dr. Rosendorff explained why that was

18  the case.  And he also testified that when people get better

19  during these clinics, that they're actually expecting to

20  live longer because as your heart gets better, patients live

21  longer.  It's pretty common sense.

22          So there it is.  There's the chart showing all

23  of these references in red which were showing positive

24  results, and that Garg and Kelly combined clearly show all

25  of these limitations.  Garg adds more detail to Kelly, which

1     shows that there was an 18-month program, that it was -- it

2     was with a reduced ejection fraction, and so all the

3     limitations are met as you can see with the combination.

4                  What about the patent claims?  Those claims also

5     basically stand and fall with the same reference.  Those

6     were disclosed.  These are disclosed as well for the

7     testimony you will see, you remember from Dr. Rosendorff.

8                  And then claim 9 was disclosed as well, Class 2

9     to 4.  That was explicitly listed in the Garg preference.

10                  Claim 8.  Ms. Brooks disparaged Dr. Zusman's

11     testimony about this, but he did explain why this claim is

12     not actually disclosed in the patent, and that's because the

13     only statistical significance analysis in the patent doesn't

14     have anything to do with particular doses or combinations of

15     dosage and time.

16                  So let me talk now about damages.  All right.

17     So with damages, we come to a whole different set of issues.

18     The first is there are two potential damages starting dates

19     in this case, and the one is from January 2008 to when the

20     amended label comes in in 2011.  That's called the skinny

21     label period.  And the second is the full label period, from

22     May 2011 through the end in 2015.

23                  And please pay attention to instruction 6.3.5 on

24     lost profits, because the Court is clear that GSK is not

25     entitled to lost profits based on any infringement of the

1    '000 patent that was not caused by Teva's inducement, and

2    that GSK has the burden of proving the amount of any direct

3    infringement that was caused by Teva's inducement with

4    reasonable certainty.  All right.

5         It can be done by circumstantial evidence, but

6    it has to be proven with reasonable certainty how much of

7    the direct infringement was caused by Teva.

8         And so the questions you'll be asked when you

9    are looking at lost profits asks, how much direct

10   infringement was there?  How much of the direct infringement

11   was caused by Teva?  How many additional sales would GSK

12   have made?  And how much profit would they have earned?  And

13   Dr. Addanki walked you through all of these questions that

14   you should be asking.

15        And the key question, because that's the

16   question that, remember, he left.  There's a big question

17   mark at the end.  The key question is:  How many infringing

18   prescriptions or sales are actually caused by doctors

19   reading Teva's labels?  And in the real world, we've got

20   tens of thousands of doctors writing millions of

21   prescriptions, and you've got to ask yourself, has GSK

22   really proved, you know, what percentage of those

23   prescriptions were actually infringing, or what percentage

24   of those sales?  And I submit, we're going to look at the

25   testimony, that they have not.

 1                    And Dr. Maness, I asked him:  Dr. Maness, you

 2     did not conduct your own analysis to determine whether

 3     Teva's accused conduct is what caused Teva's generic

 4     carvedilol to be dispensed for allegedly infringing uses;

 5     isn't that correct?

 6                    And he said, yes, I did not conduct my own

 7     analysis.  He didn't determine how much was caused, and that

 8     was required for him to make the damages.

 9                    And then, did you do any analysis of what

10     percentage of the sales were actually induced by Teva and

11     prescribed by the doctors because of the inducement?

12                    No.  I relied on Dr. McCullough for that.

13                    All right.  So he says, I couldn't do it.  I'm

14     at the doctor.  I can't make that estimate.

15                    So what did Dr. McCullough say?  You made

16     no effort to quantify how much is or isn't infringing,

17     right?

18                    I wasn't asked that question.

19                    Right.  So you didn't make any effort to

20     quantify because they didn't ask you to do it; is that

21     correct?

22                    That's correct.

23                    And I submit you didn't hear any testimony from

24     Dr. McCullough about what percentage of the uses were

25     actually induced by Teva.  There was no testimony about

1       that, but, of course, that's up to you to remember the

2       record.

3                   And then what about Dr. Reisetter?  He said --

4       and he was the survey guy.  Right?  And he said, you are not

5       giving any opinion that any of these uses of carvedilol that

6       you found in your survey are infringing.  You are not giving

7       an in opinion of infringement; isn't that correct?

8                   I asked him again.  I am not talking to the

9       issue of infringement, no.

10                  And you are not at all talking about whether any

11      of those sales were actually induced by Teva; is that

12      correct?

13                  That's correct.

14                  Remember he did a survey, said these are all of

15      these different groups and all of these definitives.  Did

16      you actually analyze whether they were induced by Teva?  No,

17      he didn't.  Nobody did.

18                  Now, Maness again, you didn't give an expert an

19      expert opinion on inducement; is that right?

20                  That's correct.

21                  And the numbers that you provided in your

22      reports were based on Dr. Reisetter's survey?  The specific

23      calculations are totally based on Dr. Reisetter.  To get to

24      those percentages, I agree with that.

25                  So there's nobody.  It's like they are all

1    pointing to each other saying, I didn't do it, I didn't do

2    it, I didn't do it.  Nobody actually estimated the amount of

3    sales that were caused by Teva's inducement.  Nobody

4    estimated it.  There's no proof in the damages of what that

5    would be, and instead, Dr. Maness assumed 100 percent of the

6    date that that he got was infringed and induced.  He just

7    assumed it.  And he carved that number down a little bit,

8    but he still is assuming 100 percent.

9           She asked, how can we put a question mark there

10   and say they're entitled to no lost profits?  They didn't

11   prove it and it's their burden to prove it.  They actually

12   have to come up with evidence instead of, I didn't do it, I

13   didn't do it, I didn't do it, they have to come up with

14   evidence and they didn't do it and they'd admit it.

15          So you can't just go in there and claim 100

16   percent of the infringing sales because we know, we know

17   from the way that the substitution process operates that a

18   lot of sales of Teva carvedilol have absolutely nothing to

19   do with Teva.  They are just substituting in by virtue of

20   the state laws.

21          So there are no lost profits in this case.  I

22   mean, there.  I said it.  There are none.  There should be

23   none, and it's because they failed to prove it.

24          Now, also, Dr. Maness, he didn't even analyze

25   the methods of data collection that the survey had, and

1       there were a lot of critiques about that.  He just accepted

2       it.

3                So then you heard from Dr. Addanki, and he

4       actually used real data, not data from any one survey.  And,

5       remember, he left it open at the end as to what percentage

6       was actually caused, but he made a number of adjustments

7       which showed that that original demand from GSK for $477.2

8       million was just way overblown.  All right?  And he started

9       with the different data set, which is the data that's

10      generated by the Centers For Disease Control, the federal

11      organization that monitors our health.  And he looked at

12      that data and he got a share and he calculated that you

13      would have to adjust it by 40 percent.

14               He also look at the fact that Dr. Reisetter's

15      survey hadn't taken into account the preserved ejection

16      fraction issue, which is that a large number of heart

17      failure patients don't actually meet the Court's claim

18      construction, and that's 50 percent of the heart failure

19      patients.  So he reduced it for that.

20               He reduced it for sales when the doctor

21      prescribed Coreg, and that's because if the doctor was

22      actually writing Coreg, there's a pretty good chance that he

23      wasn't induced by Teva to try to get generic carvedilol, and

24      that's why he did it.

25               And then he adjusted the price -- I'm sorry.  He

 1    did a careful analysis of the price and what the price would

 2    be after there was a launch and how the price would be

 3    adjusted.  And you didn't see Dr. Maness, the GSK expert, do

 4    anything like that.  He just assumed you'd have the same

 5    price, the same really high price like Coreg did after the

 6    launch.  When the generics came in, Coreg actually raised

 7    its prices.  They went up and down.  They raised them.  And

 8    so he adjusted for that and even corrected the 33 million.

 9            And that's how you get to this slide, which is

10    basically 33 million corrected, according to Dr. Addanki's

11    expert analysis, but then you still have to give the percent

12    that were actually induced.  And there is no estimate, no

13    percent anywhere in the record provided by GSK that should

14    be used to get lost profits, and that's why there's still a

15    question mark here.  But as I said in the next slide, the

16    answer should be zero because they haven't proved it.

17            Now, the other alternative for damages is a

18    reasonable royalty.  And you heard some testimony about

19    this.  And what you heard is that from -- from Teva is that

20    we had revenues of about $74.5 million from all of our

21    sales.  All right.  So it's real money, but it's not GSK

22    money.  And Teva's costs for those sales were about 87.5.

23    So we lost money over time.  But Ms. Berlanska, you saw her,

24    she was our first witness, she testified, it's not ideal.

25    We want to make money, but, on the other hand, we do it when

 1    the drug is important, and this one was.

 2              Dr. Maness and Dr. Addanki agreed that the

 3    reasonable royalty would be no more than 1.4 million.  So if

 4    you can't award lost profits, there is a remedy that you can

 5    give.  That's what the Court's instruction will say, and it

 6    is $1.4 million.

 7              THE COURT:  You may be being told you have ten

 8    minutes left.

 9              MR. DOWNS:  Thank you.

10              Ah, the verdict form.  So I will do the same

11    thing that you just heard from Ms. Brooks, but since she got

12    up to be first, I think maybe I won't do it.

13              The right thing to do is where it says for Teva,

14    check it off.  All right.  And where it says GSK, you can

15    leave that one blank.  But it is fairly complicated, and so

16    there is the first issue:  Has GSK proven by a preponderance

17    of the evidence that Teva induced infringement of the claim

18    during the skinny label period?  I'm sorry about that.  It's

19    a good thing I have these guys.

20              Now, so has Teva proven that -- has GSK proven

21    that Teva induced infringement of the following claims

22    during the skinny label period?  And here this one is pretty

23    easy to follow, I think.  Yes for Teva.

24              I'm sorry.  No for Teva.

25              And then, has GSK proven by a preponderance of

1    the evidence that the claims were infringed during the full

2    or amended label?

3                    Again, no.

4                    Willful infringement?  No.

5                    Anticipation?  Yes.

6                    And with respect to defendant's claim, the same.

7                    And obviousness, the same.

8                    And again based on the excellent testimony from

9    Dr. Rosendorff.

10                   Now for written description, Dr. Zusman's

11   testimony on that was not even rebutted by Dr. McCullough.

12   He didn't even respond.

13                   So, of course, again you have the right to look,

14   you should look at the evidence and confirm that, but he

15   didn't respond.

16                   So I think the answer there is yes.

17                   And for damages, first, No. 1, or I'm sorry, No.

18   8 at the top:  Has GSK proven by a preponderance of the

19   evidence that it is entitled to lost profits?

20                   And, here, the answer should definitely be no

21   because they didn't put in any evidence of what percentage

22   was caused by Teva.

23                   And then what lost profits did GSK prove by a

24   preponderance of the evidence?  Zero.

25                   And for those infringing sales, you could answer

1        that if there are some infringing sales, $1.4 million.

2                     And then Option B.

3                     Again, has GSK proven by a preponderance of the

4        evidence that it is entitled to lost profits?  No.

5                     And the same thing for the other options.  All

6        right?

7                     And then, finally, I wanted to say that although

8        this is kind of a policy issue, but from a larger

9        perspective that this is, this case is a new kind of case.

10       It is really almost an attack on the generic system.  If it

11       turns out that generic companies are going to be liable for

12       other uses besides ones that were carved out, based on

13       things that the generic drug submitted, then they're not

14       going to, they are not going to market those drugs because

15       look at the kind of damages we're going to get, you know,

16       they're proposing against us for a product that made only

17       $75 million.  Why would we be on the market even to do that,

18       if we're at risk for those damages?

19                    And that is why I mean, that is why it's really

20       important for you to focus on the issues and focus on what

21       is the evidence?  Not what is the spin but what is the

22       evidence, all right?

23                    And, again, I want to thank you so much on

24       behalf of Teva for listening and paying attention.  You guys

25       have been a great jury.  You really paid attention.  I know

1    you have taken a ton of notes.  Thank you very much.

2              THE COURT:  Thank you very much.

3              Ms. Brooks, you also have ten minutes, if you

4    wish.

5              MS. BROOKS:  Thank you, Your Honor.

6              I'll start with the last comment that this is

7    an attack on the generic system.  It's actually just the

8    opposite.

9              There were various regulatory agencies,

10   lawmakers, et cetera, that worked very hard to create this

11   delicate balance between letting the innovators be able to

12   recoup their research and development costs and make enough

13   profit that they could, one, stay in business, and, two,

14   continue to innovate.

15             If they can't do that, if Teva can violate all

16   those rules just blatantly, then the innovators will stop

17   innovating.  And if the innovators stop innovating, there

18   are no new drugs.  And if there are no new drugs, then the

19   generics will have no drugs to copy.  So there will be no

20   generics.  And so not only do the innovators get hurt, the

21   generics get hurt.

22             But do you know who ultimately gets hurt?  We

23   all get hurt.  If this system gets pulled apart by these

24   kind of blatant infringement actions by Teva, then the whole

25   thing comes crashing down.

1    This is the opposite of an attack on the generic

2    system.  This is actually standing up for it so it will work

3    the way it was intended to work.

4    Now, as you heard, I only have ten minutes and I

5    am only going to address specifically comments that counsel

6    said.

7    There was a lot of discussion about how we

8    didn't bring anyone in here to say that they were ever

9    induced by Teva.  This is the Instruction 4.2.1 on direct

10   infringement.

11   A patentee is not required to present hard

12   proof that any individual third-party direct infringer was

13   actually persuaded to infringe, but may instead present

14   evidence of inducement directed to an entire class of direct

15   infringers.

16   Meaning all of that Teva marketing that went to

17   the doctors.  That was the class or the physicians.

18   So that is the direct infringement.  What do we

19   have on inducement?

20   GSK is not required to present hard proof of

21   any direct infringer physician stating, for example, that

22   she read Teva's labels or other Teva materials and that

23   these labels or other Teva materials caused others to

24   prescribe Teva's generic carvedilol in an infringing manner.

25   Again, we're allowed to present, through

1   circumstantial evidence, of a group.  And that same applies

2   to lost profits.

3           In other words, GSK need not demonstrate a

4   one-to-one correspondence between Teva's sales of carvedilol

5   and directly infringing physicians.  GSK may introduce

6   circumstantial evidence of direct infringement by the entire

7   class of physicians prescribing Teva's generic carvedilol

8   for the patented method.

9           And sort of the representative of that class of

10  physicians who spoke was Dr. McCullough.

11          Now, Teva's attorney got up and said, even if

12  they decided to just write Coreg, it's still going to get

13  swapped out at the pharmacy.

14          No, it's not.  If the doctors decide they don't

15  want generic carvedilol because it hadn't been approved for

16  the treatment of congestive heart failure, they get to write

17  Coreg DAW.

18          And that is what Dr. McCullough talked about.

19  And that is how Teva induced what is to make the doctors

20  believe it had been approved.  And if they hadn't done that,

21  the doctors would have written DAW.

22          Now, there was also discussion about Dr. Addanki

23  and how he relied on the NAMCS database.  You may remember

24  that.

25          It's been awhile since Dr. Reisetter was here.

1    He was the survey expert.  He was asked specifically whether

2    the two databases, the NDTI or the NAMCS, were appropriate

3    for his assignment which was to determine what amount of

4    Teva's sales were infringing sales.

5                 And he said, no, neither one would be

6    appropriate.  And he gave a very long answer.  But the

7    bottom line is the NAMCS doesn't show the right population,

8    which is what his survey was aimed at.

9                 What is interesting is that in opening, Teva's

10   counsel said that we were going to hear from a Dr. Russell,

11   and that he was going to testify that Dr. Reisetter's survey

12   was unreliable and should not be acceptable as a reason for

13   finding such large damages.  And he actually had Dr. Russell

14   stand up and he introduced him to up.

15                And there is the testimony from Dr. Russell.  We

16   never heard from him.  No one came to critique Mr. --

17   Dr. Reisetter's unrebutted testimony.

18                And what did he do.  He did this really detailed

19   survey to absolutely drill down on the exact number of

20   infringing sales.

21                And the number was this (Indicating).  Just that

22   blue.  That is all.  He took a haircut after haircut after

23   haircut.  And, in fact, it was so conservative that had he

24   not been so conservative, the damages would be significantly

25   higher.

 1          And just one more point I want to make about

 2   this.

 3          If Teva had just followed the rules, they would

 4   have, 82.6 percent of the sales that they had they would

 5   still have.

 6          This is the only thing, the damages, the lost

 7   profits to GSK from Teva's not following the rules.

 8          And, lastly, you saw this slide from Teva's

 9   counsel.

10          I have written over here, and I will explain to

11   you in a moment why I wrote this.

12          That we waited six and-a-half years to sue and

13   it must have been because we didn't believe in our case.

14          GSK is not in the business of bringing lawsuits.

15   We are in the business of developing lifesaving drugs.  And

16   you can see where someone like Dr. Lukas has to sit here in

17   court and someone like Dr. Ruffalo and even someone like Dr.

18   McCullough, as an expert witness but he is a practicing

19   cardiologist, has to come into the courtroom and deal with

20   all of this.

21          A company like GSK does not make that decision

22   lightly.  In fact, they makes the opposite decision in 2002

23   when they sent everything back to the Patent Office.

24          But you know who is actually harmed by the fact

25   that GSK did wait until 2014 to bring this lawsuit?  We are,

```
 1    because the statute of limitations says we can only ask for

 2    six years of damages from the date the lawsuit was filed.

 3    And so by doing that, we are giving up all of the damages

 4    from September of 2007 until July of 2008, which was that

 5    big cliff.  We're giving up the biggest part of the damages

 6    by waiting and conservatively making sure that this is the

 7    right thing to do.

 8                    And, yes, we did finally decide to do that.

 9                    And now it's going to be in your hands.  Thank

10    you for all the attention and time that you paid to this

11    case.  We will be waiting for you.  We look forward to

12    hearing from you.  Thank you.

13                    THE COURT:  Thank you very much, ladies and

14    gentlemen.

15                    Before we can give you the case I need to

16    complete reading the jury instructions.  You may still have

17    your copy.  Feel free to follow along.

18                    I'm going to pick up where I left off.  That was

19    at page 57.  Section 7.  Deliberation and Verdict.

20                    7.1.  Introduction.

21                    I have concluded the part of my instructions

22    explaining the rules for considering some of the testimony

23    and evidence.  Now let me finish up by explaining some

24    things about your deliberations in the juryroom, and your

25    possible verdicts.
```

1    Once you start deliberating, do not talk to the

2    jury officer, or to me, or to anyone else except each other

3    about the case.  If you have any questions or messages, you

4    must write them down on a piece of paper, sign them, and

5    then give them to the jury officer.  The officer will give

6    them to me, and I will respond as soon as I can.  I may have

7    to talk to the lawyers about what you have asked, so it may

8    take some time to get back to you.  Any questions or

9    messages normally should be sent to me through your

10   foreperson, who by custom of this Court is Juror No. 1.

11   One more things about messages.  Do not ever

12   write down or tell anyone how you stand on your votes.  For

13   example, do not write down or tell anyone that you are split

14   4-4, or 6-2, or whatever your vote happens to be.  That

15   should stay secret until you are finished.

16   7.2.  Unanimous Verdict.

17   Your verdict must represent the considered

18   judgment of each juror.  In order for you as a jury to

19   return a verdict, it is necessary that each juror agree to

20   the verdict.  Your verdict must be unanimous.

21   It is your duty as jurors to consult with one

22   another and to deliberate with a view towards reaching an

23   agreement, if you can do so without violence to your

24   individual judgment.  Each of you must decide the case for

25   yourself, but do so only after an impartial consideration of

1    the evidence with your fellow jurors.  In the course of your

2    deliberations, do not hesitate to reexamine your own views

3    and change your opinion, if convinced it is erroneous.  But

4    do not surrender your honest conviction as to the weight or

5    effect of evidence solely because of the opinion of your

6    fellow jurors, or for the purpose of returning a verdict.

7    Remember at all times that you are not partisans.  You are

8    judges -- judges of the facts.  Your sole interest is to

9    seek the truth from the evidence in the case.

10           A form of verdict has been prepared for you.  I

11   will review it with you in a moment.  You will take this

12   form to the jury room and when you have reached unanimous

13   agreement as to your verdict, you will have your foreperson

14   fill in, date, and sign the form.  You will then return to

15   the courtroom and my deputy will read aloud your verdict.

16           It is proper to add the caution that nothing

17   said in these instructions, and nothing in the form of a

18   verdict, is meant to suggest or convey in any way or manner

19   any intimation as to what verdict I think you should find.

20   What the verdict shall be is your sole and exclusive duty

21   and responsibility.

22           7.3.  Duty to Deliberate.

23           Now that all the evidence is in and the

24   arguments are completed, you are free to talk about the case

25   in the juryroom.  In fact, it is your duty to talk with each

1  other about the evidence, and to make every reasonable

2  effort you can to reach unanimous agreement.  Talk with each

3  other, listen carefully and respectfully to each other's

4  views, and keep an open mind as you listen to what your

5  fellow jurors have to say.  Try your best to work out your

6  differences.  Do not hesitate to change your mind if you are

7  convinced that other jurors are right and that your original

8  position was wrong.  But do not ever change your mind just

9  because other jurors see things differently, or just to get

10  the case over with.  In the end, your vote must be exactly

11  that -- your own vote.  It is important for you to reach

12  unanimous agreement, but only if you can do so honestly and

13  in good conscience.

14          No one will be allowed to hear your discussions

15  in the jury room, and no record will be made of what you

16  say.  So you should all feel free to speak your minds.

17          Listen carefully to what the other jurors have

18  to say, and then decide for yourself.

19              7.4.  Social Media.

20          During your deliberations, you must not

21  communicate with or provide any information to anyone by any

22  means about this case.  You may not use any electronic

23  device or media, such as the telephone, a cellphone,

24  smartphone, iPhone, Blackberry, tablet, or computer, the

25  Internet, any Internet service, any text or instant

1    messaging service, any Internet chatroom, blog or website

2    such as Facebook, linked in, YouTube, Instagram, Snapchat or

3    Twitter to communicate to anyone any information about this

4    case or to conduct any research about this case until I

5    accept your verdict.  In other words, you cannot talk to

6    anyone on the phone, correspond with anyone, or

7    electronically communicate with anyone about this case.  You

8    can only discuss the case in the juryroom with your fellow

9    jurors during deliberations.

10           I'm finally to the Instruction 7.5.  Court Has

11    No Opinion.

12           Let me finish by repeating something I said to

13    you earlier.  Nothing that I said have said or done during

14    this trial was meant to influence your decision in any way.

15    You must decide the case yourself based on the evidence

16    presented.

17           Let me turn your attention to verdict form which

18    was another document handed to you this morning.  You may

19    have seen it in closing arguments.  I want to go over it

20    with you now.

21           On the page marked 2, at the top, it says

22    Induced Infringement.

23           And Question No. 1 asks you:  Has GSK proven

24    by a preponderance of the evidence that Teva induced

25    infringement of the following asserted claims of the '000

 1    patent during the period of time when Teva's generic

 2    carvedilol contained the "partial" or "skinny" label?

 3              And then there is a spot for claim 1.  You mark

 4    yes of GSK or no for Teva.

 5              And then you are given an instruction:  If YES,

 6    answer Question 1 for each of the following claims.  If NO,

 7    go to Question 2.

 8              And then listed below, if you get there, is

 9    claims 2, 3, 6, 7, 8, and 9 and a place to mark yes or no.

10              Then on Question 2:  Has GSK proven by a

11    preponderance of the evidence that Teva induced infringement

12    of the following asserted claims of the '000 patent during

13    the period of time beginning when Teva's generic carvedilol

14    contained the "full" or "amended" label?

15              And then, again, you will see there is a place

16    to mark yes or no for claim 1, and the instruction.

17              If yes, answer Question 2 for each of the

18    following claims.  If no, go to Question 3.

19              And the dependent claims are listed there below.

20              Page 4.  Willful Infringement.

21              If you answered "YES" to Question 1 for any of

22    the claims, answer Question 3.  If not, go to Question 4.

23              So Question 3 asks you:  Has GSK proven by a

24    preponderance of the evidence that Teva's infringement of

25    the claims of the '000 patent was willful during the

1      "partial" or "skinny" label period?

2              You see a spot to mark yes for GSK or no for

3      Teva.

4              The instruction says:  If you answered "YES" to

5      Question 2 for any of the claims, answer Question 4.  If

6      not, go to Question 5.

7              And Question 4 says:  Has GSK proven by a

8      preponderance of the evidence that Teva's infringement of

9      the claims of the '000 patent was willful during the "full"

10     or "amended" label period?

11             And, again, you mark yes for GSK or no for Teva.

12             Now, that will take us to page 5.

13             Validity.  Anticipation.

14             Question 5.  Has Teva proven by clear and

15     convincing evidence that claim 1 of the '000 patent is

16     invalid due to anticipation?

17             For claim 1, you would mark yes for Teva or no

18     for GSK.

19             And then you are instructed:  If YES, answer

20     Question 5 for each of the following claims.  If no, go to

21     Question 6.

22             And there is a box there for claims 2, 3, 6, 7,

23     8, 9, to mark yes or no.

24             Obviousness.

25             Question 6.  Has Teva proven by clear and

1    convincing evidence that any of the following asserted

2    claims of the '000 patent is invalid due to obviousness?

3              For claim 1, you mark yes for Teva or no for

4    GSK.  And then you are instructed if yes, answer Question 6

5    for each of the following claims.  If no, go to Question 7.

6              Written description.  Question 7.

7              Has Teva proven by clear and convincing evidence

8    that the following claim of the '000 patent is invalid due

9    to lack of written description?

10             For claim 8, you mark yes for Teva or no for

11   GSK.

12             And then we come to page 7.  Damages.  And you

13   are giving some bold instructions.  Let me read those to

14   you.

15             If you answered "Yes" to any asserted claim in

16   Question 1 or 2, and answered "No" to the corresponding

17   claim in Questions 5, 6, and 7 (i.e., if you found any

18   asserted claim of the '000 patent to be valid and

19   infringed), then you must consider damages and follow the

20   instructions below.  If you did not so answer, then you

21   should not answer any questions related to damages and

22   should proceed to the signature page (page 10).

23             There are three sets of damages questions and

24   each set has three questions.  You need only answer one set

25   of damages questions depending on your prior answers to

1    Questions 1 and 2.

2                 Please consider the following instruction in

3    determining which set of damages questions to answer.

4                 Option A.  If you found Teva induced

5    infringement for both the time period when Teva's generic

6    carvedilol contained the partial or skinny label and the

7    time period when Teva's generic carvedilol contained the

8    full or amended label, i.e., you answered yes for any claim

9    for both questions 1 and 2, answer questions 8 through 10.

10   Do not answer questions 11 through 16.

11                Option B.  If you found Teva induced

12   infringement for only the time period when Teva's generic

13   carvedilol contained a partial or skinny label, i.e., you

14   answered yes for any claim in only Question 1 and answered

15   no to every claim in Question 2, answer Questions 11

16   through 13.  Do not answer Questions 8 through 10, or 14

17   through 16.

18                Option C.  If you found Teva induced

19   infringement for only the time period when Teva's generic

20   carvedilol contained a full or amended label, i.e., you

21   answered no to every claim in Question 1 and answered yes

22   for any claim in Question 2, answer Question 14 through 16.

23   Do not answer questions 8 through 13.

24                And then on page 8 you see damages option A at

25   the top.  Question 8 asks you:  Has GSK proven by a

1    preponderance of the evidence that it is entitled to lost

2    profits?  Yes for GSK or no for Teva.

3            If you answered yes to Question 8, go to

4    Questions 9 and 10.  If you answered no to Question 8, go to

5    Question 10.

6            Question 9 asks you:  What lost profits did GSK

7    prove by a preponderance of the evidence?

8            And Question 10 says, for those infringing sales

9    for which GSK did not prove its entitlement to lost profits

10   by a preponderance of the evidence, what reasonable royalty

11   did accrue by a preponderance of the evidence?

12           And Questions 9 and 10, should you reach either

13   of them, has a dollar sign and then a blank for you to write

14   in a dollar figure.

15           Very similar.  If you were to do damages option

16   B or damages option C, they each ask Questions 11 or 14:

17   Has GSK proven by a preponderance of the evidence that it is

18   entitled to lost profits?  You answer yes or no.

19           And then you're instructed, if you answered yes,

20   go to Question 11 in option B, go to Questions 12 and 13.

21   If you answered no to Question 11 in option B, go to

22   Question 13.

23           And similarly, if you find yourself in option C,

24   the instruction says to you, based on question 14, if you

25   answered yes to question 14, go to question 15 and 16.  If

1    you answered no to question 14, go to question 16.

2            And then truly finally on page 10 you are

3    instructed:  You have now reached the end of the verdict

4    form and you should review it to ensure it and unanimously

5    reflects your unanimous determinations.  You must each sign

6    the verdict form in the space below and notify the jury

7    officer after you have reached a verdict.

8            With that, we'll ask the jury officer, our Court

9    security officer to come forward, please, and I will ask

10   Mr. Looby to administer the oath.

11           (Court security officer sworn.)

12           THE COURT:  Thank you.  You may now take the

13   jury out.

14           (The jury was excused to the jury room to begin

15   deliberating.)

16           THE COURT:  All right.  Anything to discuss from

17   GSK before we break?

18           MS. BROOKS:  No, Your Honor.  Thank you.

19           THE COURT:  And from Teva?

20           MR. DOWNS:  No.

21           THE COURT:  Okay.  Make sure that Mr. Looby

22   knows how to reach you if and when we need to do so.  We'll

23   be in recess.

24           (Court recessed at 1:06 p.m. while jury

25   commenced deliberations.)

```
 1                    *    *    *
 2                (Proceedings reconvene in chambers with a
 3      telephone conference.)
 4                THE COURT:  Good afternoon, everybody.  This is
 5      Judge Stark.  Who is there, please?
 6                MS. FLANAGAN:  Your Honor, this is Betsy
 7      Flanagan, Doug McCann, Juanita Brooks, Mike Amon, and our
 8      client, Tom Smith from GSK.
 9                THE COURT:  Okay.
10                MR. CASTELLANO:  Good afternoon, Your Honor.
11                MR. DOWNS:  Good afternoon.  Go ahead.
12                MR. CASTELLANO:  Jeffrey Castellano from Shaw
13      Keller for Teva, and my co-counsel are also on the line.
14      I'll let them introduce themselves.
15                MR. DOWNS:  Your Honor, Tony Downs and Daryl
16      Wiesen.
17                THE COURT:  All right.  And I have my court
18      reporter here with me.  So we have gotten several notes.  I
19      haven't felt it necessary to run them by you until now, and
20      I'm only actually really running them by you now because of
21      the time of day, which I hope you will understand once you
22      tell you what these notes are.
23                So for the record, at approximately 3:07 we
24      received a note that says:  Do you have a magnifying glass?
25                And so I didn't respond.  We just sent in some
```

1   sort of magnifying glass that we found here.

2           Then about, so it's now 3:55.  I would say about

3   20 minutes ago, let's say 3:35, we received a note that

4   appears to say:  Want another copy of blank verdict form.

5           And I have not responded to that yet.  That is

6   when we, I took a break from our other trial and reached out

7   to all of you to get you on the phone.

8           And then in the last few minutes, I would say,

9   we received another note which appears to say:  Request some

10  push pins.

11          And so that is the sum total of the notes.

12          I did want to get your views on how to proceed,

13  but what I propose to do, so we'll start there, is that I

14  respond with another copy of the blank verdict form and

15  we're looking around the courthouse for push pins.  If we

16  find any, I propose to send them in as well.  And then if we

17  get to 4:15 without hearing anything further from the jury,

18  I propose to send in the following note:

19          If you have not reached a verdict by 4:30,

20  please send me a note and tell me whether you all

21  unanimously agree you wish to say and deliberate beyond four

22  30.  If you wish to stay beyond 4:30, you may do so as late

23  as you wish.  Alternatively, you may return at 9:00 tomorrow

24  to continue your deliberations.  Again, send me a note and

25  let me know whether you wish to continue to deliberate until

1  some time later today.

2         So with all that, let me first hear from GSK

3  whether you have any concerns with what I proposed or any

4  alternatives.

5         MS. FLANAGAN:  We do not have any concerns with

6  what you proposed, Your Honor.

7         THE COURT:  Thank you.  What about Teva?

8         MR. DOWNS:  No concerns, Your Honor.

9         THE COURT:  All right.  Well, then we will

10  proceed as I have outlined, and we'll let you know whatever

11  happens next.

12         Thank you all very much.  Good-bye.

13         MS. FLANAGAN:  Thank you very much.

14         MR. DOWNS:  Thank you, Your Honor.

15         (Telephone conference ends.  Deliberations

16  continue.)

17                 *    *    *

18         (Proceedings reconvene in the courtroom.)

19         THE COURT:  All right.  So for the record, we're

20  now in the courtroom.  We have received several notes since

21  we spoke on the phone.  The first one -- and I will give you

22  all a chance to comment in a moment about how we should

23  respond.

24         But it says, is PTX-1084.0001 considered as

25  Teva's full label?  If not, can you point us to the

1  evidence number for short and long Teva label.  Document

2  PTX-1804.0001 says highlights of prescribing information,

3  which is throwing us off.

4              I came in about 4:10 p.m.

5              Then we sent in the note as we discussed on the

6  phone about whether they want to deliberate later.  And it

7  says:  We are all prepared to stay until 7:00 p.m.  If we

8  are not unanimous by then, we can resume at 9:00 a.m.

9  tomorrow.

10             So the jury is presumably deliberating as we

11 speak.

12             I don't know if the parties had a chance to

13 confer on that and respond to this note but we'll hear from

14 Mr. McCann.

15             MR. McCANN:  Good afternoon, Your Honor.  Doug

16 McCann from Fish on behalf of GSK.

17             THE COURT:  Good afternoon.

18             MR. McCANN:  So looking at the note, we think

19 the appropriate response should be:  PTX-1084.001 through

20 .0023 is the full label.

21             Just to avoid any confusion, because when you

22 look at the document, at the top, on the first page, it says

23 highlights of prescribing information, and then it goes on

24 for 22 more pages with all of the detail.

25             So they're not confused, the full label is just

1    the full page and not the rest of it, so identify the full

2    range of exhibit pages.

3            And then with respect to the short or partial

4    label, that is PTX-1080.001 to 0025.  So again we would

5    suggest, Your Honor, that the same response, the short

6    label, partial label is 1080.1 through 25 (sic).

7            THE COURT:  All right.

8            MR. McCANN:  Thank you, Your Honor.

9            THE COURT:  What is Teva's view?

10           MR. WIESEN:  Thank you, Your Honor.  Daryl

11   Wiesen on behalf of Teva.

12           THE COURT:  Good afternoon.

13           MR. WIESEN:  Good afternoon.

14           We agree that 1084 is the full label and 1080

15   is the skinny label.  And we're comfortable providing a

16   response to the jury.  We don't think we need to provide the

17   full Bates number but rather just to let them know that

18   PTX-1080 is the full label and/or -- sorry -- PTX-1084 is

19   the full label and PTX-1080 is the skinny label would be

20   sufficient.

21           THE COURT:  Now, does the word "highlights"

22   appear on the first page of one or both of those labels?

23           MR. WIESEN:  I believe it does on 1084.  I

24   haven't looked at 1080.

25           THE COURT:  Why not just give them the full

1   Bates range?

2              MR. WIESEN:  If that is your preference, I think

3   that is fine.  We're not sure that it's necessary.

4              THE COURT:  Okay.  It just seems to me possibly

5   that the word "highlights" is not entirely clear to them.

6   So if we do all agree that the full Bates range is as Mr.

7   McCann has listed, I'm having a hard time seeing why I

8   shouldn't tell them.

9              MR. WIESEN:  We agree that is the full Bates

10  range for the 1080 and 1084.

11             THE COURT:  All right.  So let me just make sure

12  I've got this right.

13             So in response to their question, I would say

14  PTX-1084.0001 through .023 is the full label.  And

15  PTX-1080.0001 to .00025 is the partial label.  Is that

16  correct, Mr. McCann?

17             MR. McCANN:  Yes, Your Honor.  I think when you

18  spoke, you might have said 023, it's 0023.

19             THE COURT:  0023.

20             MR. McCANN:  Two zeroes.

21             THE COURT:  So I should say I think it is Teva's

22  full label and Teva's partial label.  Do you agree?

23             MR. McCANN:  I agree.

24             THE COURT:  Mr. Wiesen, do you agree with all of

25  that?

 1                    MR. WIESEN:  I do, Your Honor.  With the caveat

 2      that I think we called it the skinny label and the amended

 3      label, and we would prefer that you use both terms in the

 4      answer to the question.

 5                    THE COURT:  So amended label and then skinny

 6      label.

 7                    MR. McCANN:  Your Honor, I think if I remember

 8      this from the jury instructions, we had that full term.

 9                    THE COURT:  I think we had both.

10                    MR. McCANN:  So we can follow the same format.

11                    MR. WIESEN:  Right.

12                    THE COURT:  So the first one would be full label

13      or amended label.  Correct?

14                    MR. WIESEN:  Correct.

15                    MR. McCANN:  Yes.

16                    THE COURT:  And the second would be partial

17      label or?

18                    MR. McCANN:  Or skinny.

19                    THE COURT:  Or skinny label.

20                    MR. McCANN:  (Nodding yes.)

21                    THE COURT:  Correct?

22                    MR. McCANN:  Yes.

23                    MR. WIESEN:  That's right.

24                    THE COURT:  Mr. Wiesen, do you agree?

25                    MR. WIESEN:  I do, Your Honor.

 1                THE COURT:  All right.  I think it would

 2   probably save time if I just typed this up and sent it in.

 3   Do you object to me responding in that form?

 4                MR. McCANN:  No, Your Honor.

 5                THE COURT:  Do you object?

 6                MR. WIESEN:  No, Your Honor.

 7                THE COURT:  All right.  They're presumably

 8   deliberating until 7:00 or until they have a verdict, but if

 9   anything changes we'll let you know.

10                MR. WIESEN:  Thank you, Your Honor.

11                MR. McCANN:  Thank you, Your Honor.

12                (Recess taken while jury continues deliberating.)

13                *      *      *

14                (Proceedings reconvened after recess.)

15                THE COURT:  All right.  We have another note.

16   This one appears to say:  Can any company get a patent

17   without FDA approval?

18                Mr. McCann.

19                MR. McCANN:  Well, Your Honor, I don't intend to

20   divine the purpose without the behind the question but I

21   think you could answer it:  Yes.

22                THE COURT:  Okay.  What does Teva propose I

23   answer?

24                MR. WIESEN:  Your Honor, I haven't been able to

25   consult yet with Mr. Downs about the question, so if we

1   could have a couple minutes so I could do that, I would

2   appreciate it.

3               THE COURT:  All right.  You can.  All right.

4   We'll come back in in a few minutes.

5               MR. WIESEN:  Thank you, Your Honor.

6               (Brief recess taken.)

7               *      *      *

8               (Proceedings reconvened after recess.)

9               THE COURT:  Okay.  Have a seat.  Let's hear from

10  whoever is speaking for Teva.

11              MR. WIESEN:  Thank you, Your Honor.

12              I apologize for the delay.

13              THE COURT:  No, that's fine.

14              MR. WIESEN:  We're happy to agree with the

15  answer of yes.

16              THE COURT:  Yes.  Okay.

17              MR. WIESEN:  I think that is an accurate answer,

18  and that it's short and we won't fight about it, so that is

19  probably a good answer.

20              THE COURT:  Those are all good virtues.

21              So then I will just send one sentence back

22  basically saying:  In response to your last question, the

23  answer is yes.

24              Does that sound good?

25              MR. WIESEN:  Fine, Your Honor.

```
 1                    THE COURT:  Sound good?

 2                    MR. McCANN:  Yes, Your Honor.

 3                    THE COURT:  All right.  Thank you.

 4                    (Recess was taken while jury continued

 5       deliberating.)

 6                         *    *    *

 7                    (Proceedings reconvened in the courtroom.)

 8                    THE COURT:  Have a seat.

 9                    So as you all know, we recently received another

10       note.  It appears to say:  If we determine damages are

11       awarded, can we calculate our own numbers or is the Court

12       expecting us to use GSK or Teva's alleged damages?

13                    Mr. McCann.

14                    MR. McCANN:  Yes, Your Honor.  We think an

15       appropriate response would be you may calculate your own

16       number or you may calculate your own damages award provided

17       it is based on the evidence presented in court and the law

18       as given to you in the jury instructions.

19                    THE COURT:  All right.  Mr. Wiesen?

20                    MR. WIESEN:  Your Honor, we think given the way

21       the arguments came in and the evidence came in, the only

22       appropriate way to respond is to simply refer them to the

23       jury instructions as a whole rather than emphasizing any

24       particular piece or even telling them that they can

25       calculate on their own.
```

1          That is one of the arguments we made is that any

2    calculation zero or 100 percent is too speculative.  So we

3    think you can refer them to the jury instructions on damages

4    but beyond that would be to overemphasize an answer that is

5    contrary to one of the arguments and the evidence that came

6    in.

7          THE COURT:  Do you disagree that the jury may

8    return any number that they find is supported by the

9    evidence consistent with the instructions?  That is, I think

10   I said do you disagree?

11         MR. WIESEN:  No, Your Honor.  We, our view is

12   the jury can -- well, so to make sure I'm preserving the

13   record, we don't think there is a justification in the

14   record for any number between zero and 100 percent.  So if

15   they came in between there, there would be an argument we

16   would have that that is based on speculation.  I don't

17   disagree that conceptually they can put in any number that

18   they want, but because of the way the arguments were

19   presented.

20         THE COURT:  So the argument really would be as

21   you said, I think, that it would overemphasize.  It's not

22   that it would be improper under the law, recognizing you all

23   have the right to say whatever number they might come up

24   with isn't supported by the evidence?

25         MR. WIESEN:  I think that is right, Your Honor.

1    I think that it's the emphasis point because of where we

2    find ourselves.   I don't think we disagree -- I should

3    confirm with my colleagues -- that they don't have to pick

4    one of the numbers that was presented.

5              THE COURT:   Okay.   Mr. McCann, do you want to

6    add anything?

7              MR. McCANN:   Nothing really to add, Your Honor.

8    I think the question is clear enough.   I think that we're

9    all in agreement on that they can do what they are

10   suggesting they might do.   There could, I suppose, possibly

11   there might be some post-trial issue that arises from a new

12   number that they decide, but I also think there is really no

13   basis to tell them you must use this number or you must use

14   that number.   That might be creating a worse problem for the

15   record in the case.

16             THE COURT:   Right.   I don't understand Teva's

17   position to be that I say that.   Just simply that I should

18   say in response to your question, I direct you to the jury

19   instructions on damages.

20             MR. McCANN:   Respectfully, Your Honor, that

21   probably isn't quite an answer to the question that would be

22   very helpful to them.

23             THE COURT:   All right.   Mr. Wiesen, anything

24   further?

25             MR. WIESEN:   I think the concern we have, Your

1   Honor, is that the instructions include the burden of proof,

2   the fact that they have to prove causation and the direction

3   not to speculate, and any answer that leaves that out and

4   says, yes, you can pick a number without specifically adding

5   those additional details puts an overemphasis on a simple

6   yes, you can pick a number.  And the best way to make sure

7   we've gone through what language is appropriate there is the

8   jury instructions.

9           THE COURT:  And what if I added to what Mr.

10  McCann's proposed, something along the lines of:  I remind

11  you that all the instructions are important?  I previously

12  instructed you on damages.  I remind you that all the

13  instructions are important in response to your question.

14  Here is my answer.

15          MR. WIESEN:  I still think that given the

16  arguments that were presented that simply saying, yes, you

17  can pick a number overemphasizes in light of the arguments

18  since again one of the arguments we made was that they can't

19  just pick a number because there is no evidence to support

20  it.

21          THE COURT:  Right.

22          Mr. McCann, could you read to me again what you

23  have proposed?

24          MR. McCANN:  Your Honor, the answer would be:

25  You may calculate your own number provided it is based on

1   the evidence presented in court and the law as given to you

2   in the jury instructions.

3           And then I, I understood Your Honor to say,

4   perhaps further, I remind you that all of the instructions

5   are important.  You were proposing to add some language

6   along those lines.

7           THE COURT:  Would that now be GSK's proposal?

8           MR. McCANN:  Yes, Your Honor.

9           THE COURT:  All right.  And what is Teva's

10  position at this point?

11          MR. WIESEN:  Our position is that the

12  appropriate response is simply to refer them to the jury

13  instructions on damages as a whole.

14          THE COURT:  Okay.  Bear with me a moment.

15          (Court and law clerk confer.)

16          THE COURT:  All right.  Well, I find myself I

17  guess largely in agreement with GSK on this one.  I think

18  it's going to be most helpful and appropriate under the

19  totality of circumstances to give more guidance to the jury

20  in response to their question.

21          So what I'm going to convey to them, one way or

22  another, is if you determine damages are to be awarded, you

23  may calculate your own number provided it is based on the

24  evidence presented and the jury instructions.  I remind you

25  of all the instructions I have previously given.

1    Any further objections other than those that

2    have already been stated?

3    MR. McCANN:  No, Your Honor.

4    THE COURT:  Anything further?

5    MR. WIESEN:  Nothing further.

6    THE COURT:  All right.  So it's basically 7:00

7    o'clock.  Sometimes juries don't know that they can leave,

8    so I feel that I should tell them they're free to leave,

9    although they are free to continue to deliberate.

10    So I think what I will do is ask, I think I will

11    type up what I just said and then add to it something to the

12    effect of, as it is now 7:00 p.m., you are free to go if you

13    have not reached a verdict.  And, if so, you are return at

14    9:00 a.m. tomorrow to continue your deliberations.

15    Any objections or concerns about that?

16    MR. McCANN:  Your Honor, to complete the

17    thought, you are also free to stay, if you choose.

18    THE COURT:  All right.  I don't mind adding

19    that, if you all are game for that.

20    What is Teva's view?

21    MR. WIESEN:  I mean I think that in light of

22    your ruling, I think that is fine, Your Honor.  If they want

23    to keep deliberating, then they want to keep deliberating.

24    THE COURT:  Then I will say stick around and

25    we'll let you know.  Because I think probably what I will do

```
 1    is make it clear they are to send out a note if they want to

 2    keep deliberating beyond 7:00 so we know that.

 3                 Okay.  We will be in recess.

 4                 (Proceedings recess while jury continued

 5    deliberating.)

 6                    *      *      *

 7                 (Proceedings resumed in the courtroom, beginning

 8    at 8:14 p.m.)

 9                 THE COURT:  All right.  So as I think you all

10    know, after we last met, I sent in a note and the jury sent

11    out a note:  "We have all agreed to continue to deliberate

12    until 8:30 p.m. in hopes to get a unanimous decision," and

13    moments ago we were told they have a verdict.

14                 Anything before we bring the jury in?

15                 MR. McCANN:  No, Your Honor.

16                 MR. DOWNS:  No.

17                 THE COURT:  All right.  Let's bring the jury in.

18                 (The jury entered the courtroom.)

19                 THE COURT:  You may all than seated.  Welcome

20    back.  I will ask the foreperson, do you have a verdict?

21                 I will ask you to hand it to my law clerk.

22    Thank you.  You may have a seat.

23                 All right.  I will ask my law clerk to please

24    read the verdict.

25                 THE LAW CLERK:  Question 1:  Has GSK proven by a
```

1    preponderance of the evidence that Teva induced infringement

2    of the following asserted claims of the '000 patent during

3    the period of time when Teva's generic carvedilol contained

4    the partial or skinny label?

5                    Claim 1, yes.

6                    Claim 2, yes.

7                    Claim 3, yes.

8                    Claim 6, no.

9                    Claim 7, no.

10                    Claim 8, no.

11                    Claim 9, no.

12                    Question 2.  Has GSK proven by a preponderance

13    of the evidence that Teva induced infringement of the

14    following asserted claims of the '000 patent during the

15    period of time beginning when Teva's generic carvedilol

16    contained the full or amended label?

17                    Claim 1, yes.

18                    Claims 2, 3, 6, 7, 8 and 9, yes.

19                    Question 3.  Has GSK proven by a preponderance

20    of the evidence that Teva's infringement of the claims of

21    the '000 patent was willful during the partial or skinny

22    label period?

23                    Yes.

24                    Question 4.  Has GSK proven by a preponderance

25    of the evidence that Teva's infringement of the claims of

1    the '000 patent was willful during the full or amended label

2    period?

3              Yes.

4              Question 5.  Has Teva proven by clear and

5    convincing evidence that claim 1 of the '000 patent is

6    invalid due to anticipation?

7              Claim 1, no.

8              Question 6.  Has Teva proven by clear and

9    convincing evidence that any of the following asserted

10   claims of the '000 patent is invalid due to obviousness?

11             Claim 1, no.

12             Question 7.  Has Teva proven by clear and

13   convincing evidence that the following claim of the

14   '000 patent is invalid due to lack of written description?

15             Claim 8, no.

16             Question 8.  Has GSK proven by a preponderance

17   of the evidence that the that it is entitled to lost

18   profits?

19             Yes.

20             Question 9.  What lost profits did GSK prove by

21   a preponderance of the evidence?

22             $234.11 million.

23             Question 10.  For those infringing sales for

24   which GSK did not prove its entitlement to lost profits by a

25   preponderance of the evidence, what reasonable royalty did

1   it prove by a preponderance of the evidence.

2            $1.4 million.

3            The verdict form is signed and dated by all

4   eight jurors.

5            THE COURT:  Thank you very much.

6            Does GSK wish for us to poll the jury?

7            MR. McCANN:  No Your Honor.

8            THE COURT:  Does Teva wish for us to poll the jury?

9            MR. DOWNS:  No, Your Honor.

10           THE COURT:  Okay.  Ladies and gentlemen of the

11  jury, this basically completes your duties.  I do want to

12  have a chance to shake your hands back in the jury room and

13  we have some certificates for you, but I do want to thank

14  you all in open court for the time and attention you have

15  given to this case and the fact that you deliberated until

16  8:23 p.m., roughly.  That is a wonderful showing of civic

17  service and, I know counsel had a chance to thank you and I

18  on behalf of the Court want to thank you all as well.

19           So but for collecting your things and shaking

20  my hand at the moment, you have completed your duty, and

21  thank you very much.  And we'll take the jury out, please.

22           (The jury was excused.)

23           THE COURT:  Is there anything we should discuss

24  from GSK?

25           MR. McCANN:  No Your Honor.

1       THE COURT:  And from Teva?

2       MR. WIESEN:  Your Honor, we just wanted to

3    ensure that in light of the pending issues that are to be

4    tried to you, no judgment will be entered on this until

5    those issues are resolved?

6       THE COURT:  Well, I can't say anything that

7    definitive, but I will say I'm not entering any judgment

8    tonight, and I do want to hear back from all of you as to

9    how I propose I proceed.

10       I think it is still Tuesday.  How about by next

11    Monday?  If you will give me a joint status report and lay

12    out for me what you propose I do.  Okay.

13       Anything else?

14       MR. WIESEN:  That's all, Your Honor.

15       THE COURT:  Thank you, all.  It has been a very

16    interesting and well-tried case on both sides.  I appreciate

17    you all sticking around to this late hour.  I hope you can

18    safely make your way out of the building and to wherever you

19    are headed.  We'll be in recess.  Goodnight.

20       (Proceedings concluded at 8:22 p.m.)

21

22       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                      /s/ Brian P. Gaffigan
                      Official Court Reporter
25                       U.S. District Court